**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen (KR 4963)
Paul Kizel (PK 4176)
Jeffrey D. Prol (JP 7454)
Suzanne Iazzetta (SI 2116)
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:   (973) 597-2500
Facsimile:   (973) 597-2400

Proposed Counsel to the Debtors
and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| THE NEWARK GROUP, INC., *et al.*,[1] | Case No. 10-_____ (____) |
| Debtors. | Joint Administration Requested |
| | Hearing Date:  June [___], 2010 |

**MOTION OF DEBTORS FOR AN ORDER (I) AUTHORIZING DEBTORS TO OBTAIN INTERIM POST-PETITION FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 363, 364(c) AND 364(d); (III) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (IV) AUTHORIZING DEBTORS TO ENTER INTO DIP ABL AGREEMENT WITH WELLS FARGO BANK, N.A. AS AGENT; (V) AUTHORIZING DEBTORS TO ENTER INTO DIP TERM LOAN AGREEMENT WITH ORIX FINANCE CORP. AS AGENT; (VI) AUTHORIZING REPAYMENT OF PREPETITION SECURED DEBT OWING TO WELLS FARGO BANK, N.A., AS EXISTING AGENT UNDER THE PREPETITION ABL AGREEMENT PURSUANT TO 11 U.S.C. § 363; (VII) AUTHORIZING REPAYMENT OF PREPETITION SECURED DEBT OWING TO WACHOVIA BANK, N.A., AS EXISTING AGENT UNDER THE PREPETITION TERM LOAN AGREEMENT PURSUANT TO 11 U.S.C. § 363; AND (VIII) SCHEDULING A FINAL HEARING PURSUANT TO FEDERAL <u>RULE OF BANKRUPTCY PROCEDURE 4001</u>**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Newark Group, Inc. (4844); Jackson Drive Corp. (4573); and NP Cogen, Inc. (9626).

.8

The Newark Group, Inc., *et al.,* as debtors and debtors-in-possession in the above-captioned Chapter 11 Cases[2] (collectively, the "**Debtors**"), by and through their proposed undersigned counsel, hereby submit this motion (the "**Motion**") pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c) and 364(d), and Federal Rules of Bankruptcy Procedure 2002, 4001, 6004, 9014, and 9034(f), for entry of an interim order, substantially in the form attached hereto as Exhibit A (the "**Interim DIP Order**"), and a final order (the "**Final DIP Order**" and together with the Interim DIP Order, the "**DIP Orders**"): (I) authorizing certain of the Debtors to obtain interim post-petition financing as follows: (a) the debtor-in-possession credit facility (the "**DIP ABL Facility**") with Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacity, the "**DIP ABL Agent**") and certain other financial institutions party to the DIP ABL Loan Agreement (as defined below) and (b) the debtor-in-possession credit facility (the "**ORIX DIP Facility**") with ORIX Finance Corp. as administrative agent and collateral agent (in such capacity, the "**ORIX DIP Facility Agent**"), and certain other financial institutions party to the ORIX DIP Facility Credit Agreement (as defined below); (II) granting security interests and superpriority administrative expense status in connection with the DIP ABL Facility pursuant to 11 U.S.C. §§ 363 and 364(c), and granting security interests and superpriority administrative expense status in connection with the ORIX DIP Facility pursuant to 11 U.S.C. §§ 363 and 364(c) and (d); (III) modifying the automatic stay pursuant to 11 U.S.C. § 362; (IV) authorizing certain of the Debtors to enter into the DIP ABL Loan Agreement with Wells Fargo Bank, N.A. as agent; (V) authorizing Debtors to enter into the ORIX DIP Facility Credit Agreement with ORIX Finance Corp. as agent; (VI) authorizing repayment of prepetition secured debt owing to Wells Fargo Bank, N.A., as existing agent under the Existing ABL Loan Agreement (as defined below) pursuant to 11 U.S.C. § 363; (VII) authorizing repayment of prepetition secured debt owing to Wells Fargo Bank, N.A., a successor by merger to Wachovia

---

[2]    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Prepackaged Plan of Reorganization of The Newark Group, Inc., *et al.*, dated May 7, 2010.

Bank, N.A., as existing agent under the Prepetition CL Credit Agreement (as defined below) pursuant to 11 U.S.C. § 363; and (VIII) scheduling a final hearing pursuant to Federal Rule of Bankruptcy Procedure 4001.  In support of the Motion, the Debtors respectfully represent as follows:

### STATEMENT OF THE RELIEF REQUESTED AND MATERIAL TERMS OF THE PROPOSED CREDIT AGREEMENTS PURSUANT TO BANKRUPTCY RULE 4001

1.      The Debtors require the immediate interim approval of the post-petition financing proposed herein on an expedited basis in order to avoid immediate and irreparable harm to their estates and their creditors pending a final hearing.  Absent approval of the proposed financing, the Debtors will be unable to pay for any goods or services that are necessary for the uninterrupted operation of their businesses, including, but not limited to, employee wages and related obligations, inventory, utility charges and insurance.

2.      Significantly, the two DIP facilities proposed herein - the DIP ABL Facility and the ORIX DIP Facility (together, the "**DIP Facilities**") - as well as the ABL Exit Facility (as defined below) and the ORIX Exit Facility (as defined below) that are contemplated under the Joint Prepackaged Plan of Reorganization of The Newark Group, Inc., *et al.*, dated May 7, 2010 (the "**Plan**") that has been approved by all impaired classes entitled to vote on the Plan, are contingent upon, *inter alia*, specific orders being entered by the Court by certain dates.  Most importantly, the commitment that binds the lenders under the ORIX DIP Facility and the ORIX Exit Facility expires on June 11, 2010, and is contingent upon this Court's entry of an Interim DIP Order approving the ORIX DIP Facility before that loan can be consummated.  Therefore, if the Interim DIP Order is not entered on Thursday, June 10, 2010, in time to close the ORIX DIP Facility by June 11, 2010, the Debtors will not have the financing necessary to preserve and maximize the value of their businesses and assets.  Without the proposed financing, the Debtors cannot operate and will be forced to cease operations, to the detriment of their estates, their creditors, their employees, and all other stakeholders.

3.      The failure to approve the DIP Facilities will also derail and immediately and irreparably impair the Debtors' ability to confirm their prepackaged Plan, which was approved overwhelmingly by the Debtors' impaired classes of creditors and equity holders, and which provides for the Debtors' trade creditors to be paid in full.

4.      Accordingly, it is imperative that the relief requested by this Motion be granted on an expedited basis.

**The DIP ABL Facility**

5.      The following are the material provisions of the DIP ABL Loan Agreement[3] as required by Federal Rule of Bankruptcy Procedure 4001(c)(1)(B)(i)-(xi)[4]:

| DIP ABL LOAN AGREEMENT | |
|---|---|
| **Borrowers** | The Newark Group, Inc. ("**The Newark Group**" or "**Company**"), and Newark Group International, B.V. ("**NGI**"), (together, the "**DIP ABL Borrowers**"). (DIP ABL Loan Agreement, § 1.17.) |
| **Guarantor** | NP Cogen, Inc. ("**Cogen**" or the "**DIP ABL Guarantor**"). (DIP ABL Loan Agreement, § 1.105.) |
| **Administrative Agent and Collateral Agent** | Wells Fargo Bank, National Association ("**Wells**"), as successor by merger to Wachovia Bank, National Association, as DIP ABL Agent. (DIP ABL Loan Agreement, § 1.4.) |
| **DIP ABL Lenders** | Various banks, financial institutions, and other entities (collectively, the "**DIP ABL Lenders**"). (DIP ABL Loan Agreement, first paragraph.) |
| **Borrowing Limits** | $50 million, consisting of a revolving loan subject to a borrowing base and other terms, including up to $15 million for letters of credit and a swingline subfacility of up to $7.5 million. (DIP ABL Loan Agreement, §§ 1.126, 1.135, 1.189; §§ 2.1 – 2.5.) |
| **NGI Revolving Loan Limit** | NGI is subject to a borrowing limit under the revolving loan equal to (a) the lesser of (i) €15 million or (ii) $50 million <u>minus</u> (b) the aggregate dollar amount of any outstanding investments, loans or |

---

[3]      The description of the terms of the DIP ABL Loan Agreement set forth herein is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof. For a complete description of the terms and conditions of the DIP ABL Loan Agreement, reference should be made to the DIP ABL Loan Agreement, which is attached hereto as <u>Exhibit B</u>. This summary is qualified in its entirety by reference to the provisions of the DIP ABL Loan Agreement. In the event of any conflict or inconsistency between the provisions stated in this Motion and the DIP ABL Loan Agreement, the DIP ABL Loan Agreement shall control in all respects.

