**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen (KR 4963)
Paul Kizel (PK 4176)
Jeffrey D. Prol (JP 7454)
Suzanne Iazzetta (SI 2116)
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:   (973) 597-2500
Facsimile:    (973) 597-2400

Proposed Counsel to the Debtors
and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>THE NEWARK GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 10-_____ (_____)<br><br>Joint Administration Requested<br><br>Hearing Date:  June ___, 2010 |

**MOTION OF THE DEBTORS FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO (I) MAINTAIN THEIR EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM; (II) CONTINUE TO USE THEIR EXISTING BUSINESS FORMS AND RECORDS; AND (III) CONTINUE INTERCOMPANY TRANSACTIONS; (B) WAIVING COMPLIANCE WITH INVESTMENT GUIDELINES UNDER 11 U.S.C. § 345(b) AND (C) PROVIDING THE UNITED STATES TRUSTEE WITH A 60-DAY PERIOD TO OBJECT TO SAID ORDER <u>BEFORE IT BECOMES A FINAL ORDER</u>**

The  Newark  Group,  Inc.,  *et al.*,  as  debtors  and  debtors-in-possession  in  the  above-captioned  chapter  11  cases  (collectively,  the  "**Debtors**"),  by  and  through  their  proposed undersigned counsel, hereby submit this motion (the "**Motion**") seeking entry of an order (the "**Order**"),  substantially  in  the  form  attached  hereto  as  **Exhibit A**,  pursuant  to  11  U.S.C.  §§ 105(a), 363, 1107, and 1108 and Federal Rule of Bankruptcy Procedure 6004(h), (A) authorizing

---

[1]    The  Debtors  in  these  chapter  11  cases,  along  with  the  last  four  digits  of  each  Debtor's  federal  tax identification number, are: The Newark Group, Inc. (4844); Jackson Drive Corp. (4573); and NP Cogen, Inc. (9626).

the Debtors to (i) maintain their existing bank accounts and cash management system, (ii) continue to use their existing business forms and records, and (iii) continue intercompany transactions; (B) waiving compliance with investment guidelines pursuant to 11 U.S.C. § 345(b); and (C) providing the United States Trustee with a 60-day period to object to said order before it becomes a final order.  In support of the Motion, the Debtors respectfully represent as follows:

## **JURISDICTION, VENUE AND STATUTORY PREDICATE**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are §§ 105, 363, 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the applicable Local Bankruptcy Rules for the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**").

## **BACKGROUND**

4.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").

5.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

6.      As of the filing of this Motion, no trustee, examiner or committee has been requested or appointed in any of these Chapter 11 Cases.

7.      Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases.

**The Debtors' Businesses**

8.     The Newark Group, Inc. ("**The Newark Group**" or "**Company**"), along with its Non-Debtor Affiliates[2] (collectively, "**TNG Global**"), operates as an integrated global producer of 100% recycled paperboard and paperboard products with significant manufacturing and marketing operations in North America and Europe.  Jackson Drive Corp. ("**Jackson Drive**") is a New Jersey corporation and a wholly-owned subsidiary of The Newark Group, which owns the real estate that houses the Company's executive offices in Cranford, New Jersey.  Jackson Drive has no other material assets and its primary liability is a mortgage loan in the approximate amount of $2.2 million.  NP Cogen, Inc. ("**Cogen**"), a California corporation, is also a wholly-owned subsidiary of The Newark Group.  It owns and operates a cogeneration power plant located on the property of The Newark Group's paper mill in Los Angeles.  Cogen provides electricity solely to the Los Angeles mill.  The only material asset of Cogen is a generator with an assessed value of approximately $1.3 million.

9.     The Company is primarily a manufacturer of industrial converting grades of paperboard, core-board, and coated and uncoated folding carton board, and is among the largest producers of these grades in North America.  The Newark Group is also a major North American producer of tubes, cores and allied products, and, together with its non-debtor European subsidiaries, is a leading producer of laminated products and graphicboard in both North America and Europe.  In addition, The Newark Group collects, trades and processes recovered paper in North America and believes that it is among the six largest competitors in this industry.  The Newark Group supplies its products to the paper, packaging, stationery, book printing, construction, plastic film, furniture, and game industries.