[4]      Given that this Motion seeks Court approval of two separate DIP credit facilities, the concise statement of the relief requested exceeds the five page limit contained in Federal Rule of Bankruptcy Procedure 4001(c)(1)(B).

| | |
|---|---|
| | advances made by any DIP ABL Borrower or DIP ABL Guarantor to foreign subsidiaries (other than Newark Paperboard Products, Ltd.), excluding (i) certain intercompany loans made by The Newark Group to NGI, and (ii) any investment, loan or advance made by The Newark Group to NGI from the proceeds of the revolving loan and the swingline subfacility in order to repay outstanding indebtedness of NGI on the closing date.  (DIP ABL Loan Agreement, § 1.65.) |
| **Borrowing Base** | Availability under the DIP ABL Facility will be subject to a borrowing base (the "**Borrowing Base**") which will be calculated as follows:<br><br>i.  85% of the eligible accounts of The Newark Group, plus<br>ii.  the lesser of: (a) 50% multiplied by the value of the Eligible Inventory[5] of The Newark Group consisting of raw materials or (b) 85% of the Net Recovery Percentage of such Eligible Inventory multiplied by the value thereof; plus<br>iii.  the lesser of: (a) 65% multiplied by the value of the Eligible Inventory of The Newark Group consisting of finished goods or (b) 85% of the Net Recovery Percentage of such Eligible Inventory times the value thereof, minus<br>iv.  the applicable reserves established by the DIP ABL Agent.<br><br>(DIP ABL Loan Agreement, § 1.200.) |
| **Term** | The DIP ABL Loan Agreement will terminate on the earliest of: (i) 180 days after the commencement of the Chapter 11 Cases, (ii) 60 days after the entry of the Interim DIP Order if the Final DIP Order has not been entered prior to the expiration of such 60-day period, (iii) the substantial consummation of a confirmed plan of reorganization, but no later than the Effective Date of the Plan, and (iv) the date of confirmation of a plan of reorganization or liquidation for the Company or the DIP ABL Guarantor in the Chapter 11 Cases unless such confirmation order is in form and substance satisfactory to DIP ABL Agent; and (v) the date of confirmation of a plan of reorganization or liquidation.  (DIP ABL Loan Agreement, § 1.193.) |
| **Interest** | For Prime Rate Loans: 4% per annum in excess of the greatest of (a) the prime rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, and (c) 2%.<br><br>For Eurodollar Rate Loans: 5% in excess of the greatest of (a) the rate per annum determined by dividing (i) LIBOR by (ii) a percentage equal to (A) 1 minus (B) the percentage that is in effect for that day under regulation D of the Board of Governors of the Federal Reserve System or (b) 2%.  (DIP ABL Loan Agreement, § 1.115.) |
| **Default Rate** | 2% above the otherwise applicable interest rate in effect.  (DIP ABL Loan Agreement, § 1.115(b).) |
| **Fees** | <u>Unused Line Fee:</u>  1% per annum calculated on the average daily |

---

[5]      Capitalized terms used in this table and not otherwise defined herein shall have the meanings ascribed to them in the DIP ABL Loan Agreement.

| | |
|---|---|
| | unused portion of the maximum credit available during the immediately preceding month. |
| | Letter of Credit Fee:  5% per annum on the average daily maximum amount available to be drawn under all Letters of Credit for the immediately preceding month. |
| | Additional Letter of Credit Fee: 0.5% per annum shall be paid to the issuing bank on the average daily maximum amount available to be drawn under each letter of credit issued. |
| | At the DIP ABL Agent's option, The Newark Group shall pay an additional 2% for (i) the period from the termination of the DIP ABL Facility until full payment of all obligations due thereunder have been received and (ii) the period from the occurrence of an Event of Default for as long as such Event of Default is continuing. |
| | (DIP ABL Loan Agreement, § 1.90.)[6] |
| **Budget** | Borrowers will deliver on the Tuesday of each week: (1) an updated 13 week Budget (as defined below); and 2 a weekly Budget variance report for the prior week and the prior trailing 4 week period.  (DIP ABL Loan Agreement, § 8.31.) |
| **Covenants** | Compliance with affirmative and negative covenants are usual and customary for DIP financings, including, among other things: (a) delivery of monthly, quarterly and annual financial statements and compliance certificates; (b) limitations on liens, debt, restricted payments, fundamental changes, asset sales, investments, acquisitions, capital expenditures, affiliate transactions and payments relating to prepetition obligations (with baskets for certain covenants to be mutually agreed upon), and (c) minimum consolidated EBITDA and excess availability requirements. <br><br> (DIP ABL Loan Agreement, §§ 9.1 – 9.34.) |
| **Liens, Priorities, and Collateral** | A first priority security interest in accounts receivable, inventory, and other Priority Collateral, as defined in the DIP ABL Loan Agreement; a second priority security interest in other personal property of The Newark Group and Cogen, including certain property recovered pursuant to Chapter 5 of the Bankruptcy Code (as defined below); and all products and proceeds of the foregoing.  (DIP ABL Loan Agreement, § 5.1.) |
| **Carve-Out** | The security interests are subordinate to the payment of the following (such amounts being the "**Carve-Out**"): (i) fees to be paid to the Clerk of the Bankruptcy Court, and (ii) claims of professionals retained pursuant to Sections 327 and 1103 provided, that, (A) such allowed fees and expenses incurred after an Event of Default shall not exceed $2,000,000 in the aggregate. (DIP ABL Loan Agreement, § 5.5(c).) |

---

[6]    Pursuant to a confidentiality agreement, the Debtors are not herein disclosing certain fees payable to the DIP ABL Agent and the DIP ABL Lenders.

| | |
|---|---|
| **Use of Proceeds** | Satisfaction of existing obligations, including costs, fees, and expenses arising under the Existing ABL Loan Agreement; costs, fees, and expenses arising under the DIP ABL Loan Agreement and in connection with the Debtors' chapter 11 cases (the "**Chapter 11 Cases**"); payment of prepetition claims in the ordinary course of business pursuant to the Budget; and post-petition working capital and other general corporate purposes pursuant to the Budget.  (DIP ABL Loan Agreement, § 6.7.) |
| **Events of Default** | The DIP ABL Loan Agreement contains events of default that are usual and customary for debtor-in-possession financing, including, among other things: |

    v.   failure to make principal or interest payments when due;

   vi.   failure to perform any term or covenant contained in the DIP ABL Loan Agreement, subject to cure periods in certain instances;

   vii.  material misrepresentations made in the DIP ABL Facility documents;

  viii.  any assignment for the benefit of creditors;

   ix.   an involuntary bankruptcy case is filed against an DIP ABL Borrower or an DIP ABL Guarantor and not dismissed within 60 days;

    x.   other than with respect to the within Chapter 11 Cases, a DIP ABL Borrower or a DIP ABL Guarantor files a bankruptcy proceeding;

   xi.   any uncured default with respect to any indebtedness of any DIP ABL Borrower or DIP ABL Guarantor in excess of $2,500,000;

   xii.  any material provision of any of the documents comprising the DIP ABL Loan Agreement shall cease to be valid, binding and enforceable;

  xiii.  any Change of Control;

  xiv.  conversion of any of the Chapter 11 Cases to a chapter 7 case;

   xv.  dismissal of any of the Chapter 11 Cases or any subsequent chapter 7 case either voluntarily or involuntarily;

  xvi.  the Interim DIP Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the DIP ABL Agent;

  xvii.  the appointment of a trustee pursuant to §§ 1104(a)(1) or 1104(a)(2);

 xviii.  the appointment of an examiner with special powers pursuant to § 1104(a);

  xix.  the filing or confirmation of a plan of reorganization or liquidation by or on behalf of any DIP ABL Borrower or DIP ABL Guarantor, to which the DIP ABL Agent has not consented in writing, which does not provide for the payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein.

| | (DIP ABL Loan Agreement, § 10.1.) |
|---|---|
| **Waivers** | Each DIP ABL Borrower and DIP ABL Guarantor waives demand and notice with respect to the Obligations, the Collateral and the DIP ABL Loan Agreement, except as such are expressly provided for therein. (DIP ABL Loan Agreement, § 11.2.)<br><br>Each DIP ABL Borrower and DIP ABL Guarantor waives all rights to interpose any claims, deductions, setoffs or counterclaims (other then compulsory counterclaims) in any action or proceeding with respect to the DIP ABL Loan Agreement, the Obligations, the Collateral or any matter arising therefrom.  (DIP ABL Loan Agreement, § 11.4.) |
| **Indemnification** | Each DIP ABL Borrower and DIP ABL Guarantor shall indemnify and hold DIP ABL Agent, each DIP ABL Lender, the Arranger and Issuing Bank, (each such person being an "**Indemnitee**"), harmless from and against any and all losses, liabilities, costs or expenses (including attorneys' fees and expenses) in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the DIP ABL Loan Agreement, other than resulting from the gross negligence or willful misconduct of the Indemnitee.  (DIP ABL Loan Agreement, § 11.5.) |
| **Conditions to Borrowing** | The initial borrowing under the DIP ABL Facility is subject to customary conditions to borrowing, including without limitation, (i) no material adverse change in the businesses shall have occurred since March 2, 2010, (ii) excess availability shall not be less than $12.5 million after giving effect to the initial loans under the DIP ABL Facility and the ORIX DIP Facility; and (iii) consolidated EBITDA for the most recently ended trailing 12 fiscal month period shall be not less than $44 million. (DIP ABL Loan Agreement, § 4.1.) |
| **Liens on Causes of Action Under Chapters 5 of the Bankruptcy Code** | A security interest in, a lien upon, and a right of set off against all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Chapter 5 of the Bankruptcy Code.  (DIP ABL Loan Agreement, § 5.1.) |

6.     The provisions described in Rule 4001(c)(1)(B)(i)-(xi) of the Federal Rules of Bankruptcy Procedure are set out at the following sections of the Interim DIP Order and the DIP ABL Loan Agreements:

a.     A grant of priority or a lien on property of the estate under § 364(c). Interim DIP Order ¶¶ 2.2-2.4; DIP ABL Loan Agreement § 5.1.

b.     The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim.  Interim DIP Order ¶ 2.7; DIP ABL Loan Agreement § 6.7.

8

c.    A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim.  Interim DIP Order N/A (Debtor acknowledgement only); DIP ABL Loan Agreement N/A.

d.    A waiver or modification of Code provisions or applicable rules relating to the automatic stay.  Interim DIP Order ¶¶ 3.3, 3.4; DIP ABL Loan Agreement N/A.

e.    A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364.  Interim DIP Order ¶ 4.2; DIP ABL Loan Agreement § 9.30(f).

f.    The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order.  Interim DIP Order N/A; DIP ABL Loan Agreement § 1.193.

g.    A waiver or modification of the applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien.  Interim DIP Order N/A; DIP ABL Loan Agreement N/A.

h.    A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action.  Interim DIP Order ¶ 4.2; DIP ABL Loan Agreement §§ 9.30, 16.1,.

i.    The indemnification of any entity.  Interim DIP Order N/A; DIP ABL Loan Agreement § 11.5.

j.    A release, waiver, or limitation of any right under § 506(c).  Interim DIP Order ¶ 4.3; DIP ABL Loan Agreement § 9.30.

k.    The granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a).  Interim DIP Order ¶¶ 2.1.1, 2.1.2; DIP ABL Loan Agreement § 5.1.