10.     The Company owns or leases 40 active manufacturing and other facilities throughout the United States, including recovered paper plants, paperboard mills, and converting

---

[2]        Capitalized terms not herein defined will have the meaning ascribed to them in the Plan.

plants.[3]  It employs approximately 1920 employees, approximately 39% of whom are members of unions and are covered by sixteen (16) collective bargaining agreements.  The Non-Debtor Affiliates employ approximately 690 individuals in Canada and Europe, most of whom are covered by labor agreements.

11.      For the fiscal year that ended April 30, 2008, TNG Global recorded consolidated revenues of approximately $1 billion, resulting in a net loss of approximately $19.7 million.  The Newark Group generated approximately 78% of these revenues.  In fiscal year 2009, TNG Global's revenues decreased to approximately $808.7 million and its loss increased to approximately $166.7 million.  The Newark Group was responsible for approximately 77% of 2009 revenues.  In fiscal year 2010, TNG Global generated approximately $723 million in revenues, and experienced a net loss of approximately $32 million.  The Newark Group was responsible for approximately 76% of 2010 revenues.

**The Capital Structure**

12.      As of the Petition Date, the Company owed approximately $42.8 million (excluding approximately $785,000 in outstanding letters of credit) under its prepetition secured asset based credit facility dated as of March 9, 2007, as amended (the "**Prepetition ABL Credit Facility**").  The Prepetition ABL Credit Facility provides for up to $50 million of revolving credit, subject to a certain borrowing base formula and limitations.  All amounts owed under the Prepetition ABL Credit Facility are secured by (i) first priority liens on the Company's and Cogen's accounts, inventory and certain other personal property (the "**Prepetition ABL Priority Collateral**") and (ii) second priority liens on substantially all of the Company's and Cogen's other assets, except for real property.  As of the Petition Date, the Company was in default under the terms of the Prepetition ABL Credit Facility.  However, the Company has entered into a series of forbearance agreements with the Prepetition ABL Lenders and the Prepetition ABL

---

[3]      In addition to active facilities, the Debtors own seven facilities that were formerly operated as paper mill plants.

Administrative Agent and no action has been taken to accelerate the obligations due under the Prepetition ABL Credit Facility.

13.    In addition, as of the Petition Date, The Newark Group owed approximately $73.6 million under its prepetition secured term loan and credit-linked letter of credit facility dated as of March 9, 2007, as amended (the "**Prepetition CL Credit Facility**").  The Newark Group also had approximately $7.1 million in an issued but undrawn letter of credit under the Prepetition CL Credit Facility.[4]  All amounts owed under the Prepetition CL Credit Facility are secured by (i) first priority liens on a substantial portion of the Company's and Cogen's assets (excluding accounts receivable and inventory), including, but not limited to, certain real property and equipment, the capital stock of all domestic subsidiaries of The Newark Group that are at least 50% owned or controlled by The Newark Group, 65% of the capital stock of two foreign Non-Debtor Affiliates and a certain promissory note due from a Non-Debtor Affiliate and (ii) a second priority lien on the Prepetition ABL Priority Collateral.  As of the Petition Date, although the Company was in default under the terms of the Prepetition CL Credit Facility, no action has been taken to accelerate the obligations due under the Prepetition CL Credit Facility.

14.    The Newark Group also owes, as of the Petition Date, $175 million in principal and approximately $29.5 million in interest under certain 9-3/4 % senior unsecured subordinated notes that were issued pursuant to an indenture dated March 12, 2004 (the "**Prepetition 2014 Notes**").  The Prepetition 2014 Notes mature on March 12, 2014.  The Company has failed to make the semiannual interest payments on the notes since March 15, 2009.  Neither the holders of the notes nor the indenture trustee under the indenture have taken action to accelerate the obligations due under the Prepetition 2014 Notes.

15.    As of the Petition Date, in addition to the secured credit facilities and the Prepetition 2014 Notes, the Company's primary fixed liabilities include approximately $4.8 million owed to Frederick von Zuben ("**Von Zuben**") under the Von Zuben Subordinated

---

[4]    The letter of credit is collateralized by a $9.2 million deposit provided by the Prepetition CL Lenders.

Unsecured Note (the "**Von Zuben Subordinated Unsecured Note Claim**") and trade payables of approximately $57 million.  As noted in more detail below, the Debtors' proposed Plan (as defined below) contemplates that all trade and other General Unsecured Claims will "ride through" the Chapter 11 Cases and will be paid in full to the extent not paid prior to the Effective Date of the Plan.