7.    Pursuant to this Court's General Order Adopting Guidelines for Financing Requests, the Debtors call the Court's attention to the following material provisions in the attached proposed Interim DIP Order:

a.    Cross-Collateralization.  Interim DIP Order ¶ 2.1.

b.    Rollups.  Interim DIP Order ¶¶ 1.4, 1.7.

c.    Waivers and Concessions as to Validity of Prepetition Debt.  Interim DIP Order N/A (Debtor Acknowledgement only.)

d.    Waivers.  Interim DIP Order ¶ 4.2.

e.    Section 506(c) Waivers:  Interim DIP Order ¶ 4.3.

f.    Liens on Avoidance Actions:  Interim DIP Order ¶¶ 2.1.1, 2.1.2.

g.    Carve-outs:  Interim DIP Order ¶ 2.4.

h.    Termination; Default; Remedies:  Interim DIP Order ¶¶ 3.1-3.1, 5.1.

**The ORIX DIP Facility**

8.    The following are the material provisions of the ORIX DIP Facility Credit Agreement[7], as required by Bankruptcy Rule 4001(c)(1)(B)(i)-(xi)[8]:

| ORIX DIP FACILITY CREDIT AGREEMENT | |
|---|---|
| **Borrower** | The Newark Group (ORIX DIP Facility Credit Agreement, § 1.1.) |
| **Guarantor** | Cogen (ORIX DIP Facility Credit Agreement, § 1.1.) |
| **Administrative Agent and Collateral Agent** | ORIX Finance Corp., in its capacity as administrative agent, collateral agent and as a control agent for the ORIX DIP Lenders (as defined below).  (ORIX DIP Facility Credit Agreement, § 1.1.) |
| **ORIX DIP Lenders** | Various banks, financial institutions, and other entities and lenders from time to time party to the ORIX DIP Facility Credit Agreement (collectively, the "**ORIX DIP Lenders**").   (ORIX DIP Facility Credit Agreement, § 1.1.) |
| **ORIX DIP Commitment** | $110 million term loan, which shall be made available to The Newark Group upon the closing of the ORIX DIP Facility Credit Agreement.  (ORIX DIP Facility Credit Agreement, Sch. A.) |
| **Term** | The ORIX DIP Facility has the same term as the DIP ABL Facility. (ORIX DIP Facility Credit Agreement, § 1.1.) |
| **Interest** | The applicable rate for Prime Rate Loans shall be a rate per annum equal to 8.5% plus the greater of (a) the rate of interest which is identified as the "Prime Rate" and normally published in the Money Rates section of <u>The Wall Street Journal</u> and (b) one percentage point plus the three-month Adjusted Eurodollar Rate.  The Adjusted |

---

[7]    The description of the terms of the ORIX DIP Facility Credit Agreement set forth herein is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof.  For a complete description of the terms and conditions of the ORIX DIP Credit Agreement, reference should be made to the ORIX DIP Facility Credit Agreement, which is attached hereto as <u>Exhibit E</u>.  This summary is qualified in its entirety by reference to the provisions of the ORIX DIP Facility Credit Agreement.  In the event of any conflict or inconsistency between the provisions of this Motion and the ORIX DIP Facility Credit Agreement, the ORIX DIP Facility Credit Agreement shall control in all respects.

[8]    Capitalized terms used in this section of the Motion and not otherwise defined herein shall have the meanings ascribed to such terms in the ORIX DIP Facility Credit Agreement.

|  | Eurodollar Rate is, with respect to each one, two or three month period, the greater of (x) 3% per annum and (y) the offered rate per annum for deposits of dollars for the applicable period that appears on Reuters Screen LIBO Page as of 11:00 A.M. (London, England time) 2 business days prior to the first day in such period.<br><br>The applicable rate pursuant to Eurodollar Rate Loans shall be a rate per annum equal to 9.5% plus the Adjusted Eurodollar Rate.<br><br>The term loan shall initially be a Prime Rate Loan, subject to conversion to a Eurodollar Rate Loan upon request by The Newark Group pursuant to Section 3.1(b) of the ORIX DIP Facility Credit Agreement.<br><br>(ORIX DIP Facility Credit Agreement, § 1.1.) |
|---|---|
| **Default Rate** | 2% above the otherwise applicable interest rate in effect. (ORIX DIP Facility Credit Agreement, § 1.1.) |
| **Fees** | Commitment Fee: $1,100,000. (ORIX DIP Facility Credit Agreement, § 3.2(b).)[9] |
| **Budget** | Expenses must be in accordance with the Budget submitted each week to the ORIX DIP Facility Administrative Agent (subject to agreed-upon variances). (ORIX DIP Facility Credit Agreement, § 8.32.) |
| **Covenants** | Substantially the same as those set forth in the DIP ABL Loan Agreement. (ORIX DIP Facility Credit Agreement, Art. IX.) |
| **Liens, Priorities, and Collateral** | Pursuant to the ORIX DIP Facility, The Newark Group will grant the ORIX DIP Facility Agent, on behalf of the ORIX DIP Lenders, a first priority lien on all present and after-acquired personal property (excluding the DIP ABL Priority Collateral (as defined below), including, but not limited to, certain real property; the outstanding capital stock of certain direct subsidiaries of The Newark Group (limited to a pledge of 65% of the voting equity and 100% of the non-voting equity of each first tier foreign subsidiary) and a second priority lien on the DIP ABL Priority Collateral.<br><br>The priority of liens being granted pursuant to the ORIX DIP Facility Credit Agreement will be subject to the terms of the Intercreditor Agreement (as defined below).<br><br>(ORIX DIP Facility Credit Agreement, §§ 5.1 - 5.2.) |
| **Carve-Out** | The security interests and liens of the ORIX DIP Facility Agent will be subordinate to the same "Carve-Out" applicable to the DIP ABL Facility as described above. (ORIX DIP Facility Credit Agreement, § 5.5(c).) |
| **Use of Proceeds** | The proceeds of the term loan will be used by The Newark Group: (a) to pay an amount equal to, and used to refinance, all amounts due |

[9] Pursuant to a confidentiality agreement, the Debtors are not herein disclosing certain fees payable to the ORIX DIP Facility Agent and the ORIX DIP Lenders.

|  | and owing under the Prepetition CL Credit Agreement and to repay outstanding revolving loans under the DIP ABL Loan Agreement, (b) to pay any costs, fees and expenses associated with the ORIX DIP Facility Credit Agreement and related agreements, (c) to pay professional costs, expenses and fees in connection with the Chapter 11 Cases, and (d) for working capital and other general corporate purposes of The Newark Group, Cogen and NGI (not otherwise prohibited under the ORIX DIP Facility Credit Agreement) relating to post-petition operations of such parties.   (ORIX DIP Facility Credit Agreement, § 6.7.) |
|---|---|
| **Events of Default** | Substantially the same as those set forth in the DIP ABL Loan Agreement.  (ORIX DIP Facility Credit Agreement, § 10.1.) |
| **Waivers** | Substantially the same as those set forth in the DIP ABL Loan Agreement.  (ORIX DIP Facility Credit Agreement, §§ 11.2, 11.4.) |
| **Indemnification** | Substantially the same as those set forth in the DIP ABL Loan Agreement.  (ORIX DIP Facility Credit Agreement, §§ 11.5.) |
| **Conditions to Borrowing** | Substantially similar to the conditions to the initial borrowing under the DIP ABL Loan Agreement, provided that the material adverse change conditions relate back to January 31, 2010.   (ORIX DIP Facility Credit Agreement, § 4.1.) |
| **Liens on Causes of Action Under Chapters 5 of the Bankruptcy Code** | A security interest in, a lien upon, and a right of set off against certain property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Chapter 5 of the Bankruptcy Code. (ORIX DIP Facility Credit Agreement, § 5.1. |

9.      The provisions described in Fed. R. Bankr. P. 4001(c)(1)(B)(i)-(xi) are set out at the following sections of the Interim DIP Order and the ORIX DIP Facility Credit Agreements:

a.      A grant of priority or a lien on property of the estate under § 364(c) or (d). Interim DIP Order ¶¶ 2.2-2.4; ORIX DIP Facility Credit Agreement § 5.1.

b.      The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim.  Interim DIP Order ¶ 2.7; ORIX DIP Facility Credit Agreement N/A.

c.      A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim.   Interim DIP Order N/A (Debtor acknowledgement only); ORIX DIP Facility Credit Agreement N/A.

d.      A waiver or modification of Code provisions or applicable rules relating to the automatic stay.  Interim DIP Order ¶¶ 3.3, 3.4; ORIX DIP Facility Credit Agreement N/A.

e.      A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan,

request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364.  Interim DIP Order ¶ 4.2; ORIX DIP Facility Credit Agreement § 9.30(f).

f.      The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order.  Interim DIP Order N/A; ORIX DIP Facility Credit Agreement § 1.1 Definition of "Termination Date."

g.      A waiver or modification of the applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien.  Interim DIP Order N/A; ORIX DIP Facility Credit Agreement N/A.

h.      A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action.  Interim DIP Order ¶ 4.2; ORIX DIP Facility Credit Agreement §§ 9.30, 16.1.

i.      The indemnification of any entity.  Interim DIP Order N/A; ORIX DIP Facility Credit Agreement § 11.5.

j.      A release, waiver, or limitation of any right under § 506(c).  Interim DIP Order ¶ 4.3; ORIX DIP Facility Credit Agreement § 9.30.

k.      The granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a).  Interim DIP Order ¶¶ 2.1.1-2.1.2; ORIX DIP Facility Credit Agreement § 5.1.