## CHAPTER 11 CASES

16.     The Debtors commenced their Chapter 11 Cases to effectuate a restructuring of their balance sheets pursuant to a Joint Prepackaged Plan of Reorganization dated May 7, 2010 (the "**Plan**") which, as described in more detail below, has the support of each and every impaired class of claims and interests.

17.     Generally, the restructuring was necessitated by liquidity issues resulting from, among other factors, a significant decline in sales that is largely attributable to the dramatic downturn of the economy in late 2008 and 2009, higher costs for freight and energy, and a decrease in the value of the Debtors' waste paper inventories.  Although the Company's business has rebounded somewhat from the downturn in the economy, it still does not have the ability to meet its significant debt service obligations under the Prepetition 2014 Notes.

## THE PROPOSED PREPACKAGED PLAN

18.     Prior to the Petition Date, after more than a year of lengthy discussions and negotiations with various creditor constituencies and prospective lenders, and after considering various alternatives, the Company reached agreements on the terms of the Plan with, among others, holders of more than 80% in amount of the Prepetition 2014 Notes.

19.     In essence, the Plan provides for a balance sheet restructuring that will, among other things, eliminate and fully equitize all amounts due under the Prepetition 2014 Notes and result in the immediate reduction of the Company's annual cash interest costs by approximately

$13 million.  Furthermore, pursuant to a prepetition settlement between the Company and Von Zuben, the Plan provides for the partial payment, in a combination of cash and notes, of the Von Zuben Subordinated Unsecured Note Claim.  In addition, the Plan provides that former shareholders who currently own approximately 84% of the equity of the Company will receive 1.5% of the New Common Stock of the Reorganized Company plus warrants to acquire up to 15% of the New Common Stock of the Reorganized Company, subject to dilution as set forth in detail in the Plan.  Lastly, the Plan provides that The Newark Group Employee Stock Ownership Plan (the "**ESOP**"), which currently owns approximately 16% of  the equity of the Company, will receive 2% of the New Common Stock, subject to dilution as described in the Plan.

20.    Set forth below is a summary of the classification and treatment provisions of the Plan:[5]

- **Class 1:**  Priority Non-Tax Claims will be Unimpaired and paid in full;

- **Class 2:**  Other Secured Claims will be Unimpaired and paid in full;

- **Class 3:** Prepetition ABL Claims arising under the Company's Prepetition ABL Credit Facility will be paid in full in cash from the proceeds of the ABL DIP Facility which, in turn, will be paid by and replaced with the ABL Exit Facility on the Effective Date;

- **Class 4:** Prepetition CL Claims arising under the Company's Prepetition CL Credit Facility will be paid in full in cash from the proceeds of the ORIX DIP Facility, which, in turn, will be paid by and replaced with the ORIX Exit Facility on the Effective Date;

- **Class 5:** General Unsecured Claims against the Debtors will be Unimpaired and Reinstated and paid in full to the extent such Claims are not paid in the ordinary course of business prior to the Effective Date;

- **Class 6:** Prepetition Notes Claims, consisting of the Claims arising under the Prepetition 2014 Notes and the general unsecured claim of Robert H. Mullen in the approximate aggregate amount of $210,000, will be exchanged for their Pro Rata share of 96.5% of the New Common Stock of the Reorganized Company to be issued pursuant to the Plan;

- **Class 7:** The holder of the Von Zuben Subordinated Unsecured Note Claim in the approximate amount of $4.8 million will receive $250,000 in

---

[5]    This summary does not contain all relevant Plan provisions.  Reference is made to the Plan and Disclosure Statement, both of which were filed on the Petition Date, for a full and complete description of the Plan, including the treatment of all Claims and Interests under the Plan.

cash, two subordinated unsecured promissory notes in the aggregate principal amount of $1,350,000, and up to $15,000 in cash representing legal fees incurred by Von Zuben in connection with the negotiation of the treatment of his claims under the Plan;

- **Class 8:** Each holder of an Equity Interest (other than ESOP Interests) shall receive its Pro Rata share of 1.5% of the New Common Stock of the Reorganized Company to be issued pursuant to the Plan, plus five year Equity Warrants to purchase up to 15.0% of the fully diluted New Common Stock of the Reorganized Company; and

- **Class 9:** Each holder of an ESOP Interest arising out of the ESOP shall receive its Pro Rata share of 2% of the New Common Stock of the Reorganized Company to be issued pursuant to the Plan, and the ESOP, as amended by the ESOP Plan Amendments, will be assumed by the Reorganized Company.