10.      The provisions set forth above are all justified under the relatively unique circumstances of these cases to avoid immediate and irreparable harm to the Debtors' estates. The Debtors, in consultation with their advisors, attempted to obtain the most advantageous financing available and engaged in extensive and good faith negotiations with the potential lenders.  Neither the DIP ABL Lenders nor the ORIX DIP Lenders (together, the "**DIP Lenders**") would agree to provide the proposed DIP Facilities without the inclusion of such terms, each of which was heavily negotiated between the parties.  In addition, the Debtors determined, in the exercise of their sound business judgment, that agreeing to such provisions was appropriate under the circumstances of these cases, which include a prepackaged Plan that will pay all trade creditors in full and which has the support of all impaired classes of claims and interests.

## JURISDICTION, VENUE AND STATUTORY PREDICATE

11.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

12.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

13.      The statutory predicates for the relief requested herein are §§ 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004, 9014, and 9034(f) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**").

## BACKGROUND

14.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").

15.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

16.      As of the filing of this Motion, no trustee, examiner or committee has been requested or appointed in any of these Chapter 11 Cases.

17.      Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases.

**The Debtors' Businesses**

18.      The Newark Group, along with its Non-Debtor Affiliates (collectively, "**TNG Global**"), operates as an integrated global producer of 100% recycled paperboard and paperboard products with significant manufacturing and marketing operations in North America and Europe.  Jackson Drive Corp. ("**Jackson Drive**") is a New Jersey corporation and a wholly-owned subsidiary of The Newark Group, which owns the real estate that houses the Company's

executive offices in Cranford, New Jersey.  Jackson Drive has no other material assets and its primary liability is a mortgage loan in the approximate amount of $2.2 million (the "**Jackson Drive Mortgage**").  Cogen, a California corporation, is also a wholly-owned subsidiary of The Newark Group.  It owns and operates a cogeneration power plant located on the property of The Newark Group's paper mill in Los Angeles.  Cogen provides electricity solely to the Los Angeles mill.  The only material asset of Cogen is a generator with an assessed value of approximately $1.3 million.

19.    The Company is primarily a manufacturer of industrial converting grades of paperboard, core-board, and coated and uncoated folding carton board, and is among the largest producers of these grades in North America.  The Newark Group is also a major North American producer of tubes, cores and allied products, and, together with its non-debtor European subsidiaries, is a leading producer of laminated products and graphicboard in both North America and Europe.  In addition, The Newark Group collects, trades and processes recovered paper in North America and believes that it is among the six largest competitors in this industry. The Newark Group supplies its products to the paper, packaging, stationery, book printing, construction, plastic film, furniture, and game industries.

20.    The Company owns or leases 40 active manufacturing and other facilities throughout the United States, including recovered paper plants, paperboard mills, and converting plants.[10]  It employs approximately 1920 employees, approximately 39% of whom are members of unions and are covered by 16 collective bargaining agreements.  The Non-Debtor Affiliates employ approximately 690 individuals in Canada and Europe, most of whom are covered by labor agreements.

21.    For the fiscal year that ended April 30, 2008, TNG Global recorded consolidated revenues of approximately $1 billion, resulting in a net loss of approximately $19.7 million.  The Newark Group generated approximately 78% of these revenues.  In fiscal year 2009, TNG

---

[10]    In addition to active facilities, the Debtors own seven facilities that were formerly operated as paper mill plants.

Global's revenues decreased to approximately $808.7 million and its loss increased to approximately $166.7 million. The Newark Group was responsible for approximately 77% of 2009 revenues. In fiscal year 2010, TNG Global generated approximately $723 million in revenues, and experienced a net loss of approximately $32 million. The Newark Group was responsible for approximately 76% of 2010 revenues.

**The Capital Structure**

22.    As of the Petition Date, the Company owed approximately $42.1 million (excluding approximately $785,000 million in outstanding letters of credit) under its prepetition secured asset based credit facility dated as of March 9, 2007, as amended (the "**Existing ABL Loan Agreement**"). The Existing ABL Loan Agreement provides for up to $50 million of revolving credit, subject to a certain borrowing base formula and limitations. All amounts owed under the Existing ABL Loan Agreement are secured by (i) first priority liens on the Company's and Cogen's accounts, inventory and certain other personal property (the "**Existing ABL Priority Collateral**") and (ii) second priority liens on substantially all of the Company's and Cogen's other assets, except for real property. As of the Petition Date, the Company was in default under the terms of the Existing ABL Loan Agreement. However, the Company has entered into a series of forbearance agreements with the Existing ABL Lenders and the Existing ABL Agent (as defined below) and no action has been taken to accelerate the obligations due under the Existing ABL Loan Agreement.

23.    In addition, as of the Petition Date, The Newark Group owed approximately $73.6 million under its prepetition secured term loan and credit-linked letter of credit facility dated as of March 9, 2007, as amended (the "**Prepetition CL Credit Facility**", and, with the Existing ABL Loan Agreement, the "**Prepetition Credit Facilities**")[11]. This amount does not include a

---

[11]    The Prepetition Credit Facilities and all other material agreements, documents, and instruments executed or delivered with, to, or in favor of the Existing ABL Agent, the Prepetition CL Administrative Agent (as defined below), the Existing ABL Lenders, and the Prepetition CL Lenders, including, without limitation, security agreements, documents and instruments executed and/or delivered in connection with the Prepetition Credit Facilities, as all have been amended, supplemented, modified, extended, renewed, restated or replaced at any time

$7.1 million standby letter of credit that was issued under the Prepetition CL Credit Facility for the benefit of Liberty Mutual Insurance Company, solely as security to guarantee payment of The Newark Group's workers' compensation obligations (the "**Workers' Compensation Letter of Credit**").[12]

24.    All amounts owed under the Prepetition CL Credit Facility are secured by (i) first priority liens on a substantial portion of the Company's and Cogen's assets (excluding accounts receivable and inventory), including, but not limited to, certain real property and equipment, the capital stock of all domestic subsidiaries of The Newark Group that are at least 50% owned or controlled by The Newark Group, 65% of the capital stock of two foreign Non-Debtor Affiliates and certain promissory notes due from a Non-Debtor Affiliate and (ii) a second priority lien on the Existing ABL Priority Collateral.  As of the Petition Date, although the Company was in default under the terms of the Prepetition CL Credit Facility, no action has been taken to accelerate the obligations due under the Prepetition CL Credit Facility.

25.    The Newark Group also owes, as of the Petition Date, $175 million in principal and approximately $29.5 million in interest under certain 9-3/4 % senior unsecured subordinated notes that were issued pursuant to an indenture dated March 12, 2004 (the "**Prepetition 2014 Notes**").  The Prepetition 2014 Notes mature on March 12, 2014.  The Company has failed to make the semiannual interest payments on the notes since March 15, 2009.  Neither the holders of the notes nor the indenture trustee under the indenture have taken action to accelerate the obligations due under the Prepetition 2014 Notes.

26.    As of the Petition Date, in addition to the secured credit facilities and the Prepetition 2014 Notes, the Company's primary fixed liabilities include approximately $4.8 million owed to Frederick von Zuben ("**Von Zuben**") under the Von Zuben Subordinated

---

prior to the Petition Date, are collectively referred to as the "**Prepetition Financing Documents**" and are contained in the **DIP Exhibit Supplement** filed contemporaneously with this Motion.   The DIP Exhibit Supplement will be filed with the Bankruptcy Court and available on CM/ECF, but will not be served on all applicable parties due to its large volume.  The DIP Exhibit Supplement is also available from the Debtors' counsel, upon request.

[12]     The Workers' Compensation Letter of Credit is collateralized by a $9.2 million deposit provided by the Prepetition CL Lenders.

Unsecured Note (the "**Von Zuben Subordinated Unsecured Note Claim**") and trade payables of approximately $57 million.  As noted in more detail below, the Debtors' proposed Plan (as defined below) contemplates that all trade and other General Unsecured Claims will "ride through" the Chapter 11 Cases and will be paid in full to the extent not paid prior to the Effective Date of the Plan.

## THE CHAPTER 11 CASES

27.    The Debtors commenced their Chapter 11 Cases to effectuate a restructuring of their balance sheets pursuant to a prepackaged Plan that, as described in more detail below, has the support of each and every impaired class of claims and interests.

28.    Generally, the restructuring was necessitated by liquidity issues resulting from, among other factors, a significant decline in sales that is largely attributable to the dramatic downturn of the economy in late 2008 and 2009, higher costs for freight and energy, and a decrease in the value of the Debtors' waste paper inventories.  Although the Company's business has rebounded somewhat from the downturn in the economy, it still does not have the ability to meet its significant debt service obligations under the Prepetition 2014 Notes.

## THE PROPOSED PREPACKAGED PLAN

29.    Prior to the Petition Date, after more than a year of lengthy discussions and negotiations with various creditor constituencies and prospective lenders, and after considering various alternatives, the Company reached agreements on the terms of the Plan with, among others, holders of more than 80% in amount of the Prepetition 2014 Notes.