21.    The Debtors commenced solicitation of the Plan and the accompanying Disclosure Statement (the "**Disclosure Statement**") on May 7, 2010.  The solicitation period ended on June 7, 2010 (the "**Voting Deadline**").

22.    As set forth in the Declaration of David M. Sharp of Kurtzman Carson Consultants LLC Regarding Mailing, Voting, and Tabulation of Ballots Accepting the Proposed Joint Prepackaged Plan of Reorganization of The Newark Group, Inc., *et al.* (the "**KCC Declaration**"), filed contemporaneously herewith, the Plan has been accepted by well in excess of the statutory thresholds of impaired claims and interests required by §§ 1126(c) and (d) of the Bankruptcy Code.  Specifically, the Class 6 Prepetition Notes Claims, the Class 7 Von Zuben Subordinated Unsecured Note Claim, the Class 8 Equity Interests, and the Class 9 ESOP Interests each voted to accept the Plan.

23.    In sum, other than holders of the Prepetition Notes Claims and the Von Zuben Subordinated Unsecured Note Claim in Classes 6 and 7, each class of which voted to accept the Plan, no other creditors are Impaired under the Plan.  Moreover, each of the two Impaired classes of equity interests has voted to accept the Plan.

24.    The Debtors anticipate funding these Chapter 11 Cases through two separate debtor-in-possession financing credit facilities (collectively, the "**DIP Facilities**").  Upon

approval of the DIP Facilities by the Court, the proceeds of one facility will repay in full and replace the Prepetition ABL Credit Facility and the proceeds of the other will repay in full and replace the Prepetition CL Credit Facility.  The proceeds of the DIP Facilities will also fund the ongoing operating expenses of the Debtors' businesses and the costs of these Chapter 11 Cases.

25.     The Debtors believe that consummation of the consensual financial restructuring transactions proposed under the Plan is necessary to provide the Debtors with a strong balance sheet and capital structure and the liquidity necessary to successfully operate in the future. Indeed, the Debtors believe that the prompt realization of the transactions outlined in the Plan will enable them to exit chapter 11 appropriately capitalized and competitively positioned for success and future growth.

26.     A more fully detailed description of the Debtors' businesses, the reasons for commencing these Chapter 11 Cases, and the relief sought from this Court to allow for a smooth transition into chapter 11 is set forth in the Declaration of Robert H. Mullen in Support of Chapter 11 Petitions and Various First Day Applications and Motions (the "**First Day Declaration**") filed contemporaneously herewith, and is incorporated by reference as though fully set forth herein.

## RELIEF REQUESTED

27.     The Debtors seek entry of an order (i) authorizing the Debtors to maintain their existing bank accounts and cash management system and continue to use existing business forms and records; (ii) waiving compliance with investment guidelines pursuant to 11 U.S.C. § 345(b); and (iii) providing the United States Trustee with a sixty (60) day period to object to said order before it becomes a final order.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the United States Trustee for the District of New Jersey that require the Debtors to close all of their prepetition bank accounts,

open new accounts designated as debtor-in-possession accounts and provide new business forms and statements.

## BASIS FOR RELIEF REQUESTED

28.     The United States Trustee has established certain operating guidelines (the "**Guidelines**") for debtors-in-possession in order to supervise the administration of Chapter 11 Cases.  These Guidelines require Chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor-in-possession bank accounts; (ii) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor-in-possession account for cash collateral; and (iv) obtain checks for all debtor-in-possession accounts that bear the designation "Debtor In Possession," the bankruptcy case number, and the type of account.

**Continued Use of the Existing Bank Accounts and a Waiver of**
**the U.S. Trustee's Bank Account Closing Requirements**

29.     The Debtors seek a waiver of the United States Trustee's requirement that the prepetition bank accounts be closed and that new post-petition bank accounts be opened.  The continued use of the existing bank accounts and a waiver of the bank account closing requirements are in the best interest of the Debtors' estates and their creditors.

30.     Prior to the commencement of these Chapter 11 Cases, in the ordinary course of their business, the Debtors maintained numerous bank accounts including, but not limited to, checking, savings, payroll, investment and operating accounts (the "**Bank Accounts**"), to collect, transfer, and disburse funds generated by its operations.

31.     The Debtors maintain twenty-one (21) Bank Accounts in nine (9) banks (each, a "**Bank**" and collectively, the "**Banks**").  A list of the Debtors' Bank Accounts is attached hereto as **Exhibit B**.