30.    In essence, the Plan provides for a balance sheet restructuring that will, among other things, eliminate and fully equitize all amounts due under the Prepetition 2014 Notes and result in the immediate reduction of the Company's annual cash interest costs by approximately $13 million.  Furthermore, pursuant to a prepetition settlement between the Company and Von Zuben, the Plan provides for the partial payment, in a combination of cash and notes, of the Von

Zuben Subordinated Unsecured Note Claim.  In addition, the Plan provides that former shareholders who currently own approximately 84% of the equity of the Company will receive 1.5% of the New Common Stock of the Reorganized Company plus warrants to acquire up to 15% of the New Common Stock of the Reorganized Company, subject to dilution as set forth in detail in the Plan.  Lastly, the Plan provides that The Newark Group Employee Stock Ownership Plan (the "**ESOP**"), which currently owns approximately 16% of the equity of the Company, will receive 2% of the New Common Stock, subject to dilution as described in the Plan.

31.    Set forth below is a summary of the classification and treatment provisions of the Plan:[13]

- **Class 1:**  Priority Non-Tax Claims will be Unimpaired and paid in full;

- **Class 2:**  Other Secured Claims will be Unimpaired and paid in full;

- **Class 3:** Prepetition ABL Claims arising under the Existing ABL Loan Agreement will be paid in full in cash from the proceeds of the DIP ABL Facility which, in turn, will be paid by and replaced with the ABL Exit Facility on the Effective Date;

- **Class 4:** Prepetition CL Claims arising under the Prepetition CL Credit Facility will be paid in full in cash from the proceeds of the ORIX DIP Facility, which, in turn, will be paid by and replaced with the ORIX Exit Facility on the Effective Date;

- **Class 5:** General Unsecured Claims against the Debtors will be Unimpaired and Reinstated and paid in full to the extent such Claims are not paid in the ordinary course of business prior to the Effective Date;

- **Class 6**: Prepetition Notes Claims, consisting of the Claims arising under the Prepetition 2014 Notes and the general unsecured claim of Robert H. Mullen in the approximate aggregate amount of $210,000, will be exchanged for their Pro Rata share of 96.5% of the New Common Stock of the Reorganized Company to be issued pursuant to the Plan;

- **Class 7:** The holder of the Von Zuben Subordinated Unsecured Note Claim in the approximate amount of $4.8 million will receive $250,000 in

---

[13]    This summary does not contain all relevant Plan provisions.  Reference is made to the Plan and the Disclosure Statement dated May 7, 2010 (the "**Disclosure Statement**"), both of which were filed on the Petition Date, for a full and complete description of the Plan, including defined terms as well as the treatment of all Claims and Interests under the Plan.

cash, two subordinated unsecured promissory notes in the aggregate principal amount of $1,350,000, and up to $15,000 in cash representing legal fees incurred by Von Zuben in connection with the negotiation of the treatment of his claims under the Plan;

- **Class 8:** Each holder of an Equity Interest (other than ESOP Interests) shall receive its Pro Rata share of 1.5% of the New Common Stock of the Reorganized Company to be issued pursuant to the Plan, plus five year Equity Warrants to purchase up to 15.0% of the fully diluted New Common Stock of the Reorganized Company; and

- **Class 9:** Each holder of an ESOP Interest arising out of the ESOP shall receive its Pro Rata share of 2% of the New Common Stock of the Reorganized Company to be issued pursuant to the Plan, and the ESOP, as amended by the ESOP Plan Amendments, will be assumed by the Reorganized Company.

32.    The Debtors commenced solicitation of the Plan and the accompanying Disclosure Statement on May 7, 2010.  The solicitation period ended on June 7, 2010 (the "**Voting Deadline**").

33.    As set forth in the Declaration of David M. Sharp of Kurtzman Carson Consultants LLC Regarding Mailing, Voting, and Tabulation of Ballots Accepting the Proposed Joint Prepackaged Plan of Reorganization of The Newark Group, Inc., *et al.* (the "**KCC Declaration**"), filed contemporaneously herewith, the Plan has been accepted by well in excess of the statutory thresholds of impaired claims and interests required by §§ 1126(c) and (d) of the Bankruptcy Code.  Specifically, the Class 6 Prepetition Notes Claims, the Class 7 Von Zuben Subordinated Unsecured Note Claim, the Class 8 Equity Interests, and the Class 9 ESOP Interests each voted to accept the Plan.

34.    In sum, other than holders of the Prepetition Notes Claims and the Von Zuben Subordinated Unsecured Note Claim in Classes 6 and 7, each class of which voted to accept the Plan, no other creditors are Impaired under the Plan.  Moreover, each of the two Impaired classes of equity interests has voted to accept the Plan.

35.    The Debtors intend to fund these Chapter 11 Cases through two DIP Facilities that are the subject of this Motion.  Upon approval of the DIP Facilities by the Court,

the proceeds of the DIP ABL Facility will repay in full and replace the Existing ABL Loan Agreement, and the proceeds of the ORIX DIP Facility will repay in full and replace the Prepetition CL Credit Facility.  The remaining proceeds of the DIP Facilities will fund, among other things, the ongoing operating expenses of the Debtors' businesses and the costs of these Chapter 11 Cases.

36.    The Debtors believe that consummation of the consensual financial restructuring transactions proposed under the Plan is necessary to provide the Debtors with a strong balance sheet and capital structure and the liquidity necessary to operate successfully in the future. Indeed, the Debtors believe that the prompt realization of the transactions outlined in the Plan will enable them to exit chapter 11 appropriately capitalized and competitively positioned for success and future growth.

37.    A more fully detailed description of the Debtors' businesses, the reasons for commencing these Chapter 11 Cases, the Debtors' prepetition indebtedness, and the relief sought from this Court to allow for a smooth transition into chapter 11 is set forth in the Declaration of Robert H. Mullen in Support of Chapter 11 Petitions and Various First Day Applications and Motions (the "**First Day Declaration**") filed contemporaneously herewith, and is incorporated by reference as though fully set forth herein.

## THE DEBTORS' NEED FOR POST-PETITION FINANCING

38.    The Debtors require the immediate approval of the proposed financing to provide working capital in order to avoid irreparable harm and to preserve and maintain their businesses. Without the relief requested within, the Debtors will be unable to, *inter alia*, continue the operation of their businesses, maintain vital business relationships with their existing vendors, suppliers, and customers, make payroll, pay their existing obligations, purchase inventory, pay for utilities, freight, insurance, or satisfy their basic needs for working capital.

39.    The Debtors will use the funds available pursuant to the DIP ABL Loan Agreement to repay the obligations due under the Existing ABL Loan Agreement.  The Debtors

will use the funds available pursuant to the ORIX DIP Facility to pay in full all obligations due under the Prepetition CL Credit Facility;[14] to pay down part of the DIP ABL Facility, thereby creating additional borrowing availability under the asset-based loans; for expenses associated with the Debtors' operations; and for costs of administration, each in accordance with the 13-week cash flow budget (subject to permitted variances), substantially in the form attached to this Motion as <u>Exhibit C</u> (the "**Budget**").[15]

40.    If the Court approves the financing proposed herein, the Debtors fully expect that they can meet the terms of the DIP Facilities, including the Budget, and operate their businesses as going concerns, thereby maximizing the value of their assets until they can confirm the Plan, which, as noted above, will pay virtually all claims in full.  The only Impaired classes of Claims under the Plan are the Prepetition Notes Claims and the Von Zuben Subordinated Unsecured Note Claim.  Both of these classes have voted to accept the Plan.  On the other hand, if the Court does not authorize the Debtors to obtain the proposed post-petition financing, the Debtors will be forced to cease operations; the value of their assets will diminish greatly and rapidly to the detriment of all stakeholders; and the ability of the Debtors to confirm their Plan will be irreparably impaired.

41.    Starting in late 2008, The Newark Group, with the assistance of its investment banker, Jefferies & Co., Inc. ("**Jefferies**"), began exploring restructuring and recapitalization alternatives.  In January of 2009, The Newark Group enlisted the assistance of AlixPartners, LLP ("**AlixPartners**") as financial advisors, and continued exploring the restructuring and recapitalization options.  It soon became apparent, however, that the Debtors would not be able to secure out-of-court financing in the current lending market in the time period available, particularly in light of their liquidity position and their significant leverage.  In mid-February

---

[14]    Simultaneous with the full payoff and termination of the Prepetition CL Credit Facility, and pursuant to an agreement between the Prepetition CL Lenders, the DIP ABL Lenders, and the Company, the Workers' Compensation Letter of Credit in the approximate amount of $7.1 million, originally issued under the Prepetition CL Credit Facility, will be deemed to be issued under the DIP ABL Facility, and will thereafter be governed by the terms and conditions thereof.

[15]    The Budget will be updated on a weekly basis.

2009, therefore, The Newark Group, primarily through Jefferies, commenced efforts to solicit proposals for debtor-in-possession financing in connection with a potential chapter 11 filing.

42.     After a thorough analysis of potential lenders, the Debtors, through their advisors, contacted numerous lenders.  The lenders contacted represented a targeted list of hedge funds, private equity funds and other distressed lenders that were viewed as potential candidates for financing the Debtors' businesses.  A number of the potential lenders contacted requested and received further information describing the Debtors' businesses and historical financial performance.  Thereafter, certain potential lenders indicated that they were interested in moving forward with the process and executed confidentiality agreements for the purpose of obtaining additional information.

43.     Upon the execution of confidentiality agreements, several lenders that were able to demonstrate an advanced interest in providing the Debtors with financing were granted meetings with the Debtors' senior management, and several potential lenders submitted term sheets to the Debtors.

44.     In March 2009, the Newark Group began having discussions with certain holders of the Prepetition 2014 Notes regarding the possible restructuring of the Prepetition 2014 Notes through either an out-of-court restructuring or a chapter 11 reorganization plan.  These holders subsequently formed a coalition (the "**Coalition of Prepetition Noteholders**")[16] and retained financial advisors and counsel.  The Newark Group and the Coalition of Prepetition Noteholders proceeded to actively negotiate a potential restructuring of the Prepetition 2014 Notes.