32.      Given the automated infrastructure and existing setup of the Bank Accounts, as described below, such requirements, if enforced in these cases, would cause disruption to the Debtors' businesses and would impair the Debtors' efforts to effectively reorganize their estates. Accordingly, in order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into and out of Chapter 11 as possible with minimal disruption, and to aid the Debtors' efforts to successfully and rapidly reorganize, it is important that the Debtors be permitted to maintain their existing Bank Accounts and, if necessary, open new accounts and/or close certain existing Bank Accounts where needed.

33.      Specifically, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that the Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

34.      In other cases of this size, it has been recognized that the strict enforcement of the bank account closing requirements does not serve the rehabilitative purposes of Chapter 11. Accordingly, these courts have waived the bank account closing requirements and replaced them with alternative procedures.  *See, e.g., In re Adamar of New Jersey, Inc.*, Case No. 09-20711 (JHW) (Bankr. D.N.J. May 1, 2009); *In re Tarragon Corporation*, Case No. 09-10555 (DHS) (Bankr. D.N.J. April 2, 2009); *In re TCI 2 Holdings LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J. February 19, 2009); *In re THCR/LP Corporation*, Case No. 04-46898 (JHW) (Bankr. D.N.J. November 20, 2004); *In re Pennsylvania Fashions, Inc.*, Case No. 02-31152 (Bankr. D.N.J. February 4, 2002); *In re The Grand Union Co.*, Case No. 98-27912 (NW) (Bankr. D.N.J. June 24, 1998); *In re NBO Stores, Inc.*, Case No. 95-20001 (RG) (Bankr. D.N.J. Jan. 5, 1995); *In re Emerson Radio Corp.*, Case Nos. 93-27874 (NW) through 93-27879 (NW) (Bankr. D.N.J. Sept. 30, 1993 through Oct. 1, 1993); *In re SHC, Inc.*, Case No. 03-12002 (MFW) (Bankr. D. Del. May 20, 2004); *In re SFMB Acquisition Corp.*, Case No. 03-11524 (PJW) (Bankr. D. Del.

May 20, 2003); *In re Alterra Healthcare Corp.*, Case No. 03-10254 (MFW) (Bankr. D. Del. Jan. 24, 2003).

**Continued Use of the Centralized Cash Management System,**

35.     Similarly, the Debtors' continued ordinary course use of their existing Cash Management System (as defined below) is in the best interest of the Debtors' estates and their creditors, and is consistent with § 363(c)(1) of the Bankruptcy Code, which allows a debtor in possession to "use property of the estate in the ordinary course of business."  11 U.S.C. § 363(c)(1).

36.     The Debtors utilize a highly automated and computerized cash management system (the "**Cash Management System**") which includes the necessary accounting controls to enable the Debtors to trace funds and ensure that all transactions are adequately documented and readily ascertainable.

37.     The Cash Management System was designed to meet the Debtors' operating needs – enabling the Debtors to centrally control and monitor corporate funds, ensure cash availability and liquidity, invest excess cash, comply with the requirements of its financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances and presentment information.  These controls are crucial given the significant volume of transactions managed through the Cash Management System each day.

38.     The procedures employed in the use of the Cash Management System constitute the Debtors' ordinary, usual and essential business practices, and are similar to those used by other corporate enterprises.  The Debtors will continue to maintain detailed records reflecting all movements of funds.

39.     The Cash Management System provides significant benefits to the Debtors, including the ability to (i) control corporate funds centrally, (ii) ensure availability of funds when

necessary, (iii) minimize outstanding amounts under the revolving credit agreement and the associated interest expense, and (iv) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

40.    The principal components of the Cash Management System and the flow of funds among the various Bank Accounts are as follows:

a.    <u>Concentration Account</u>.  The Debtors maintain an account at Wachovia Capital Finance, a Wells Fargo Company, (the "**<u>Wachovia Operating Account</u>**") which serves as the operating account for the Debtors and is the ultimate collection point for all funds that move in and out of the Cash Management System.  The Wachovia Operating Account also supplies cash, directly or indirectly, to all other Bank Accounts as necessary.  Funds are swept automatically from the Debtors to the Wachovia Operating Account daily and applied to outstanding amounts under the Prepetition ABL Credit Facility.  The Wachovia Operating Account will also be used to pay down amounts owed under the Debtors' proposed DIP Facilities.  The Wachovia Operating Account will remain in place in the post-Effective Date Cash Management System.