45.     After reaching an agreement in principle with the Coalition of Prepetition Noteholders, the Company, along with its advisors, commenced efforts to solicit proposals for DIP and exit financing in connection with the prepackaged Plan.  Jefferies contacted eleven potential lenders, of which three submitted proposals for asset-based revolvers and term loans, and two submitted proposals solely for asset-based revolvers.  The Company decided to pursue

---

[16]     The Coalition of Prepetition Noteholders represents approximately 84% of the outstanding Prepetition 2014 Notes, measured as a percentage of the face amount of the issuance.

financing proposals from one potential asset-based revolver lender and one term loan lender, in addition to exploring the possibility of financing with their prepetition lenders, the Existing ABL Lenders and the Prepetition CL Lenders.

46.     The Company conducted extensive negotiations with the potential asset-based revolver lender and a group consisting of certain of the Existing ABL Lenders. Both lenders conducted full due diligence, and both offered the Company "DIP-to-exit" financing commitments. In addition, both lenders proposed financing facilities that would have repaid and replaced the existing secured credit facilities provided by the Existing ABL Lenders with the new DIP-to-exit facilities. The Company eventually chose Wells, agent for the Existing ABL Lender, based on the more favorable terms offered.

47.     At the same time, the potential term loan lender commenced an exploratory syndication process, contacting over 100 potential investors and conducting extensive investor due diligence. As with the proposed asset-based loans, the financing offered by the potential term loan lender would have taken out and replaced the existing term loan held by the Prepetition CL Lenders. Ultimately, however, the Company decided that the terms offered by the Prepetition CL Lenders were more favorable than those that were offered by the new term loan lender.

48.     The Company, along with its financial and legal advisors, spent months negotiating the agreements for the new asset-based revolver, the agreements covering the restructuring of the existing Prepetition CL Credit Facility into an exit facility, and the intercreditor agreement that would govern the post-petition relationships between these two lender groups.

49.     During these negotiations, an impasse developed between the prepetition lending groups with regard to the intercreditor relationship. In response to the impasse, certain of the Prepetition Noteholders proposed providing term loan financing that would refinance the existing Prepetition CL Credit Facility and provide for an intercreditor agreement acceptable to the Existing ABL Lenders.

50.     Although the Company, its advisors, and the three proposed post-petition lenders attempted to work out the details of this arrangement for months, the negotiations broke down due to various intercreditor issues that simply could not be resolved.  The Company, with the assistance of its financial advisors, began to explore alternate financing, which ultimately resulted in the DIP Facilities proposed herein.

## THE PROPOSED DIP FACILITIES

51.     After an extensive re-canvassing of the available financial markets and lenders, the Debtors, along with AlixPartners and Jefferies, decided upon a simpler post-petition financing package that affords them all the benefits of the previously contemplated financing package, but also provides additional funding availability, as described below.

52.     The financing package proposed herein consists of:

a.     the DIP ABL Facility - a revolving loan of up to $50 million which will be used to pay in full the obligations due pursuant to the Existing ABL Loan Agreement on the day the Interim DIP Order is signed;

b.     the ABL Exit Facility – a revolving loan of up to $50 million, which will be used as follows:

(i)     to pay in full the remaining obligations due on the Effective Date under the DIP ABL Facility (some of which obligations will have been paid down by the ORIX DIP Facility); and

(ii)    to finance the Company's working capital needs post-Effective Date;

c.     the ORIX DIP Facility, pursuant to which the Company will be authorized to borrow up to $110 million, which will be used as follows:

(i)     to pay in full all obligations due under the Prepetition CL Credit Facility;

(ii)    to pay down part of the DIP ABL Facility, thereby creating approximately $22.5 million in additional borrowing availability under the asset-based loans, i.e., the DIP ABL Facility and, on the Effective Date, the ABL Exit Facility; and

       d.      the ORIX Exit Facility, pursuant to which the Company will be authorized to borrow up to $110 million, which will be used to pay in full the obligations due under the ORIX DIP Facility on the Effective Date and for general corporate purposes.

53.      Prior to the Petition Date, the Company had approximately $3.5 million of borrowing availability under its Prepetition Credit Facilities.  As a result of the DIP Facilities proposed herein, the Company expects to have approximately $22.5 million of availability immediately upon the closing of the DIP Facilities.  This increased availability is critical to the viability and growth of the Company.

54.      The Debtors believe that the financing provided pursuant to the proposed DIP Facilities and the increased availability they will realize therefrom will provide them with the necessary liquidity to fund their operating, working capital and capital expenditure needs during the course of these Chapter 11 Cases.

**The DIP ABL Facility**

55.      The DIP ABL Facility provides for borrowings of up to $50 million in the aggregate, consisting of (a) a revolving loan subject to a borrowing base and other terms, including up to $15 million for letters of credit and a swingline subfacility in a principal amount of up to $7.5 million.

56.      The terms and conditions of the DIP ABL Facility are set forth in that certain Amended and Restated Loan and Security Agreement by and among the DIP ABL Borrowers, the DIP ABL Guarantor, the DIP ABL Lenders, and the DIP ABL Agent, substantially in the form attached hereto as Exhibit B (the "**DIP ABL Loan Agreement**").  The proceeds of the DIP ABL Loan Agreement will be used to "take out" and pay off the Existing ABL Loan Agreement.

57.      The obligations under the DIP ABL Loan Agreement will be secured by first priority perfected security interests and liens on, primarily, all accounts receivable, inventory, and other Priority Collateral, as defined in the DIP ABL Loan Agreement, of The Newark Group

and Cogen (the "**DIP ABL Priority Collateral**"), and a second priority security interest in all other personal property of The Newark Group and Cogen.

58.     The priority of the liens and security interests in the DIP ABL Priority Collateral shall be subject to the terms of that certain intercreditor agreement to be executed simultaneously with the execution of the DIP ABL Loan Agreement and the ORIX DIP Facility Credit Agreement, by and among The Newark Group, NGI, and certain domestic subsidiaries of The Newark Group, as borrowers, certain domestic subsidiaries of The Newark Group as guarantors; the ORIX DIP Facility Agent and the ORIX Exit Facility Agent, and Wells, in its capacity as administrative agent and collateral agent under the DIP ABL Loan Agreement and the ABL Exit Facility Credit Agreement; (the "**Intercreditor Agreement**"), substantially in the form attached hereto as Exhibit D.

59.     The significant elements of the DIP ABL Facility are described in detail in paragraphs 4-5 above.

**The ORIX DIP Facility**

60.     Pursuant to the ORIX DIP Facility, the Company will be authorized to borrow up to $110 million.  The terms and conditions of the ORIX DIP Facility are set forth in that certain Loan and Security Agreement by and among The Newark Group as borrower, certain domestic subsidiaries of The Newark Group as guarantors, the ORIX DIP Facility Lenders, and the ORIX DIP Facility Agent, substantially in the form attached hereto as Exhibit E (the "**ORIX DIP Facility Credit Agreement**").   The proceeds of the ORIX DIP Facility will be used to immediately "take out" and pay off the Prepetition CL Credit Facility

61.     The obligations under the ORIX DIP Facility Credit Agreement will be secured by a first priority lien on all present and after-acquired personal property (excluding the DIP ABL Priority Collateral), including, but not limited to, equipment, real property; the outstanding capital stock of certain direct subsidiaries of The Newark Group (limited to a pledge of 65% of the voting equity and 100% of the non-voting equity of each first tier foreign subsidiary) (the

"**ORIX DIP Priority Collateral**"), and a second priority lien on the DIP ABL Priority Collateral.

62.    The priority of liens being granted pursuant to the ORIX DIP Facility Credit Agreement will be subject to the terms of the Intercreditor Agreement.

63.    The significant elements of the ORIX DIP Facility are described in paragraphs 7-8 above.

64.    The Debtors have an urgent need to obtain the proposed financing for, among other things, continuing the operation of their businesses in an orderly manner, maintaining business relationships with vendors, suppliers, and customers, paying employee wages, and satisfying other working capital and operational needs – all of which are necessary to preserve and maximize the assets of the Debtors' estates, minimize disruption to the Debtors' businesses operations, and ensure that the Debtors can consummate their balance sheet restructuring embedded in their Plan.

65.    Given the existing prepetition liens on the Debtors' assets, it is impossible to obtain sufficient post-petition unsecured credit in the ordinary course of business, even by offering to grant lenders administrative expense priority.

66.    After pursing extensive, aggressive, and good faith, arms-length negotiations with representatives of numerous lenders, the Debtors determined, given, among other things, the severe credit environment that exists in today's market, that the DIP Facilities proposed herein offer the best option for financing their businesses.  The proposed financing will benefit the Debtors, their creditors, and their estates.  Under the circumstances of these cases, which involve a prepackaged chapter 11 Plan that has the overwhelming support of all impaired classes of claims and interests, and which will pay General Unsecured Claims in full, the terms of the DIP Facilities are just, fair, and reasonable and reflect the Debtors' exercise of their prudent business judgment.

67.     Likewise, the various fees and charges required by the lenders under the proposed DIP Facilities were necessary to secure their agreement to provide the financing, given the state of today's capital markets.

68.     Finally, the Debtors have prepared an initial Budget, substantially in the form attached hereto as <u>Exhibit C</u>, which is incorporated herein.  The Debtors believe the Budget is achievable and will allow them to operate while in Chapter 11 without the accrual of unpaid liabilities.

69.     Through the refinancing offered by the DIP Facilities, which will be converted to exit facilities upon confirmation of the Plan, the Debtors intend to restructure their finances, ensure that the Plan remains on course, and emerge from chapter 11 protection with stronger businesses that are better able to compete in the industry in which they operate.  Without the immediate approval of the DIP Facilities, the Debtors' estates will suffer immediate and irreparable harm.