b.    <u>Deposit Account</u>.  The Debtors maintain one (1) Bank Account to collect receipts and deposits (the "**<u>Deposit Account</u>**").  The Deposit Account will remain in place in the post-Effective Date Cash Management System.

c.    <u>Disbursement Accounts</u>.    The Debtors maintain Bank Accounts with various financial institutions that make disbursements to the Debtors' various creditor constituencies (collectively, the "**<u>Disbursement Accounts</u>**").   The Debtors' current Cash Management System currently has eleven (11) Disbursement Accounts.  The Disbursement Accounts are funded by the Wachovia Operating Account.   All Disbursement Accounts have check-writing capabilities and will remain in place in the post-Effective Date Cash Management System.

i.    <u>Payroll Accounts</u>.   Many of the Disbursement Accounts disburse payments on account of payroll obligations owed to the Debtors' employees.

ii.    <u>Accounts Payable Account</u>.  The Debtors maintain a Bank Account at Wachovia Capital Finance, a Wells Fargo Company, to fund accounts payable.

iii.    <u>Healthcare Benefit Account</u>.  The Debtors maintain a Bank Account at Wachovia Capital Finance, a Wells Fargo Company, to fund disbursements for healthcare premiums.

iv.    <u>Scale Accounts</u>.  The Debtors maintain Bank Accounts with various financial institutions to pay small haulers and consumers for recycled goods that are brought to Debtors' recycling centers.

v.    <u>Workers' Compensation Account</u>.  The Debtors maintain a checking account at PNC Bank for payment of workers' compensation claims in the State of Ohio.

vi.    <u>ESOP Payment Account</u>.  The Debtors maintain a bank account at Wachovia Capital Finance, a Wells Fargo Company, to fund disbursements pursuant to the ESOP.

d.    <u>Foreign Currency Accounts</u>.  The Debtors maintain Bank Accounts with various financial institutions that make disbursements and collect receipts in Canadian Dollars and in Eurodollars ("**Foreign Currency Accounts**").  The Debtors contemplate that the Foreign Currency Accounts will remain in place in the post-Effective Date Cash Management System.

e.    <u>Jackson Drive Account</u>.  The Debtors maintain a bank account at Wachovia Capital Finance, a Wells Fargo Company, to pay interest and principal for a mortgage obligation ("**Jackson Drive Mortgage Account**").  The Debtors contemplate that the Jackson Drive Mortgage Account will remain in place in the post-Effective Date Cash Management System.

f.    <u>Other Accounts</u>.  The Debtors maintain Bank Accounts with various financial institutions for miscellaneous disbursements/receipts, for safekeeping, and for petty cash ("**Other Accounts**").  The Debtors contemplate that the Other Accounts will remain in place in the post-Effective Date Cash Management System.

41.    In sum, the Cash Management System allows the Debtors to effectively and efficiently run their business.  To maximize the value of their business, there must be minimal disruption to the Debtors' administrative affairs, and the maintenance of their current Cash

14

Management System, as provided herein, is essential to limiting disruptions to the Debtors'
operations.

42.     The Debtors submit that they will implement appropriate mechanisms to ensure
that no payments will be made on any debts incurred by them prior to the Petition Date, other
than those that are specifically authorized by this Court.  For example, concurrently with the
filing of this Motion, the Debtors are filing motions requesting authority to pay certain
prepetition obligations to employees, taxing authorities, vendors, customers and other key
constituencies in the ordinary course of business.

**Existing Business Forms and Records**

43.     In order to minimize expenses to the Debtors' estates, the Debtors also request
authorization to continue to use all correspondence, business forms (including, but not limited to,
letterhead, purchase orders and invoices) and bank check stock existing immediately prior to the
Petition Date, without adding a reference to the Debtors' status as debtors in possession.  *See In
re Gold Standard Baking, Inc.*, 179 B.R. 98, 105-106 (Bankr. N.D. Ill. 1995) (holding United
States Trustee's requirement of prohibiting issuance of checks without "debtor-in-possession"
designation to be unenforceable); *In re Johnson*, 106 B.R. 623, 624 (Bankr. D. Neb. 1989)
(debtors not always required to obtain new checks imprinted with "Debtor in Possession"
legend).  Indeed, courts have held that while the United States Trustee's office is granted
supervisory powers, Title 28 of the United States Code does not provide the U.S. Trustee with
any power to "impose substantive or administrative requirements on debtors."  *In re Young*, 205
B.R. 894, 897 (Bankr. W.D. Tenn. 1997).