<b><u>RELIEF REQUESTED</u></b>

70.     By this Motion, the Debtors request that this Court enter an order pursuant to §§ 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, 9014, and 9034(f), for entry of an Interim DIP Order, substantially in the form attached hereto as <u>Exhibit A</u>, and a Final DIP Order:

    a.     authorizing the Debtors to obtain and enter into the following post-petition financing:

        (i)     the DIP ABL Loan Agreement with the DIP ABL Agent and the DIP ABL Lenders, substantially in the form attached hereto as <u>Exhibit B</u>, including, without limitation, security agreements, pledge agreements, notes, guarantees, mortgages, and Uniform Commercial Code ("**UCC**") financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, the "**<u>DIP ABL Facility Documents</u>**").

      (ii)    the ORIX DIP Facility Credit Agreement with ORIX Finance Corp. and the ORIX DIP Lenders, substantially in the form attached hereto as <u>Exhibit E</u>, including, without limitation, security agreements, pledge agreements, notes, guarantees, mortgages, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, the "**ORIX DIP Facility Documents**");

b.      granting liens and security interests and superpriority administrative expense status in connection with the DIP ABL Facility pursuant to 11 U.S.C. §§ 363 and 364(c);

c.      granting security interests and superpriority administrative expense status in connection with the ORIX DIP Facility pursuant to 11 U.S.C. §§ 363 and 364(c) and (d);

d.      modifying the automatic stay pursuant to 11 U.S.C. § 362;

e.      authorizing repayment of the prepetition secured debt owing to Wells, as agent under the Existing ABL Loan Agreement (the "**Existing ABL Agent**") pursuant to 11 U.S.C. § 363;

f.      authorizing repayment of the prepetition secured debt owing to Wells, as existing agent under the Prepetition CL Credit Facility (the "**Prepetition CL Administrative Agent**") pursuant to 11 U.S.C. § 363;

g.      scheduling a final hearing pursuant to Bankruptcy Rule 4001 to consider entry of the Final DIP Order granting the relief requested in this Motion on a final basis and approving the form of notice with respect to the final hearing;

h.      authorizing the use of the proceeds of the DIP ABL Facility (net of any amounts used to pay fees, costs and expenses under the DIP ABL Loan Agreement), to pay in full the obligations due pursuant to the Existing ABL Loan

Agreement in a manner consistent with the terms and conditions of the DIP ABL

Loan Agreement and in a manner substantially consistent with the Budget; [17]

i.        authorizing the use of the proceeds of the ORIX DIP Facility (net of any

amounts used to pay fees, costs and expenses under the ORIX DIP Facility Credit

Agreement), in a manner consistent with the terms and conditions of the ORIX

DIP Facility Credit Agreement and in a manner substantially consistent with the

Budget:

> (i)      to pay in full all obligations due under the Prepetition CL Credit
> Facility;
>
> (ii)     to pay down part of the DIP ABL Facility;
>
> (iii)    for working capital, letters of credit and capital expenditures;
>
> (iv)     for other general corporate purposes of the Debtors (including
> intercompany loans to the extent permitted by the DIP Facilities);
>
> (v)      for payment of any related transaction costs, fees and expenses;
> and
>
> (vi)     for the costs of administration of the Chapter 11 Cases;

j.        waiving any applicable stay (including under Bankruptcy Rule 6004) and

providing for immediate effectiveness of the Interim DIP Order; and

k.        granting the Debtors such other and further relief as the Court deems

necessary, appropriate, proper and consistent with the terms of the DIP Orders.

## **BASIS FOR RELIEF REQUESTED**

71.      Section 364(c) of the Bankruptcy Code provides, among other things, that if a

debtor is unable to obtain unsecured credit allowable as an administrative expense under §

503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur

debt with priority over certain administrative expenses, secured by a lien on unencumbered

property, or secured by a junior lien on already-encumbered property.

---

[17]      The Debtors' preliminary 13-week Budget, including cash flow projections, is attached hereto as <u>Exhibit C</u>
(the "**<u>Budget</u>**").

72.    Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on already-encumbered property provided that the debtor is unable to obtain such credit otherwise and the prior lienholder's interest in the property is adequately protected.

73.    For the reasons discussed below, the Debtors satisfy the standards for obtaining post-petition financing on a secured basis pursuant to § 364(c) and § 364(d) of the Bankruptcy Code.

**The Debtors Satisfy the Requirements Necessary to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

74.    The Debtors propose to obtain secured financing under the DIP Facilities by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code by providing both a senior lien on unencumbered property and a junior lien on encumbered property, both of which would be entitled to superpriority administrative expense status.  Specifically, § 364(c) provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or, 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

75.    To obtain post-petition credit under § 364(c), a Debtor first must show that it is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).  See also In re Garland Corp., 6 B.R. 456,

461 n.11 (1st Cir. BAP 1980) (secured credit under § 364(c) is authorized, after notice and a

hearing, upon showing that unsecured credit cannot be obtained).

76.     To determine whether a debtor may obtain financing under section 364(c) of the

Bankruptcy Code, the courts have articulated a three-part test:

> (1) the debtor is unable to obtain unsecured credit under
> section 364(b) (i.e., by granting a lender administrative
> expense priority);
>
> (2) the credit transaction is necessary to preserve the assets
> of the estate; and
>
> (3) the terms of the transaction are fair, reasonable and
> adequate, given the circumstances of the debtor-borrower
> and the proposed lender.

In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D.

Pa. 1988); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa.), modified on other

grounds, 75 B.R. 553 (1987) (debtor seeking unsecured credit under section 364(c) of the

Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section

364(b) of the Bankruptcy Code).

77.     A debtor seeking financing under § 364(c) of the Bankruptcy Code must make

reasonable efforts to seek other sources of unsecured credit, but is granted deference in acting in

accordance with its business judgment and, indeed, is not required to seek credit from every

possible source.  See, e.g., In re Ames, 115 B.R. at 40 (approving financing facility and holding

that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less

onerous terms where debtor approached four lending institutions, was rejected by two, and

selected the least onerous financing option from the remaining two lenders); see also In re:

Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to

seek credit from every possible lender before concluding that such credit is unavailable").

78.     As discussed above, the Debtors attempted to identify all reasonable sources of post-petition financing on the best possible terms while they were in the process of soliciting a financing facility.  Based on current capital market conditions and discussions with numerous potential lenders, however, the Debtors, in consultation with their professional advisors, determined that post-petition financing on an unsecured, administrative claim basis or on a junior lien priority basis would be unobtainable.

79.     Moreover, the proposed financing is necessary to preserve the assets of the Debtors' estates.  Without post-petition financing, the Debtors would be unable to operate their businesses as going concerns, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts and liabilities.  Indeed, the Debtors' ability to continue operating their businesses and complete the proposed financial restructuring hinges upon their being able to access post-petition financing.

80.     Finally, given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, the Debtors believe the terms of the proposed DIP Facilities are fair, reasonable, and adequate.

81.     Therefore, the Debtors meet the requirements to obtain post-petition financing pursuant to § 364(c) of the Bankruptcy Code.

**The Debtors Satisfy the Requirements Necessary to Obtain Post-Petition Financing Pursuant to Section 364(d) of the Bankruptcy Code and Rule 4001(d).**

82.     In addition to obtaining post-petition financing pursuant to § 364(c), the Debtors propose to obtain financing pursuant to § 364(d) and Rule 4001(d) of the Bankruptcy Code.

83.     Section 364(d) provides that the court may authorize the debtor to obtain secured financing, as follows:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if -

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

84.     Bankruptcy Rule 4001(d) provides, in pertinent part, that the Court may enter an order approving "an agreement between the debtor and an entity that has a lien or interest in property of the estate pursuant to which the entity consents to the creation of a lien senior or equal to the entity's lien or interest in such property."  Fed. R. Bankr. P. 4001(d)(1)(A)(5).

85.     The ORIX DIP Lenders propose to take a senior position to any existing liens on the collateral that currently secures the Prepetition CL Credit Facility (the "**DIP TL Priority Collateral**"), and have refused to provide financing without obtaining a lien of equal priority to that which secures the obligations under the Prepetition CL Credit Facility.

86.     Moreover, the Debtors have been unable to obtain financing to replace the Prepetition CL Lenders without granting similar liens.

87.     The Existing ABL Lenders and the DIP ABL Lenders have agreed, as allowed by Rule 4001(d)(1)(A)(v), that their liens on the DIP TL Priority Collateral shall be junior and subordinate to the liens granted under the ORIX DIP Facility, pursuant to the terms of the Interim DIP Order and the Intercreditor Agreement.

88.     The Debtors are unaware of any other liens on the DIP TL Priority Collateral. However, the ORIX DIP Lenders have indicated that they are unwilling to provide the ORIX DIP Facility unless they are assured that their liens in that collateral will be first priority liens. The proposed priority, while technically might be considered "priming," will not impair the rights of any potential existing lienholder, because such lienholder would find itself in essentially the same position that it currently maintains – in second position behind the existing term loan lenders.  Vis-à-vis any existing lienholder, the proposed ORIX DIP Facility will simply take the

place of the Prepetition CL Credit Facility.  Accordingly, the interests of any potential existing lienholder are not being impaired in any way by the Court's authorization of the proposed post-petition financing.

89.    Moreover, the interests of any other potential lienholders will not be impaired in any way by the Court's authorization of the proposed post-petition financing, as such potential lienholders are adequately protected by the value of the large equity cushion in the collateral.

90.    Section 361 of the Bankruptcy Code states, in pertinent part, that when adequate protection is required pursuant to § 364, "such adequate protection may be provided by" (1) cash payment(s), to the extent that the grant of the § 364 lien results in a decrease in the value of the existing lienholder's interest in the property; (2) an additional or replacement lien to the extent that the grant of the § 364 lien results in a decrease in the value of the existing lienholder's interest in the property; or (3) other relief that will result in the "indubitable equivalent" of the existing lienholder's interest in the property, other than an administrative expense claim under § 503(b)(1).  11 U.S.C. § 361.