44.     Changing correspondence and business forms would be expensive, unnecessary
and burdensome to the Debtors' estates and disruptive to the Debtors' business operations.  In
addition, such actions would not confer any benefit upon the Debtors, their estates, their creditors
or those dealing with the Debtors.

45.     For these reasons, the Debtors request that they be authorized to use existing checks and business forms without being required to place the label "Debtor in Possession" on each.

**The Intercompany Transactions**

46.     In the ordinary course of business, certain of the Debtors and their Non-Debtor Affiliates[6] maintain business relationships with each other, resulting in intercompany receivables and payables (the "**Intercompany Claims**").   In addition, the Debtors maintain business relationships with each other in the ordinary course of business, which also result in Intercompany Claims.   As such, in connection with the daily operation of the businesses, as funds flow through the Cash Management System, at any given time there may be Intercompany Claims between Debtors and Non-Debtor Affiliates, as well as Intercompany Claims between Debtors (collectively, the "**Intercompany Transactions**").[7]

47.     The Debtors maintain records of all Intercompany Transactions (including fund transfers) and, therefore, are able to ascertain, trace, and account for all Intercompany Transactions.   The Debtors intend to continue to maintain proper records of Intercompany Transactions in the post-petition period.   No Non-Debtor Affiliate bank accounts are integrated into the Debtors' Cash Management System.

---

[6]     The Newark Group's Non-Debtor Affiliates (and their jurisdiction of formation) are as follows: (1) Integrated Paper Recyclers LLC (Delaware); (2) Newark Paperboard Products, Ltd. (British Columbia, Canada); (3) Newark Group International B.V. (Netherlands); (4) Newark Group International, S.L. (Spain); (5) Newark Catalana, S.L. (Spain); (6) Newark Graphicboard Products Berlin GmbH (Germany); (7) Alcover Cogeneración, A.I.E. (Spain); (8) Derivados del Cartón, S.L. (Spain); (9) Servicárrega, S.L. (Spain); (10) Servicios y Mantenimientos de Papeleras, S.L. (Spain); (11) Newark San Andrés, S.L. (Spain); (12) Fibor Packaging B.V. (Netherlands); (13) Videcart, S.A. (Spain); (14) Atelier des Landes S.A. (France); (15) Paper, S.A. (Spain); (16) Newark Viersen GmbH (Germany); and (17) Newark Energie GmbH (Germany).

[7]     Because the Debtors engage in Intercompany Transactions on a regular basis and because such transactions are common among enterprises similar to the Debtors, the Debtors believe that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and thus, do not require the Court's approval.   Out of an abundance of caution, however, the Debtors are seeking express authority to continue to engage in the Intercompany Transactions post-petition.   The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors-in-possession.

48.     The continuation of the Intercompany Transactions is in the best interests of the Debtors and their creditors.  If the Intercompany Transactions were to be discontinued, the administrative controls provided by the Debtors' Cash Management System would be disrupted, to the detriment of the Debtors and their creditors.  Therefore, the Debtors seek express authority to continue to engage in the Intercompany Transactions post-petition, subject to the terms of the DIP Facility Credit Agreements and the Exit Facility Credit Agreements.

**Waiver of 11 U.S.C. § 345(b) Investment Guidelines**

49.     By this Motion, the Debtors also seek a waiver of the deposit/investment guidelines set forth in section 345(b) of the Bankruptcy Code.  Section 345 of the Bankruptcy Code governs a debtor's deposits and investments during a Chapter 11 case and authorizes deposits or investments of money "such as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) (1) of the Bankruptcy Code requires that the estate secure from the entity with which the money is deposited or invested a bond in favor of the United States, secured by the undertaking of an adequate corporate surety.  In the alternative, section 345(b)(2) states that the estate shall require the deposit of securities pursuant to 31 U.S.C. § 9303[8] from the entity with which the money is deposited or invested.  *See* 11 U.S.C. § 345(b).