91.    Section 361 does not set forth the *only* methods of adequate protection that are available to the Court, as evidenced by the Legislature's use of the permissive "may" in the first phrase of the section.  It merely illustrates the means by which adequate protection may be provided, and provides general contours of the concept.  See House Report No. 95-595, 95th Cong. 1st Sess. 338-40 (1977); see also 1 Alan N. Resnick & Henry J. Sommer, Collier Pamphlet Edition 2010, p. 219  (Matthew Bender).

92.    Courts have held that a meaningful equity cushion can obviate the need for any other forms of adequate protection.  In re Mellor, 734 F.2d 1396 (9th Cir. 1984); In re Cardell, 88 B.R. 627 (Bankr. D.N.J. 1988).  See also In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion is sufficient to be adequate protection).

93.    "Equity cushion" has been defined as "the surplus of value remaining after the amount of indebtedness is subtracted from the fair market value of the collateral."

Commonwealth of Pa. State Employees Retirement Fund v. Roane, 14 B.R. 542, 545 (E.D. Pa. 1981). Here, the substantial equity cushion provided by the value of the collateral provides sufficient adequate protection to any lienholder that may subsequently be discovered.

94.    The appraised value of the DIP TL Priority Collateral is well over $158 million. In March, 2009, the machinery and equipment located at five (5) of the Debtors' U.S. locations was appraised at approximately $87 million, and just a portion of the Debtors' real estate holdings were appraised at approximately $71 million, for a total of $158 million.

95.    Moreover, the value of only part of the ABL Priority collateral securitizing that loan was approximately $97.2 million, consisting of approximately $60.6 million in gross accounts receivable and approximately $36 million in gross inventory.

96.    Accordingly, the aggregate maximum amount of the obligations pursuant to the DIP Facilities will be a total of approximately $160 million, while the value of the collateral securing those obligations is approximately $254.6 million, leaving an equity cushion of no less than $94.6 million, or over 59%. This is more than sufficient to provide an adequate equity cushion to any potential lienholders.

**Take-Out Transactions**

97.    The DIP ABL Lenders were willing to extend post-petition financing to the Debtors on the terms described herein on the condition that the proceeds of the DIP ABL Facility be used to repay in full the obligations due pursuant to the Existing ABL Loan Agreement.

98.    Paying in full the obligations due pursuant to the Existing ABL Loan Agreement will, among other things, obviate the need to segregate and separately account for post-closing collections, avoid additional intercreditor issues and an unnecessary priming fight, as well as avoid the accrual of interest payments under the Existing ABL Loan Agreement (potentially at default rates) pursuant to § 506(b) of the Bankruptcy Code.

99.     Moreover, the Existing ABL Loan Agreement is fully and validly secured, [18] and the obligations due thereunder must be paid in full.  The Debtors submit, therefore, that the proposed refinancing with the provision to pay off, in full, the Existing ABL Loan Agreement upon the entry of the Interim DIP Order will not prejudice the Debtors' estates – it merely pays off one facility which has been in default for over a year, and replaces it with another facility that, in combination with the ORIX DIP Facility, will provide approximately $24 million in additional borrowing availability and will enable the Debtors to smoothly navigate the chapter 11 process and emerge stronger and better positioned to keep themselves competitive in this rapidly changing economic environment.

100.     Similarly, the ORIX DIP Lenders extended their post-petition financing package to the Debtors on the terms described herein on the condition that the proceeds of the ORIX DIP Facility be used to repay in full the obligations due under the Prepetition CL Credit Facility.  As noted above, the value of the collateral securing the Prepetition CL Credit Facility is well in excess of the claim amount.

101.     Refinancing on the terms proposed herein and satisfying the obligations due under the Prepetition CL Credit Facility will not prejudice the Debtors' estates because the obligations due pursuant to the Prepetition CL Credit Facility must be repaid in full upon consummation of any plan and, in fact, the prepackaged Plan expressly provides for the satisfaction of the Prepetition CL Credit Facility from the proceeds of the ORIX DIP Facility.  Moreover, no one can reasonably expect the ORIX DIP Lenders, or any other lender, to provide new financing if the collateral securing the debt is already encumbered by the obligations due under the Prepetition CL Credit Facility.  Furthermore, the ORIX DIP Facility will allow the Debtors to increase their availability under the DIP ABL Facility by approximately $22.5 million.  This is a significant benefit to the estates and their creditors.

---

[18]     As of the Petition Date, the balance due pursuant to the Existing ABL Loan Agreement was approximately $42.1 million (excluding approximately $785,000 in outstanding letters of credit), while the value of only part of the collateral securitizing that loan was approximately $70 million, consisting of approximately **[$58 million]** in gross accounts receivable and approximately **[$12 million]** in eligible inventory.

102.    Significantly, all classes of impaired creditors have voted to accept the Plan – a Plan that provides for a full recovery to, among others, the Existing ABL Lenders (through the DIP ABL Loan Agreement) and the Prepetition CL Lenders (through the ORIX DIP Facility), and to General Unsecured Creditors.

103.    Courts in this circuit have approved financing facilities that, like the DIP Facilities proposed herein, provide for the repayment in full of prepetition financing facilities. See, e.g., In re U.S. Concrete, Inc., Case No. 10-11407 (Bankr. D. Del. April 29, 2010) (DIP facility take-out of $40 million prepetition facility on interim order basis); In re ACG Holdings, Inc., Case No. 08-11467 (Bankr. D. Del. July 16, 2008).

**Approval of the DIP Facilities Is In the Best Interests of the Debtors' Estates.**

104.    The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms available, consistent with their goal of confirming their chapter 11 Plan on an expedited basis.  The proposed DIP Facilities are fair, reasonable and adequate given the circumstances of these cases in particular, and the severe credit crisis that exists in today's market in general.

105.    Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, a receivables facility and an asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [, were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court.").  In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d

1303, 1311 (5th Cir. 1985).  Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the proposed DIP Facilities.

106.    A denial of the requested relief will cause immediate and irreparable harm to the Debtors and their estates.  Absent immediate approval of the DIP Facilities, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees and other creditors.  If the Debtors are unable to pay their ongoing obligations, they will not be able to operate.  Moreover, and of particular significance, if the DIP Facilities are not approved immediately, the Debtors' ability to confirm and implement the prepackaged Plan will be irreparably harmed to the severe detriment of their creditors, employees, and all other stakeholders.  In contrast, the Debtors' immediate access to the DIP Facilities will ensure that the "going concern" value of their assets are preserved – a value that is substantially greater than the value which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately – and will permit the Debtors to move forward with the prompt confirmation of their prepackaged Plan.

107.    The Debtors submit for all these reasons that ample justification exists for the relief requested herein.

## REQUEST FOR INTERIM RELIEF

108.    Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for authority to obtain financing during the 14-day period following the filing of a motion for authority to obtain such financing, "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(c)(2).  In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions.  See, e.g., In re Ames, 115 B.R. at 38.  The Debtors submit that, for the reasons set forth herein, authority to obtain post-petition financing on an

interim basis as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtors' businesses.

## <u>REQUEST FOR FINAL HEARING</u>

109.    Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

## <u>WAIVER OF MEMORANDUM OF LAW</u>

110.    Because the legal points and authorities upon which this Motion relies are incorporated herein and do not raise any novel issues of law, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law pursuant to Local Rule 9013-2 be deemed waived.

## <u>NOTICE</u>

111.    Notice of this Motion will be provided by facsimile, electronic transmission, overnight delivery or hand delivery to:

   a.    Creditors (or their counsel, if known) holding the twenty (20) largest unsecured claims against the Debtors, on a consolidated basis;

   b.    Counsel to the Coalition of Prepetition Noteholders;

   c.    Counsel to the DIP ABL Agent;

   d.    Counsel to the ABL Exit Facility Administrative Agent;

   e.    Counsel to the ORIX DIP Facility Agent;

   f.    Counsel to the ORIX Exit Facility Agent;

   g.    Counsel to the Existing ABL Agent;

   h.    Counsel to the Prepetition CL Administrative Agent;

i.      Counsel to the Prepetition Indenture Trustee

j.      Von Zuben and his counsel;

k.      The ESOP Trustees;

l.      The ESOP Independent Fiduciary and its counsel;

m.      The Office of the United States Trustee for the District of New Jersey;

n.      The Office of the United States Attorney for the District of New Jersey;

o.      The Internal Revenue Service;

p.      All known lienholders;

q.      All landlords; and

r.      Any entity that has filed a notice of appearance in the Chapter 11 Cases
         pursuant to Bankruptcy Rule 2002.

112.    In light of the nature of the relief requested, the Debtors submit that no other or
further notice is necessary.

## **NO PRIOR REQUEST**

113.    No prior request for the relief sought herein has been made by the Debtors to this
Court or to any other court.

**(Remainder of page intentionally left blank.)**

42

**WHEREFORE**, the Debtors respectfully request that this Court: (a) enter an Order, in the form submitted herewith, granting the relief requested herein; and (b) grant to the Debtors such other and further relief as the Court may deem proper.

Dated:  June 9, 2010

**LOWENSTEIN SANDLER PC**

By: _____ */s/ Kenneth A. Rosen* _____
    Kenneth A. Rosen (KR 4963)
    Paul Kizel (PK 4176)
    Jeffrey D. Prol (JP 7454)
    Suzanne Iazzetta (SI 2116)
    65 Livingston Avenue
    Roseland, New Jersey 07068
    Telephone:(973) 597-2500
    Facsimile: (973) 597-2400

Proposed Counsel to the Debtors and Debtors-in-Possession