50.     The Court has the discretion to extend or waive the investment guidelines requirement under section 345(b) of the Bankruptcy Code "for cause."  11 U.S.C. § 345(b); *see also* 140 Cong. Rec. H10752-01 (October 4, 1995) (stating that section 345(b) investment guidelines may be "wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, [but] can work to needlessly handcuff larger, more sophisticated

---

[8]     This statutory provision provides that where a person is required by law to give a surety bond, that person, in lieu of such surety bond, may provide a governmental obligation.  31 U.S.C. § 9303.

debtors."). Courts have held that, in determining whether "cause" exists for such a waiver, the court should consider the sophistication and size of the debtor's business, the bank ratings of the financial institution where the funds are held, the complexity of the debtor's bankruptcy case, and the reasonableness of the debtor's request for relief from Section 345 in light of the overall circumstances. *In re Service Merchandise Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999). *See also, e.g., In re TCI 2 Holdings LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J. February 19, 2009) (waiving the application of the deposit guidelines set forth in section 345 of the Bankruptcy Code).

51.     Under the existing circumstances, cause exists to authorize the Debtors to continue to deposit and invest cash in substantially the same manner as the Debtors have invested such funds prior to the Petition Date for several reasons. The Debtors do not maintain any investment accounts of significance. In light of the Debtors' sophisticated and complex Cash Management System, it would be unnecessary and wasteful for the Debtors to be forced to incur the expense of obtaining a bond. The Debtors' current practices provide sufficient protection for their cash and it would be in the estates' best interests for the Debtors to continue to follow these practices. Thus, requiring adherence to the strictures of Section 345(b) is unnecessary and would needlessly impede the administration of the Debtors' cases.

**60 Day Objection Period for U.S. Trustee**

52.     The Debtors propose that the United States Trustee (the "**UST**") shall have sixty (60) days from the date the Interim Order is signed to review the Debtors' Bank Accounts and to object to the relief granted pursuant to this Motion, if necessary.

53.     If the UST does not file a written objection within sixty (60) days from the date the Interim Order is signed, the Debtors shall be authorized to maintain and utilize the Cash Management System and Bank Accounts on a permanent basis. If the UST files a written objection within the sixty (60) day period, the Court will schedule the matter for a hearing. In such event, the Debtors shall be authorized to maintain the Cash Management System and Bank

Accounts, and shall be excused from opening debtor-in-possession accounts, pending further Order of the Court.

**Immediate Application**

54.     To the extent Bankruptcy Rule 6004(h) is applicable to this Motion, the Debtors also seek a waiver of the ten-day stay under Bankruptcy Rule 6004(h).

## **WAIVER OF MEMORANDUM OF LAW**

55.     Because the legal points and authorities upon which this Motion relies are incorporated herein and do not raise any novel issues of law, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law pursuant to Local Rule 9013-2 be deemed waived.

## **NOTICE**

56.     Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to:

a.     Creditors (or their counsel, if known) holding the twenty (20) largest unsecured claims against the Debtors, as set forth in the Debtors' bankruptcy petitions;

b.     Counsel to the Coalition of Prepetition Noteholders;

c.     Counsel to the ABL DIP Facility Administrative Agent;

d.     Counsel to the ABL Exit Facility Administrative Agent;

e.     Counsel to the ORIX DIP Facility Agent;

f.     Counsel to the ORIX Exit Facility Agent;

g.     Counsel to the Prepetition ABL Administrative Agent;

h.     Counsel to the Prepetition CL Administrative Agent;

i.     Counsel to the Prepetition Indenture Trustee

j.     Von Zuben and his counsel;

k.     The ESOP Trustees;

l.     The ESOP Independent Fiduciary and its counsel;

m. The Office of the United States Trustee for the District of New Jersey;

n. The Office of the United States Attorney for the District of New Jersey;

o. The Internal Revenue Service; and

p. Any entity that has filed a notice of appearance in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

57. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

**NO PRIOR REQUEST**

58. No prior request for the relief sought herein has been made by the Debtors to this or any other court.

**WHEREFORE,** the Debtors respectfully request that this Court: (a) enter an

Order, in the form submitted herewith, granting the relief requested herein; and (b) grant to the

Debtors such other and further relief as the Court may deem proper.

Dated:  June 9, 2010

**LOWENSTEIN SANDLER PC**

By:    */s/ Kenneth A. Rosen*
        Kenneth A. Rosen (KR 4963)
        Paul Kizel (PK 4176)
        Jeffrey D. Prol (JP 7454)
        Suzanne Iazzetta (SI 2116)
        65 Livingston Avenue
        Roseland, New Jersey 07068
        Telephone: (973) 597-2500
        Facsimile: (973) 597-2400

        Proposed Counsel to the Debtors and Debtors-in Possession