**The Newark Group, Inc., Jackson Drive Corp., and NP Cogen, Inc. (collectively, the "Debtors" or the "Company") are sending you this document (the "Disclosure Statement") and the accompanying materials (collectively, the "Solicitation Package") because you may be a creditor entitled to vote to approve the *Joint Prepackaged Plan of Reorganization of The Newark Group, Inc., et al.*, dated May 7, 2010, as the same may be amended from time to time as set forth therein (the "Plan"). The Company is commencing the solicitation of your vote to approve the Plan (the "Solicitation") before the Company files voluntary cases under chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code").**

**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT PREPACKAGED PLAN OF REORGANIZATION PRIOR TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE COMPANY EXPECTS TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING (a) THIS DISCLOSURE STATEMENT AS HAVING CONTAINED ADEQUATE INFORMATION AND (b) THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE AND (II) CONFIRMING THE JOINT PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN.**

---

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF THE NEWARK GROUP, INC., *ET AL*., DATED MAY 7, 2010**

---

**Dated: May 7, 2010**

**A COPY OF THE JOINT PREPACKAGED PLAN OF REORGANIZATION TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PREPACKAGED PLAN OF REORGANIZATION IS 5:00 P.M., PREVAILING EASTERN TIME, ON JUNE 7, 2010, UNLESS EXTENDED BY THE DEBTORS. TO BE COUNTED, THE BALLOT (OR MASTER BALLOT IN THE CASE OF BENEFICIAL HOLDERS OF CLAIMS VOTING THROUGH A NOMINEE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS, LLC, THE DEBTORS' VOTING AGENT, NO LATER THAN THE VOTING DEADLINE.**

# TABLE OF CONTENTS

                                                                                                    **PAGE**

ARTICLE I.      INTRODUCTION...................................................................................1

   A. PARTIES ENTITLED TO VOTE ON THE PLAN.............................................4

   B. SOLICITATION PACKAGE .............................................................................5

   C. VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE.........................5

   D. CONFIRMATION HEARING AND OBJECTIONS TO DISCLOSURE
      STATEMENT AND CONFIRMATION ...............................................................6

ARTICLE II.     OVERVIEW OF THE PLAN ....................................................................7

   A. GENERAL OVERVIEW ..................................................................................7

      1. The Allowed Prepetition Notes Claims ...................................................7
      2. The Allowed Prepetition ABL Claims .....................................................7
      3. The Allowed ABL DIP Claims................................................................8
      4. The Allowed Prepetition CL Claims........................................................8
      5. The Allowed Von Zuben Subordinated Unsecured Note Claim ...................8
      6. The Allowed Equity Interests .................................................................8
      7. The Allowed ESOP Interests ..................................................................8
      8. All Other Claims ..................................................................................9

   B. SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED
      CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE
      PLAN .........................................................................................................10

ARTICLE III.    GENERAL INFORMATION ...................................................................11

   A. OVERVIEW OF CHAPTER 11 ......................................................................11

   B. THE DEBTORS' BUSINESSES AND OPERATIONS...........................................12

      1. Products and Materials..........................................................................13
      2. Paperboard Segment .............................................................................14
      3. Converted Products Segment ..................................................................15
      4. International Segment ............................................................................15
      5. Raw Materials/Operating Costs ..............................................................15
      6. Employees...........................................................................................16
      7. Customers ...........................................................................................17

   C. MANAGEMENT OF THE NEWARK GROUP ...................................................17

      1. Board of Directors................................................................................17
      2. Executive Officers ...............................................................................17

   D. COMPENSATION AND BENEFITS PROGRAMS ...............................................18

   E. DEBT AND CAPITAL STRUCTURE OF THE COMPANY ...................................18

      1. Description of The Newark Group's Prepetition Debt Structure...................18

Table of Contents
(continued)

Page

**2.** Description of The Newark Group's Prepetition Interests ..........................24

F. EVENTS LEADING UP TO CHAPTER 11 .......................................................24

**1.** Reduced Sales Volume and Increased Costs ..........................................24
**2.** Attempts to Improve the Financial Outlook ..........................................25
**3.** Defaults and Forbearances under the Prepetition Credit Facilities............25
**4.** Default and Forbearance under the Prepetition Indenture ........................26
**5.** Consideration of Restructuring and Recapitalization Alternatives............27
**6.** The Plan Support Agreement .............................................................27
**7.** ESOP Settlement Agreement .............................................................35
**8.** The Von Zuben Settlement Agreement ................................................39

**ARTICLE IV.    EVENTS DURING THE ANTICIPATED CHAPTER 11 CASES............41**

A. FIRST DAY RELIEF ....................................................................................41

**1.** Joint Administration of Debtors' Chapter 11 Cases ...............................41

B. ADDITIONAL FIRST-DAY RELIEF..............................................................41

**1.** Approval of Disclosure Statement and Scheduling a Confirmation Hearing.............42
**2.** Post-Petition Financing....................................................................42
**3.** Assumption of the Plan Support Agreement ........................................43
**4.** Employee Compensation...................................................................43
**5.** Payment of Creditors in Ordinary Course of Business............................44
**6.** Cash Management............................................................................44
**7.** Taxes 44
**8.** Utilities.........................................................................................44
**9.** Schedules and Statements ................................................................45
**10.** Retention of Professionals ...............................................................45
**11.** Notice, Case Management, and Administrative Procedures......................46

**ARTICLE V.    THE PLAN OF REORGANIZATION ...........................................46**

A. GENERAL ..................................................................................................46

B. CLASSIFICATION AND ALLOWANCE OF CLAIMS & INTERESTS
GENERALLY .............................................................................................46

**1.** Classification and Allowance ............................................................46

C. PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE
CLAIMS, DIP FACILITY CLAIMS AND PRIORITY TAX CLAIMS.........................47

**1.** Administrative Expense Claims..........................................................47
**2.** DIP Facility Claims.........................................................................48
**3.** Priority Tax Claims.........................................................................49

D. NON-SUBSTANTIVE CONSOLIDATION AND INTERCOMPANY
CLAIMS ....................................................................................................49

Table of Contents
(continued)

Page

E.  CLASSIFICATION OF CLAIMS ............................................................50

F.  PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS.................51

   **1.**  Priority Non-Tax Claims (Class 1) ...............................................51
   **2.**  Other Secured Claims (Class 2) ...................................................51
   **3.**  Prepetition ABL Claims (Class 3) ................................................51
   **4.**  Prepetition CL Claims (Class 4) ..................................................52
   **5.**  General Unsecured Claims (Class 5) .............................................52
   **6.**  Prepetition Notes Claims (Class 6) ...............................................52
   **7.**  Von Zuben Subordinated Unsecured Note Claim (Class 7) .................53
   **8.**  Equity Interests (Class 8) ...........................................................53
   **9.**  ESOP Interests (Class 9) ............................................................54

G.  IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS THAT
   ARE IMPAIRED; ACCEPTANCE OR REJECTION OF THE PLAN ..........................55

   **1.**  Holders of Claims Entitled to Vote................................................55
   **2.**  Acceptance by an Impaired Class .................................................56
   **3.**  Nonconsensual Confirmation.......................................................56

H.  MEANS OF IMPLEMENTATION .........................................................56

   **1.**  Reorganized Company Securities .................................................56
   **2.**  Continued Corporate Existence; Reincorporation of The Newark Group;
      and Vesting of Assets in the Reorganized Debtors.............................58
   **3.**  Corporate Governance, Directors, Officers and Corporate Action............58
   **4.**  Termination of Liens..................................................................60
   **5.**  Exit Financing.........................................................................60
   **6.**  Intercreditor Agreement.............................................................62
   **7.**  Management Incentive Plan.........................................................62
   **8.**  Warrants.................................................................................63
   **9.**  Deferred Compensation Agreement ..............................................64
   **10.** Management Bonus...................................................................65
   **11.** Additional Transactions Authorized Under the Plan ..........................65
   **1.**  Distributions for Claims in Classes 6 and 7 and Interests in Classes 8 and 9..............66
   **2.**  Interest on Claims....................................................................66
   **3.**  Distributions by Disbursing Agent ...............................................66
   **4.**  Delivery of Distributions and Undeliverable or Unclaimed Distributions .................66
   **5.**  Record Date for Distributions......................................................67
   **6.**  Allocation of Plan Distributions between Principal and Interest................68
   **7.**  Means of Cash Payment.............................................................68
   **8.**  Sources of Cash for Plan Distributions...........................................69
   **9.**  Withholding and Reporting Requirements ......................................69
   **10.** Setoffs..................................................................................69
   **11.** Fractional Shares.....................................................................69
   **12.** Exemption for Securities Law .....................................................70

Table of Contents
(continued)

Page

**13.** Preservation of Rights of Action.................................................................70

J. TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES
AND PENSION PLANS .............................................................................70

   **1.** General Treatment ...............................................................................70
   **2.** Cure of Defaults..................................................................................71
   **3.** Post-Petition Contracts and Leases....................................................71
   **4.** Savings and Pension Plans .................................................................71
   **5.** Compensation and Benefit Programs .................................................72
   **6.** Rejection Claims .................................................................................72

K. PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND
DISPUTED INTERESTS.............................................................................72

   **1.** Resolution of Disputed Claims ..........................................................72
   **2.** Objections to and Estimation of Claims ............................................73
   **3.** Preservation of Rights to Settle Claims .............................................73
   **4.** No Distributions Pending Allowance .................................................73
   **5.** Distributions on Account of Disputed Claims Once they are Allowed.....73
   **6.** Reinstated Claims ...............................................................................74

L. CONFIRMATION AND CONSUMMATION OF THE PLAN ...................74

   **1.** Conditions to Confirmation ...............................................................74
   **2.** Conditions to Effective Date...............................................................74
   **3.** Waiver of Conditions..........................................................................75
   **4.** Effect of Non-Occurrence of Conditions to Effective Date................76

M. EFFECT OF PLAN CONFIRMATION ......................................................76

   **1.** Binding Effect.....................................................................................76
   **2.** Exculpations and Releases..................................................................76
   **3.** Injunction ............................................................................................79
   **4.** Term of Bankruptcy Injunction or Stays ...........................................80

N. MISCELLANEOUS PLAN PROVISIONS .................................................80

   **1.** Surrender of Instruments.....................................................................80
   **2.** Post-Confirmation Date Retention of Professionals ...........................81
   **3.** Bar Date for Certain Administrative Expense Claims.........................81
   **4.** Effectuating Documents and Further Transactions.............................81
   **5.** Corporate Action.................................................................................81
   **6.** Exemption from Transfer Taxes .........................................................82
   **7.** Payment of Statutory Fees .................................................................82
   **8.** Amendment or Modification of the Plan ............................................82
   **9.** Severability of Plan Provisions...........................................................83
   **10.** Successors and Assigns.......................................................................83
   **11.** Revocation, Withdrawal or Non-Consummation of the Plan .............83
   **12.** Notice83

Table of Contents
(continued)

**13.** Governing Law ......................................................................................84
**14.** Tax Reporting and Compliance .................................................................84
**15.** Exhibits ....................................................................................................84
**16.** Filing of Additional Documents ................................................................84
**17.** Reservation of Rights................................................................................84

**ARTICLE VI.    VOTING PROCEDURES AND REQUIREMENTS ...................................85**

A. VOTING RECORD DATE................................................................................85

B. HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ............................85

C. VOTING DEADLINE......................................................................................86

D. BALLOT MAILING ADDRESSES ....................................................................87

    **1.** FOR HOLDERS OF THE FOLLOWING CLAIMS AND INTERESTS:.................87
    **2.** FOR HOLDERS OF CLAIMS IN CLASS 6 ARISING UNDER THE
        PREPETITION 2014 NOTES ONLY: .....................................................87
    **3.** FOR HOLDERS OF CLAIMS IN CLASS 9 ARISING OUT OF ESOP
        ALLOCATED SHARES ONLY: .............................................................88

E. VOTING PROCEDURES ................................................................................88

    **1.** Ballots ...........................................................................................88
    **2.** Agreements upon Furnishing Ballots.................................................89
    **3.** Withdrawal or Change of Votes on the Plan ......................................89

F. SPECIAL VOTING INSTRUCTIONS FOR HOLDERS OF PREPETITION
    NOTES CLAIMS ..........................................................................................89

    **1.** Prepetition 2014 Notes - Beneficial Owners ......................................89
    **2.** Prepetition 2014 Notes - Nominees ...................................................90
    **2.** Mullen Note ....................................................................................91
    **3.** DTC Securities Clearing Agency.......................................................91
    **4.** Miscellaneous .................................................................................91

G. SPECIAL VOTING INSTRUCTIONS FOR HOLDERS OF ESOP
    INTERESTS .................................................................................................92

    **1.** Voting Instructions for ESOP Beneficiaries ......................................92
    **2.** Voting Instructions for ESOP Distributees.........................................93

H. FIDUCIARIES AND OTHER REPRESENTATIVES................................................94

I. WAIVERS OF DEFECTS, IRREGULARITIES, ETC. ..............................................94

J. DELIVERY OF EXTINGUISHED SECURITIES.....................................................94

K. FURTHER INFORMATION; ADDITIONAL COPIES .............................................95

L. VOTE REQUIRED FOR ACCEPTANCE BY A CLASS ...........................................95

    **1.** Class of Claims ...............................................................................95

Table of Contents
(continued)

Page

**2.** Class of Interests ................................................................95

**ARTICLE VII. CONFIRMATION OF THE PLAN** .................................................**95**

A. CONFIRMATION HEARING ..............................................95

B. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ................96

    **1.** Acceptance by All Impaired Classes ..............................96
    **2.** Fair and Equitable Test ................................................96
    **3.** Feasibility ....................................................................97
    **4.** Best Interests Test and Liquidation Analysis .................98

**ARTICLE VIII. PROJECTED FINANCIAL INFORMATION AND**
              **REORGANIZATION VALUE** ................................................**99**

A. PROJECTED FINANCIAL INFORMATION ........................99

B. REORGANIZED DEBTORS' ENTERPRISE VALUE ...................100

    **1.** Valuation Overview ..................................................100
    **2.** Valuation Methodologies ..........................................102
    **3.** Valuation Considerations ..........................................103

**ARTICLE IX. DESCRIPTION OF CAPITAL STOCK OF THE**
              **REORGANIZED COMPANY** ..............................................**104**

A. NEW COMMON STOCK ....................................................104

B. WARRANTS ......................................................................104

C. MANAGEMENT INCENTIVE PLAN ..................................104

**ARTICLE X. RISK FACTORS** ..............................................................**105**

A. GENERAL BANKRUPTCY LAW CONSIDERATIONS ..........................106

    **1.** Failure to Obtain Confirmation of the Plan May Result in Liquidation or Confirmation of an Alternative Plan on Less Favorable Terms. ..............................106
    **2.** Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms. ..............................106

B. OTHER RISK FACTORS ....................................................107

    **1.** Variances from Projections May Affect Ability to Pay Obligations. ..............107
    **2.** Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations. ....................................................................108
    **3.** Uncertainty Regarding DIP and Exit Facility Credit Agreements May Adversely Affect Success of Reorganization. ..............108
    **4.** Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect. ....................................................................108
    **5.** Historical Financial Information May Not Be Comparable. ..............109

Table of Contents
(continued)

Page

   **6.** Market and Business Risks May Adversely Affect Business Performance. .............109

   **7.** Cycles, Conditions and Problems Inherent in the Debtors' Industry May
      Adversely Affect Financial Results. ........................................................................110

   **8.** Future Increases in Raw Material and Other Operating Costs May
      Adversely Affect Financial Results. ........................................................................110

   **9.** Rising Energy Costs May Adversely Affect Financial Results. ................................110

  **10.** Cost of Compliance with Government Regulation, Including
      Environmental Laws, May Adversely Affect Financial Results. ..............................111

  **11.** Price Fluctuations and Volatility in the Debtors' Highly Competitive
      Industry May Adversely Affect Financial Results........................................................112

  **12.** The Debtors May Encounter Difficulties Restructuring Operations or
      Closing or Disposing of Facilities..............................................................................112

  **13.** Revenue and Operating Results would be Adversely Affected if
      Operations at the Fitchburg Paperboard Mill Were to Be Reduced. .........................112

  **14.** The Debtors' Revenues and Earnings Could be Adversely Affected by
      Foreign Regulations and Changes in Economic Conditions in the Foreign
      Countries in Which the Debtors Operate their Business. ..........................................113

  **15.** Terrorist Attacks/Other Military Disruptions ...........................................................113

  **16.** Some of The Debtors' Business is Seasonal and Weather Conditions
      Could Have an Adverse Effect on Revenues and Operating Results. .......................114

  **17.** If Negotiations For Renewals of The Debtors' Various Labor Agreements
      Are Not Successful, The Debtors' Operations Could Be Subject to
      Interruptions, Which Would Adversely Affect their Results of Operations
      and Cash Flows. ........................................................................................................114

 C. RISKS TO CREDITORS AND INTEREST HOLDERS WHO WILL
    RECEIVE SECURITIES............................................................................................114

   **1.** Lack of Established Market for the Securities May Adversely Affect
      Liquidity....................................................................................................................115

   **2.** Significant Contractual Transfer Restrictions...........................................................115

   **3.** Lack of Dividends on Securities May Adversely Affect Liquidity. ..........................115

**ARTICLE XI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
           THE PLAN ....................................................................................................115**

 A. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS .........................116

   **1.** Bankruptcy Exclusion for Cancellation of Indebtedness Income and Tax
      Attribute Reduction...................................................................................................117

   **2.** Deferral Election for COD Income under IRC Section 108(i) ..................................118

   **3.** Annual IRC Section 382 Limitation on Use of NOLs..............................................119

   **4.** Accrued Interest.......................................................................................................120

   **5.** Federal Alternative Minimum Tax ...........................................................................120

   **6.** Federal Income Tax Consequences to The Newark Group from the
      Exchange of New Common Stock for the Prepetition Notes ....................................120

Table of Contents
(continued)

Page

**7.** Federal Income Tax Consequences to The Newark Group from the Exchange of the Von Zuben New Subordinated Notes for the Von Zuben Subordinated Unsecured Note ..................................................................121

B. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF PREPETITION NOTES.................................................................................121

   **1.** General Tax Considerations for Holders of Prepetition Notes ...................121
   **2.** Federal Income Tax Consequences if the Exchange Qualifies as a "Recapitalization"...............................................................................122
   **3.** Federal Income Tax Consequences if the Exchange Does Not Qualify as a "Recapitalization"...............................................................................123
   **4.** Non-U.S. Persons.................................................................................123

C. FEDERAL INCOME TAX CONSEQUENCES OF OWNERSHIP AND DISPOSITION OF NEW COMMON STOCK................................................124

D. FEDERAL INCOME TAX CONSEQUENCES TO HOLDER OF VON ZUBEN SUBORDINATED UNSECURED NOTE .........................................124

E. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF OUTSTANDING COMMON STOCK INTERESTS.....................................125

   **1.** General Tax Considerations for Holders of Interests .............................125
   **2.** Federal Income Tax Consequences Associated with Warrants .................126

F. INFORMATION REPORTING AND BACKUP WITHHOLDING ..............127

G. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ADVICE .........127

**ARTICLE XII.  CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS .................................................127**

A. EXEMPTION FROM REGISTRATION REQUIREMENTS FOR NEW SECURITIES ...........................................................................................127

B. SUBSEQUENT TRANSFERS OF NEW SECURITIES.............................128

**ARTICLE XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................................129**

A. CONTINUATION OF THE CHAPTER 11 CASES .....................................129

B. LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 ..........................129

**ARTICLE XIV. CONCLUSION AND RECOMMENDATION ...........................130**

## EXHIBITS

**Exhibit A**    **Plan**

**Exhibit B**    **Plan Support Agreement**

**Exhibit C**    **ABL DIP Facility Credit Agreement**

**Exhibit D**    **ABL Exit Facility Credit Agreement**

**Exhibit E**    **Von Zuben New Subordinated Notes**

**Exhibit F**    **Reorganized Company Stockholders' Agreement**

**Exhibit G**    **Orix Exit Facility Credit Agreement**

**Exhibit H**    **ESOP Settlement Agreement**

**Exhibit I**    **Orix DIP Facility Term Sheet**

**Exhibit J**    **Certificate of Incorporation**

**Exhibit K**    **By-Laws**

**Exhibit L**    **Terms of Management Compensation and Employment for Reorganized The Newark Group, Inc.**

**Exhibit M**    **Intercreditor Agreement**

**Exhibit N**    **Warrant Agreement**

**Exhibit O**    **Deferred Compensation Agreement**

**Exhibit P**    **Projections**

**Exhibit Q**    **Liquidation Analysis**

# ARTICLE I.  INTRODUCTION

The Newark Group, Inc. ("**The Newark Group**"), Jackson Drive Corp. ("**Jackson**"), and NP Cogen, Inc. ("**Cogen**") (collectively, the "**Company**" or the "**Debtors**") submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Joint Prepackaged Plan of Reorganization for The Newark Group, Inc., *et al.* dated May 7, 2010, as the same may be amended from time to time (the "**Plan**").  The Plan is being proposed by the Debtors and is anticipated to be filed with the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") after the solicitation of votes with respect to the Plan.  A copy of the Plan is annexed as Exhibit A to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that are expected to occur during the Chapter 11 Cases, and the anticipated organization, operations, and liquidity of the Debtors upon successful emergence from chapter 11 (as the "**Reorganized Debtors**").  This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, the Debtors' financial forecasts, and other related matters.  FOR COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES THERETO IN THEIR ENTIRETY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

**THE DEBTORS HAVE NOT COMMENCED ANY BANKRUPTCY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.   THE DEBTORS EXPECT TO FILE THEIR BANKRUPTCY CASES AFTER THEY SOLICIT THE VOTES OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS PURSUANT TO THIS DISCLOSURE STATEMENT.**

**UNDER THE PLAN, "GENERAL UNSECURED CLAIMS" (AS DEFINED IN THE PLAN) WILL NOT BE AFFECTED BY THE BANKRUPTCY CASES AND, SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT, ARE ANTICIPATED TO BE PAID IN FULL IN THE ORDINARY COURSE OF BUSINESS DURING THE**

**PENDENCY OF THESE BANKRUPTCY CASES OR THEREAFTER IN ACCORDANCE WITH THEIR TERMS.**

BECAUSE NO BANKRUPTCY CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY BANKRUPTCY COURT WITH RESPECT TO WHETHER IT CONTAINS ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. NONETHELESS, IF THE CHAPTER 11 CASES ARE SUBSEQUENTLY COMMENCED, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THIS DISCLOSURE STATEMENT WAS IN COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE.

Subject to applicable law, the Debtors, with the consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, may supplement or amend this Disclosure Statement or any Exhibits attached hereto at any time prior to the hearing to approve the Disclosure Statement.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. UNLESS OTHERWISE STATED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF JANUARY 31, 2010, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THAT DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF

THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1125(a) AND 1126(b) OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("**SEC**") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS THAT THE DEBTORS HAVE AUTHORIZED TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.   IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  THE DEBTORS HAVE NO OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT, IN CONSULTATION WITH THEIR PROFESSIONAL FINANCIAL ADVISORS, PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT.   WHILE THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL.   THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.   SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.   FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.   THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

A.    **PARTIES ENTITLED TO VOTE ON THE PLAN**

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote.  Creditors or equity interest holders whose claims or interests are impaired by a plan, but who will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.  For a discussion of these matters, see Article VI, "Voting Procedures and Requirements" and Article VII, "Confirmation of the Plan" in this Disclosure Statement.

The following sets forth which Classes are entitled to vote on the Plan and which Classes are not entitled to vote on the Plan:

- The Debtors are seeking votes from the Holders of Claims in Class 6 and Class 7, and Interests in Class 8 and Class 9.

- The Debtors are not seeking votes from Holders of Claims in Classes 1, 2, 3, 4, and 5 because those Claims are Unimpaired under the Plan, and the Holders of Claims in each of these Classes are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article V, sections B through F herein.

**B.    SOLICITATION PACKAGE**

Accompanying this Disclosure Statement is a package of hard copy materials called the "**Solicitation Package**."  The Solicitation Package contains copies of:

- this Disclosure Statement

- the Plan, which is attached to this Disclosure Statement as <u>Exhibit A</u>;

- an opinion letter from the ESOP Independent Fiduciary and an opinion letter from the financial advisor to the ESOP Independent Fiduciary (only provided to ESOP Beneficiaries in Class 9)

- one or more Ballots, if applicable, including instructions describing where and when to submit your Ballot if you are entitled to vote to accept or reject the Plan, and a postage-paid return envelope, which will be used by Holders of Claims and Interests that are entitled to vote on the Plan (only provided to Holders of Claims and Interests that are entitled to vote on the Plan).

**C.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE**

If you have received a Ballot and are entitled to vote on the Plan, after carefully reviewing the materials supplied to you in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan on the Ballot by voting in favor of or against the Plan.  For your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided.  Copies, faxes, or e-mails will not be accepted as votes.  Each Ballot has been coded to reflect the Class of Claims or Interests it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

For your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and <u>received</u> by the Voting Agent no later than 5:00 P.M., prevailing Eastern Time on June 7, 2010 (the "**Voting Deadline**").  Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors with the consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, and the ORIX Exit Facility Agent, which consent shall

not be unreasonably withheld.  Do not return any debt instruments or equity securities with your Ballot.

Any executed Ballot that does not indicate either an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, will not be counted.

If you are a Holder of a Claim or Interest that is entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact Kurtzman Carson Consultants, LLC, the Voting Agent, by e-mail at KCC_TheNewarkGroup@kccllc.com or by phone at 310-751-2698 or 866-967-0498.

If you have any questions about the procedure for voting your Claim(s) or Interest(s), the packet of materials that you have received, or the amount of your Claim, or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its appendices and Exhibits, please contact the Voting Agent, Kurtzman Carson Consultants, LLC by e-mail at KCC_TheNewarkGroup@kccllc.com or by phone at 310-751-2698 or 866-967-0498.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VI, "VOTING PROCEDURES AND REQUIREMENTS" HEREIN.

Before voting on the Plan, each Holder of a Claim or Interest in a Class that is entitled to vote on the Plan should read, in their entirety, this Disclosure Statement and the Plan, along with the instructions accompanying the Ballots.  These documents contain important information concerning how Claims and Interests are classified for voting purposes and how votes will be tabulated.

D.    **CONFIRMATION HEARING AND OBJECTIONS TO DISCLOSURE STATEMENT AND CONFIRMATION**

After the Chapter 11 Cases are filed, the Debtors will request the Bankruptcy Court to schedule the Confirmation Hearing, at which time the Debtors will seek orders: (i) determining that the Disclosure Statement was prepared in accordance with applicable law and that the solicitation process was conducted in accordance with applicable law; and (ii) confirming the Plan.  Notice of the Confirmation Hearing will be provided to Holders of Claims and Interests after the date of the Confirmation Hearing is fixed.  The Confirmation Hearing may be adjourned or continued from time to time by the Debtors in consultation with the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent or by the Bankruptcy Court, without further notice except for the announcement of adjournment at the Confirmation Hearing or at any subsequent hearing.  Holders of Claims and Interests will be provided with an opportunity to object to the adequacy of the Disclosure Statement and solicitation process and to confirmation of the Plan by filing and serving objections in accordance with a schedule to be determined by the Bankruptcy Court.

## ARTICLE II.            OVERVIEW OF THE PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. For a more detailed description of the terms and provisions of the Plan, see Article V, "The Plan of Reorganization" herein. The Debtors, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 with the consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent.

## A.    **GENERAL OVERVIEW**

The primary purpose of the Plan is the restructuring of the Company's capital structure in order to better align it with the Company's present and future operating prospects.

The Plan is based primarily upon a prepetition compromise and Plan Support Agreement between ORIX Finance Corp. ("**ORIX**") for itself; certain of the Prepetition Noteholders (each of the certain Prepetition Noteholders a "**Plan Support Party**," and collectively, the "**Plan Support Parties**"); The Newark Group; each of the domestic subsidiaries of The Newark Group (the "**TNG Subsidiaries**"); and certain Equity Interest Holders party thereto (the "**Plan Support Shareholders**"). Specifically, on May 7, 2010, ORIX, the Plan Support Parties, The Newark Group, the TNG Subsidiaries, and the Plan Support Shareholders entered into the Plan Support Agreement, in substantially the form as attached hereto as Exhibit B, pursuant to which ORIX, the Plan Support Parties, and the Plan Support Shareholders agreed, subject to the terms and conditions contained in the Plan Support Agreement, to support the proposed financial restructuring described in the Plan. The Plan Support Agreement attached hereto as Exhibit B does not separately include exhibits A or B to the Plan Support Agreement, or the signature pages. Exhibits A and B to the Plan Support Agreement are the Plan and this Disclosure Statement, respectively.

At its core, the Plan provides for the following treatment of Claims and Interests:

### 1.    The Allowed Prepetition Notes Claims

The Allowed Prepetition Notes Claims, including the Prepetition 2014 Notes and the Mullen Note, will be exchanged for 96.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Equity Warrants and the Management Warrants.

### 2.    The Allowed Prepetition ABL Claims

The Allowed Prepetition ABL Claims will either be paid in full (or assigned to the ABL DIP Facility Lenders) on the day the ABL DIP Facility closes, or as soon thereafter as is practicable, from the proceeds of the ABL DIP Facility or otherwise. The terms and conditions of the ABL DIP Facility are set forth in that certain Amended and Restated Loan and Security Agreement by and among the ABL DIP Facility Lenders, the ABL DIP Facility Administrative

Agent and The Newark Group (the "**ABL DIP Facility Credit Agreement**"), substantially in the form attached hereto as Exhibit C.

3.      **The Allowed ABL DIP Claims**

The Allowed ABL DIP Facility Claims will either be paid in full on the Effective Date from the proceeds of the ABL Exit Facility or otherwise, or receive such treatment as to which the Holders of any ABL DIP Facility Claims shall have agreed upon in writing.  The terms and conditions of the ABL Exit Facility are set forth in that certain Second Amended and Restated Loan and Security Agreement, dated as of the Effective Date, by and among The Newark Group, Newark Group International, B.V. ("**NGI**"), and certain domestic subsidiaries of The Newark Group as borrowers, certain other domestic subsidiaries as guarantors, and the ABL Exit Facility Administrative Agent (the "**ABL Exit Facility Credit Agreement**"), substantially in the form attached hereto as Exhibit D.

4.      **The Allowed Prepetition CL Claims**

The Allowed Prepetition CL Claims will either be paid in full from the proceeds of the ORIX DIP Facility or otherwise on the day the ORIX DIP Facility closes, or receive such treatment as to which each Holder of an Allowed Prepetition CL Claim shall have agreed upon in writing (in accordance with the terms of the ORIX DIP Facility), including, without limitation, a release and discharge of each Holder of an Allowed Prepetition CL Claim.

5.      **The Allowed Von Zuben Subordinated Unsecured Note Claim**

The Holder of the Von Zuben Subordinated Unsecured Note Claim shall be entitled to receive a Cash payment of $250,000 payable not later than three (3) Business Days after the Effective Date, plus the Von Zuben New Subordinated Notes in the principal amounts of $800,000 and $550,000, substantially in the forms attached hereto as Exhibit E.

6.      **The Allowed Equity Interests**

Each Holder of an Equity Interest shall receive its Pro Rata Share of (x) 1.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Equity Warrants and the Management Warrants, and (y) five-year Equity Warrants to purchase 15% of the New Common Stock to be issued on the Effective Date (calculated by including the aggregate number of shares issuable upon exercise of the Equity Warrants, but not including the shares issuable upon exercise of the Management Warrants), subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Management Warrants, at a price based on an equity value of $157.5 million in consideration of the cancellation of shares of its Equity Interests.

7.      **The Allowed ESOP Interests**

On the Effective Date, (i) each Holder of an ESOP Interest, including the ESOP and all ESOP Participants, shall have its ESOP Shares cancelled, annulled and extinguished; (ii) in full satisfaction, settlement, release, and discharge of and in exchange for the cancelled ESOP Shares, the ESOP, as amended by the ESOP Plan Amendments, shall be assumed by the

Reorganized Debtors, and the Reorganized Debtor shall continue to perform its obligations under the ESOP as amended by the ESOP Plan Amendments; (iii) the ESOP Participants shall receive their Pro Rata share of 2% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants; provided, however, that the New Common Stock to be issued on account of the ESOP Allocated Shares shall be distributed to the ESOP and allocated to the accounts of the ESOP Beneficiaries on a Pro Rata basis, and each Holder of a Class 9 Interest (other than the ESOP) will be required, as a condition to such Holder's receipt of New Common Stock, to execute a counterpart of the Reorganized Company Stockholders' Agreement; and (iv) to the extent that (a) with respect to an ESOP Beneficiary's ESOP Allocated Shares, the ESOP Beneficiary instructs the ESOP Independent Fiduciary to direct the ESOP Trustees to vote such shares in favor of the Plan, and (b) with respect to an ESOP Distributee's ESOP Distributed Shares, the ESOP Distributee votes such shares in favor of the Plan, such ESOP Beneficiary and ESOP Distributee will unconditionally cancel, waive and release any current or potential claims and interests that it holds, or that could be brought on its behalf by the ESOP or any fiduciary of the ESOP, against the Company and any present or former fiduciaries or administrators of the ESOP (as determined immediately prior to the Effective Date) relating to the ESOP with respect to any and all ESOP Interests, including as described in Section 10.2 of the Plan, in each case as permitted by the Code, the Bankruptcy Code and ERISA.

## 8.    **All Other Claims**

All other Claims will be Unimpaired. All General Unsecured Claims, including all valid Claims of trade creditors, will be paid in full in the ordinary course of business.

The Company believes that consummation of the recapitalization and financial restructuring transactions proposed under the Plan will provide the Company with the capital structure and liquidity necessary to continue operating as a going concern as a result of, among other things: (a) the reduction of the Company's total prepetition funded debt by approximately $ $206.3 million (including interest through March 30, 2010); (b) significant reductions in ongoing interest expense which will improve cash flow; and (c) the resolution of contractual defaults under its prepetition credit agreements, as further described herein. Indeed, the Company believes that the realization of these transactions on the terms outlined herein will enable the Company to exit chapter 11 appropriately capitalized and competitively positioned for future growth.

In connection with developing the Plan, the Company conducted a careful review of its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries of Holders of Allowed Claims and Interests in a liquidation scenario. As a result, the Company concluded that the recovery for Holders of Allowed Claims and Interests would be maximized by continuing to operate as a going concern. The Company believes that its business and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis described herein and other analyses prepared by the Company and its advisors, the value of the Company's assets would be considerably greater if the Company operates as a going concern as opposed to liquidating. Moreover, the Company believes that any alternative to Confirmation of the Plan, such as an out-of-court restructuring, liquidation or attempts by another party-in-

interest to file a plan of reorganization, would result in significant delays, litigation, execution risk and/or additional costs and, ultimately, would lower the recoveries for Holders of Allowed Claims and Interests. Accordingly, the Company strongly recommends that you vote to accept the Plan, if you are entitled to vote.

The Reorganized Company will issue the following equity securities pursuant to the terms and conditions set forth in Section V of the Plan (and as described in greater detail in Article V herein):

> New Common Stock;

> Management Warrants; and

> Equity Warrants.

**As a condition precedent to holding any newly issued equity security, each Holder thereof, except Holders of New Common Stock received on account of ESOP Interests that do not arise from, under, or relate to ESOP Distributed Shares, shall be required to enter into, or shall be deemed to have entered into, the Reorganized Company Stockholders' Agreement, in substantially the form attached hereto as <u>Exhibit F</u>. The Reorganized Company Stockholders' Agreement shall contain provisions governing the rights of Holders of the New Common Stock including, without limitation, access to information, certain transfer restrictions such as drag-along and tag-along rights and limits on the number of record Holders.**

## B.    SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN

The following chart summarizes the projected distributions to Holders of Allowed Claims against and Interests in the Debtors that were classified under the Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only estimates. The final amounts of Claims or Interests allowed by the Bankruptcy Court may vary from the estimates in this Disclosure Statement. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends, among other things, upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in the Debtors.

**Summary of Treatment of Allowed Claims and Interests**

| Class | Claim/Interest | Treatment | Estimated Allowed Amount (as of March 31, 2010) | Estimated Recovery[1] | Entitled to Vote |
|---|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | To Be Determined | 100% | No (deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | $2.2 million | 100% | No (deemed to accept) |
| Class 3 | Prepetition ABL Claims | Unimpaired | $39.9 million | 100% | No (deemed to accept) |
| Class 4 | Prepetition CL Claims | Unimpaired | $83.4 million | 100% | No (deemed to accept) |
| Class 5 | General Unsecured Claims | Unimpaired | $81.9 million | 100% | No (deemed to accept) |
| Class 6 | Prepetition Notes Claims | Impaired | $201.5 million | 75.4% | Yes |
| Class 7 | Von Zuben Subordinated Unsecured Note Claim | Impaired | $4.8 million | 33.3% | Yes |
| Class 8 | Equity Interests | Impaired | N/A | $2.4 million | Yes |
| Class 9 | ESOP Interests | Impaired | N/A | $3.1 million | Yes |

## ARTICLE III.        GENERAL INFORMATION

### A.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity security holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly-situated creditors and equity interest holders with respect to the distribution of a debtor's assets. In furtherance of these two goals, section 362 of the Bankruptcy Code generally provides for an automatic stay of substantially all acts and proceedings against a debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's chapter 11 case upon the filing of a petition for relief under chapter 11.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding, subject to the occurrence of the Effective Date, upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any

---

[1] The Estimated Recovery amounts shown for Classes 6, 8, and 9 are based upon the midpoint of the valuation of the equity of the Reorganized Company as described in Article VIII(B)(1) of this Disclosure Statement.

creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

The Bankruptcy Code authorizes a debtor to solicit votes for the acceptance of a plan of reorganization prior to the filing by the debtor of a chapter 11 case.  Certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require a plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.  The Debtors are submitting this Disclosure Statement to, and soliciting votes from, Holders of Impaired Allowed Claims and Interests against them in order to satisfy the requirements of sections 1125(a) and 1126(b) of the Bankruptcy Code.

Because no bankruptcy cases have yet been commenced, this Disclosure Statement has not been approved by any bankruptcy court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  If the Chapter 11 Cases are subsequently commenced, the Debtors expect to promptly seek an order of the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and determining that the solicitation of votes on the plan by means of this Disclosure Statement was in compliance with section 1125(a) of the Bankruptcy Code.

## B.    THE DEBTORS' BUSINESSES AND OPERATIONS

Debtor The Newark Group is a corporation organized under the laws of the State of New Jersey, with its principal executive offices located at 20 Jackson Drive, Cranford, New Jersey, 07016.  The Newark Group is the direct or indirect parent of both of the other Debtors and all of the Non-Debtor Affiliates.[2]

Debtor Jackson is a corporation organized under the laws of the State of New Jersey, and is a wholly-owned subsidiary of The Newark Group.  Jackson's only asset consists of the parcel of real estate and the improvements at 20 Jackson Drive, Cranford, New Jersey, that houses the executive offices of The Newark Group.  The primary liability of Jackson is the Jackson Drive Mortgage.

---

[2]   The Newark Group's Non-Debtor Affiliates (and their jurisdiction of formation) are as follows: (1) Integrated Paper Recyclers LLC (Delaware); (2) Newark Paperboard Products, Ltd. (British Columbia, Canada); (3) Newark Group International B.V. (Netherlands); (4) Newark Group International, S.L. (Spain); (5) Newark Catalana, S.L. (Spain); (6) Newark Graphicboard Products Berlin GmbH (Germany); (7) Alcover Cogeneración, A.I.E. (Spain); (8) Derivados del Cartón, S.L. (Spain); (9) Servicárrega, S.L. (Spain); (10) Servicios y Mantenimientos de Papeleras, S.L. (Spain); (11) Newark San Andrés, S.L. (Spain); (12) Fibor Packaging B.V. (Netherlands); (13) Videcart, S.A. (Spain); (14) Atelier des Landes S.A. (France); (15) Paper, S.A. (Spain); (16) Newark Viersen GmbH (Germany); and (17) Newark Energie GmbH (Germany).

Debtor Cogen is a corporation organized under the laws of the State of California, and is a wholly-owned subsidiary of The Newark Group.  Cogen operates a cogeneration power plant located on the property of The Newark Group's paper mill in Los Angeles and provides electricity solely to the Los Angeles mill.  The only material asset held by Cogen on the Petition Date is a turbine with an assessed value of $1.3 million.

The Debtors, along with their Non-Debtor Affiliates (collectively, "**TNG Global**"), operate as an integrated global producer of 100% recycled paperboard and paperboard products, with significant manufacturing and marketing operations in North America and Europe.  The Newark Group is primarily a manufacturer of core board, folding cartons (predominantly uncoated) and industrial converting grades of paperboard, and is among the largest producers of these grades in North America.  The Newark Group is also a major North American producer of tubes, cores and allied products, and, together with its non-Debtor European subsidiaries, is a leading producer of laminated products and graphicboard in both North America and Europe. Additionally, The Newark Group collects, trades and processes recovered paper in North America and believes that it is among the six largest participants in this industry.  The Newark Group supplies its products to the paper, packaging, stationery, book printing, construction, plastic film, furniture and game industries.

The Newark Group owns or leases 40 active manufacturing and other facilities throughout the United States, including recovered paper plants, paperboard mills and converting plants.[3]  As of January 31, 2010, TNG Global employed approximately 2,511 employees, a significant number of whom are covered by labor agreements.  For the fiscal year[4] ended April 30, 2008, TNG Global generated revenues of approximately $1,028.9 million and had a net loss of approximately $19.7 million.  For the fiscal year ended April 30, 2009, TNG Global generated revenues of approximately $808.7 million and had a net loss of approximately $166.7 million.

The foreign operations of TNG Global's corporate family are conducted through certain Non-Debtor Affiliates.  The primary foreign Non-Debtor Affiliates are Newark Paperboard Products, Ltd., a British Columbia corporation that operates in Canada, and NGI, an intermediate holding company with its corporate seat in Amsterdam, the Netherlands, which, through its wholly-owned direct and indirect subsidiaries, conducts business throughout Europe.

1.    **Products and Materials**

TNG Global operates in three business segments.  The two in North America are the Paperboard segment and the Converted Products segment.  The third is the International segment, which is a combination of all of TNG Global's European operations.  Within these three business segments, products can be broadly categorized into five product lines: recovered paper; 100% recycled paperboard; graphicboard and laminated products; tube and core products;

---

[3]  In addition to active facilities, The Newark Group owns seven facilities that were formerly operated as paperboard mills.

[4]  The Debtors' fiscal years end on April 30, and all references to "fiscal years" herein are to the Debtors' fiscal years.  For example, reference to fiscal year 2009 means the fiscal year ending April 30, 2009.

and solidboard packaging products.  TNG Global's domestic operations are primarily conducted through The Newark Group.

In the Paperboard segment, The Newark Group trades in recovered paper and manufactures various grades of recycled paperboard which are used in the production of folding cartons, rigid boxes, tubes, cores and other products.  In the Converted Products segment, The Newark Group converts paperboard into tubes, cores and allied products, and laminated products used for book covers, game boards, jigsaw puzzles and loose-leaf binders.  In the International segment, which consists of a vertically integrated network of facilities in Europe, the foreign Non-Debtor Affiliates produce 100% recycled paperboard, laminated products, and graphicboard and solidboard packaging, primarily for the European market.  For the fiscal year ended April 30, 2009, the Paperboard segment represented 46.6% of the total sales of TNG Global; the Converted Products segment represented 31.3% of the total sales; and the International segment represented 22.1% of total sales.

## 2.    **Paperboard Segment**

The Paperboard segment consists of facilities that manufacture recycled paperboard and facilities that collect, sort and handle recovered paper for internal consumption and sales to other paper manufacturers.  Intercompany and inter-segment sales are recorded at prices which approximate market prices.  In fiscal 2009, The Newark Group acquired approximately 1.9 million tons of recovered paper, of which approximately 0.8 million tons were used as raw material by the paperboard mills, and approximately 1.1 million tons were sold to others.  The recovered paper The Newark Group handles is bought and sold according to the type or grade. There are over fifty grades of recovered paper, but the most significant ones that the Company deals in are: old corrugated containers ("**OCC**"), old newspaper ("**ONP**"), and mixed paper ("**MP**").  Together, these three grades account for approximately 90% of the Company's total volume.  This activity is conducted through five regional offices located in Salem, Massachusetts; Newark, New Jersey; Moraine, Ohio; Mobile, Alabama; and Stockton, California, along with seven satellite paper processing plants.

The Newark Group also operates eight paperboard mills within the Paperboard segment. These mills manufacture paperboard from recovered paper, which is then wound onto rolls or sheeted and palletized for sale to customers or for internal transfer to the Converted Products business segment, where it is the raw material for that segment's processes.

The Newark Group manufactures many different grades of 100% recycled paperboard. Plain chip grades are used primarily in the production of simple protective packaging products and rigid boxes, such as corner boards and layer pads for separating layers of cans and bottles. The core board grades are used to manufacture spiral wound and convolute wound tubes and cores of all kinds and sizes.  Laminating grades (grades to be laminated by the customer) and laminated grades (grades already laminated at The Newark Group's paperboard mills) are used to produce heavyweight boards for the production of book covers, loose-leaf binders, solidboard packaging, game boards, jigsaw puzzles and other products.  Folding boxboard grades are used for manufacturing folding cartons and other products requiring creasing and bending of the paperboard in the manufacturing process.

### 3.    Converted Products Segment

The Converted Products segment principally consists of facilities that laminate, cut, and form paperboard produced in the Company's mills into fiber components for tubes and cores, protective packaging, books, games and office products.  Intercompany sales are recorded at prices which approximate market prices.

The Newark Group's laminated products and graphicboard are manufactured in five converting plants that make up the Company's BCI division.  Primarily, these facilities receive sheets of laminated board from The Newark Group's Fitchburg, Massachusetts mill and cut them to meet customer specifications.  These facilities also have the ability to laminate rolls of recycled paperboard by gluing together two to five layers to form a heavyweight board that is then further processed.  The Newark Group's converting plants can also customize laminated board to produce specialized products, such as by laminating foam to board for use in the manufacture of padded boards for specialty albums and books.  Additionally, The Newark Group produces pieces with hinge materials attached for use by its customers in making folding game boards and sample books.

The Newark Group also manufactures tubes, cores and allied products at 16 converting plants in the United States which make up The Newark Group's NPP division.  Tubes and cores are manufactured by applying adhesive to multiple rolls of core board and winding the core board plies around a mandrel.  The Newark Group manufactures tubes and cores in various diameters, thicknesses and widths, and its customers use tubes and cores for various applications, including winding products such as paper, tape, textiles, yarn, and plastic film on the cores, and using the tubes to form concrete columns during construction.  In addition, The Newark Group manufactures "allied products," such as paper roll end covers, roll wraps and pallets for its tube and core customers, and also provides converting services.

### 4.    International Segment

The International segment consists of facilities throughout Europe that are managed separately from the North American operations.  The Company has three paper mills and six converting operations in Europe along with recycling and support facilities in which The Newark Group has a minority ownership interest.  The vertical integration of this segment offers both paperboard manufacturing and converting.  There are minimal business transactions between the North American segments (Paperboard and Converted Products) and the International segment.

### 5.    Raw Materials/Operating Costs

Recovered paper is The Newark Group's most significant raw material.  The cost of such paper has historically fluctuated significantly due to market and industry conditions and seasonality.  The Newark Group acquires recovered paper from municipalities and many different types of businesses.  Beginning in late October 2008, the price of recovered paper dropped by historic proportions.  As discussed further below, this decrease in price contributed to liquidity issues for The Newark Group because it reduced the borrowing base under its Prepetition ABL Credit Facility.

Freight charges, which are incurred with respect to transportation of both the products The Newark Group manufactures and the materials it receives, are a significant cost to the Company.

Freight charges in 2008 for products The Newark Group sold were $99.9 million, a 3% increase over $97 million in 2007, but essentially the same as the $99.7 million total for 2006. Freight charges in 2009 for products The Newark Group sold were $85 million, a 15% decrease from 2008 – but sales in 2009 were down by 21.4% from 2008.

Freight charges for the first half of fiscal year 2010, from May 1, 2009 through October 31, 2009, for products The Newark Group sold were $34.6 million. During the same period in the prior fiscal year, from May 1, 2008 through October 31, 2008, freight charges for products The Newark Group sold were $52.8 million.

Energy, which consists of electricity, natural gas and fuel oil used to generate steam for use in the paper-making process, is also a significant manufacturing cost. Average energy costs per ton of paperboard produced in The Newark Group's North American mill system increased from $90 per ton in fiscal year 2008 to $101 per ton in fiscal year 2009, an increase of over 12%.

In the six months ended October 31, 2007, average energy costs per ton were $83.00. For the same period in 2008, the average energy costs per ton were $104, an increase of 27%. For the same period in 2009, average energy costs per ton were $62.00.

These costs are significantly higher than what The Newark Group experienced during the early part of the decade, when, for example, in 2000 its average energy cost per ton of paperboard produced was just $43. The rise in costs is due to overall increases in natural gas, fuel oil and electricity prices. When energy costs increase, The Newark Group's operating margins are adversely affected. Therefore, The Newark Group attempted to manage fluctuations in its energy costs by utilizing financial hedges and purchasing forward contracts for a portion of its energy needs. For the period of September 1, 2008 through November 30, 2008, The Newark Group hedged between 78% and 95% of its natural gas needs at prices that ultimately were unfavorable to spot market prices. Beginning in December 2008, The Newark Group's percentage of natural gas hedged at prices unfavorable to market levels dropped to between 61% and 71%. Most of those hedges expired on or about April 30, 2009, reducing the percentage of natural gas hedged to approximately 10% of forecasted needs through April 30, 2010. No hedges are currently in place after April 30, 2010.

### 6.    **Employees**

As of January 31, 2010, The Newark Group employed approximately 1,952 individuals, while its Non-Debtor Affiliates employed approximately 659 individuals in Canada and Europe. In the U.S. operations, which consist of the Paperboard and Converted Products segments as well as the domestic corporate office, The Newark Group has a total of 542 salaried employees, while the remaining employees are paid on an hourly basis. The International segment has a total of approximately 659 employees, 198 of whom are salaried and working in plant offices or as plant management, and 461 who are paid on an hourly basis, working in manufacturing.

-16-

Approximately 767, or 39%, of The Newark Group's employees in North America are represented by unions and are covered under one of approximately 16 collective bargaining agreements. The collective bargaining agreements are in place at 16 operating facilities in North America and expire at various times through 2014. Three of these agreements will expire by the end of fiscal 2010, and four additional agreements will expire by the end of fiscal 2011. Substantially all of TNG Global's employees at its facilities outside of North America are governed by collective bargaining agreements that have either already expired or will do so within the next fiscal year. Those agreements that have already expired are for locations covered by either local or national labor agreements and are currently being renegotiated.

Under the Plan, all of the collective bargaining agreements will be assumed without modification. While the terms of the collective bargaining agreements may vary, the material terms of such agreements are customary for the industry, the type of facility, the classification of the employees and the geographic location covered thereby.

### 7. Customers

TNG Global supplies products to the paper, packaging, stationery, book printing, construction, plastic film, furniture, and game industries, has nearly 7,000 active customers, and sells its products in over 60 countries around the world, mainly in the United States and Canada. During fiscal year 2008, TNG Global had consolidated sales of approximately $1,028.9 million. The Non-Debtor Affiliates accounted for approximately 22% of these sales. During fiscal year 2009, TNG Global had consolidated sales of approximately $808.7 million. The Non-Debtor Affiliates accounted for approximately 23% of these sales.

The Newark Group's Paperboard and Converted Products segments enjoy long-standing relationships with a diverse range of customers from many industries, from package goods manufacturers to industrial end users.

## C. MANAGEMENT OF THE NEWARK GROUP

### 1. Board of Directors

As of the date of this Disclosure Statement, the board of directors of The Newark Group (the "**Board**") consists of the following individuals:

| Name | Position |
|------|----------|
| Robert H. Mullen | Chairman of the Board |
| Edward K. Mullen | Vice Chairman of the Board |
| Martin A. Chooljian | Director |
| Joseph S. DiMartino | Director |
| Fred H. Rohn | Director, Chairman of the Audit Committee |

### 2. Executive Officers

Set forth below are the executive officers of The Newark Group, as of the date of the filing of this Disclosure Statement.

| Name | Position |
|------|----------|
| Robert H. Mullen | Chief Executive Officer and President |
| William D. Harper | Senior Vice President, European Operations |
| Joseph E. Byrne | Vice President and Chief Financial Officer |
| David M. Ascher | Vice President, General Counsel and Secretary |
| Richard M. Poppe | Senior Vice President, Paperboard Mills |
| Philip B. Jones | Senior Vice President, Converted Products |
| Lynn M. Herro | Vice President, Corporate Controller and Assistant Secretary |
| Marc Pryor | Treasurer |

## D.    COMPENSATION AND BENEFITS PROGRAMS

In the ordinary course of business, The Newark Group has implemented a number of compensation and benefits programs that are designed to reward management and non-management employees for excellent service, incentivize future performance, and provide employees with a competitive compensation and benefits package.    Except as otherwise expressly provided in Section III, Section VII, or any other provisions of the Plan (and except as may otherwise be agreed between an employee and the Board of Directors of the Reorganized Company), the Reorganized Company shall continue to perform its obligations under all employment and severance contracts and policies, and all compensation and benefit plans, policies and programs of the Company applicable to its employees, retirees and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans (including, but not limited to, the Savings and Pension Plans), the ESOP as amended by the ESOP Plan Amendments, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans. Nothing herein shall restrict the rights of the board of directors of the Reorganized Company to change or modify any such policy, plan or program in accordance with its terms and applicable law.

## E.    DEBT AND CAPITAL STRUCTURE OF THE COMPANY

### 1.    Description of The Newark Group's Prepetition Debt Structure

The Newark Group's prepetition debt structure was comprised of five principal components: (a) the Prepetition ABL Credit Facility; (b) the Prepetition CL Credit Facility; (c) the Prepetition 2014 Notes; (d) the Mullen Note; and (e) the Von Zuben Subordinated Unsecured Note.

As described in more detail below, as of January 31, 2010, The Newark Group had outstanding secured debt under two separate credit facilities totaling approximately $108.4 million (plus approximately $927,000 in accrued interest as of January 31, 2010), and

outstanding, non-contingent unsecured debt of approximately $279 million.[5]  As of January 31, 2010, the unsecured debt is comprised primarily of $175 million in principal plus approximately $23.5 million in accrued interest under the Prepetition 2014 Notes, and approximately $80.5 million in trade and other obligations.

(a)   <b><u>Asset-Based Lending Facility</u></b>

On March 9, 2007, The Newark Group and NGI as borrowers, with Ridge Finance Corp.[6] ("**Ridge**") and Cogen as guarantors, entered into the Prepetition ABL Credit Facility, an Asset-Based Loan and Security Agreement, with the Prepetition ABL Lenders and Wells Fargo Bank, National Association, as successor by merger to Wachovia Bank, National Association, as the Prepetition ABL Administrative Agent.  The Prepetition ABL Credit Facility is an asset-based senior secured revolving credit facility, pursuant to which the Prepetition ABL Lenders provided a revolving line of credit in the aggregate principal amount of up to $85 million, subject to certain borrowing base limitations, up to $25 million of which may be borrowed directly by NGI and up to $15 million of which may be used for letters of credit and other financial accommodations.

The term of the Prepetition ABL Credit Facility is five (5) years with an original interest rate of prime or the Eurodollar rate plus a credit spread in an amount based on availability under the facility.  The Prepetition ABL Credit Facility provides for a default rate of 2% above the interest rate otherwise in effect.

Pursuant to the Prepetition ABL Credit Facility and the Prepetition Intercreditor Agreement, The Newark Group granted the Prepetition ABL Administrative Agent, on behalf of the Prepetition ABL Lenders, a first priority lien on all of its accounts receivable, inventory and certain other personal property (the "**Prepetition ABL Priority Collateral**")[7] and a second

---

[5]  Nothing contained herein constitutes an admission or acknowledgment that any claims described and identified in this Disclosure Statement are valid, enforceable, allowable, or not subject to disputes, counterclaims, or offsets.

[6]  Ridge Finance Corp. was merged into The Newark Group on October 8, 2009.

[7]  The Prepetition Intercreditor Agreement refers to the Prepetition ABL Priority Collateral as "**Working Capital Priority Collateral**" and defines such collateral as follows:

> (a) all of the following present and future Property of the Company and each other Grantor:
>> (i) Accounts (other than Accounts or other payment obligations constituting the proceeds of Term Loan Priority Collateral);
>> (ii) Inventory;
>> (iii) Chattel Paper, Instruments, Documents and Payment Intangibles, in each case only to the extent relating to Accounts (other than Accounts or other payment obligations constituting the proceeds of Term Loan Priority Collateral) or Inventory;
>> (iv) Deposit Accounts (other than the CL Deposit Account or any deposit or investment account established to hold the CL Cash Collateral);

priority lien on substantially all of its other assets, except for real property (together with the Prepetition ABL Priority Collateral, the "**Prepetition ABL Collateral**").    Additionally, as further security, The Newark Group guaranteed the obligations of NGI under the Prepetition ABL Credit Facility.  The Prepetition ABL Credit Facility explicitly provides, however, that NGI has not guaranteed the obligations of The Newark Group and shall not be required to repay or prepay, or to guarantee, nor shall any amount paid by NGI be applied to, any obligations of The Newark Group under the Prepetition ABL Credit Facility.

On February 20, 2009, The Newark Group, NGI, the Prepetition ABL Lenders, and the Prepetition ABL Administrative Agent, entered into a forbearance agreement (the "**Prepetition ABL Forbearance Agreement**") pursuant to which, *inter alia*, the Prepetition ABL Lenders agreed to forbear from exercising certain rights as a result of the occurrence of certain events of default under the Prepetition ABL Credit Facility.  The Prepetition ABL Forbearance Agreement also provides that: (i) all revolving loans after February 6, 2009 would be prime rate loans, not Eurodollar loans; (ii) the interest rate for prime rate loans would be the prime rate plus 4%; (iii) the prime rate would be the greater of (a) the prime rate in effect on such day, (b) the Federal funds effective rate in effect on such day plus 1/2 of 1% and (c) 3%; and (iv) the Prepetition ABL Lenders would receive certain additional fees.    Thereafter, pursuant to subsequent amendments to the Prepetition ABL Forbearance Agreement, the Prepetition ABL Lenders agreed to forbear from exercising certain rights as a result of the occurrence of certain events of default under the Prepetition ABL Credit Facility until December 15, 2009.   The extended forbearance period was designed to give The Newark Group additional time to negotiate changes to its loan facilities and capital structure with the Prepetition ABL Lenders, the Prepetition CL Lenders, and the Prepetition Noteholders.   Pursuant to further amendments to the Prepetition ABL Forbearance Agreement, as of January 31, 2010, the forbearance period was extended to February 26, 2010, and as of April 28, 2010, the forbearance period was extended to May 20, 2010.  The April 28, 2010 forbearance extension also reduced the aggregate principal amount of the Prepetition ABL Credit Facility to $50 million.  As of the date of this Disclosure Statement, the Prepetition ABL Lenders have not taken any action to accelerate the obligations due under the Prepetition ABL Credit Facility.

As of January 31, 2010, The Newark Group and NGI had approximately $34.7 million in borrowings outstanding under the Prepetition ABL Credit Facility at an interest rate of 8.5% (including the credit spread); approximately $10.7 million of borrowing availability under the

---

(v) cash (other than cash which is CL Cash Collateral or cash in the CL Deposit Account);
(vi) Letter-of-Credit Rights and Supporting Obligations in respect of Inventory or Accounts (other than Accounts or other payment obligations constituting the proceeds of Term Loan Priority Collateral);
(vii) books and records and accounting systems relating to Accounts or Inventory;
(viii) Customer Contracts;
(ix) tax refunds;
(x) any Bank Products Agreements consisting of hedge agreements; and
(b) all Proceeds (including, without limitation, insurance proceeds) and products of the Property described in the foregoing clause (a).

Prepetition ABL Credit Facility; and approximately $991,369 in letters of credit outstanding under the Prepetition ABL Credit Facility.

(b)    **Credit-Linked Facility**

On March 9, 2007, The Newark Group as borrower, along with Ridge and Cogen as guarantors, entered into the Prepetition CL Credit Facility with the Prepetition CL Lenders (together with the Prepetition ABL Lenders, the "**Prepetition Lenders**"), and Wells Fargo Bank, National Association, as successor by merger to Wachovia Bank, National Association, as administrative agent, collateral agent and control agent for Prepetition CL Lenders (the "**Prepetition CL Administrative Agent**").  Pursuant to the Prepetition CL Credit Facility, the Prepetition CL Lenders provided a $15 million secured term loan and a $75 million secured credit-linked letter of credit facility, along with other financial accommodations.

The term of the Prepetition CL Credit Facility is six (6) years with an original interest rate under the term loan of prime plus 1%, or the Eurodollar rate plus a credit spread of 2.25%. Letters of credit issued under the Prepetition CL Credit Facility have a credit spread of 2.25%. The Prepetition CL Credit Facility provides for a default rate of 2% above the interest rate otherwise in effect.

Pursuant to an amendment to the Prepetition CL Credit Facility dated August 12, 2008, the term loan currently bears interest at a rate of either prime plus 5.5% or the Eurodollar rate plus 6.5%.  The Newark Group is required, pursuant to the amendment, to make certain prepayments, which include: (i) $1,000,000 quarterly installments beginning on July 31, 2009 on any outstanding term loan balance, and (ii) payments in September 2008 and 2009 of the U.S. dollar equivalent of €3 million and €8.9 million, respectively.

Pursuant to the Prepetition CL Credit Facility and the Prepetition Intercreditor Agreement, The Newark Group granted the Prepetition CL Lenders: (i) a first priority lien on a substantial portion of its assets (excluding accounts receivable and inventory), including, but not limited to, certain real property and equipment, the capital stock of all domestic subsidiaries of The Newark Group that are at least 50% owned by, or are controlled by, The Newark Group, 65% of the capital stock of NGI and Newark Paperboard Products, Ltd., and a certain promissory note from NGI to The Newark Group (the "**Prepetition CL Priority Collateral**")[8]; and (ii) a

---

[8]  The Prepetition Intercreditor Agreement refers to the Prepetition CL Priority Collateral as "**Term Loan Priority Collateral**" and defines such collateral as:

> all of the present and future assets and Property of the Company and any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Term Loan Obligations, that do not constitute Working Capital Priority Collateral, including without limitation:
>      (a) all of the Capital Stock of each of the present and future Subsidiaries of the Company;
>      (b) all of the following present and future Property of the Company and each other Grantor:

second priority lien on the Prepetition ABL Priority Collateral (together with the Prepetition CL Priority Collateral, the "**Prepetition CL Collateral**," and together with the Prepetition ABL Collateral, the "**Prepetition Collateral**").

As of January 31, 2010, the amount owing under the Prepetition CL Credit Facility term loan was approximately $ 73.7 million at an interest rate of prime plus 5.5% (including the credit spread), plus the 2% default rate.  Additionally, on January 31, 2010, The Newark Group had approximately $9.2 million in issued but undrawn letters of credit under the Prepetition CL Credit Facility.  These issued but undrawn letters of credit under the Prepetition CL Credit Facility include a stand-by letter of credit issued by the Prepetition CL Lenders to Liberty Mutual Insurance Company to secure The Newark Group's obligations under its workers' compensation policy.  As of January 31, 2010, the Liberty Mutual letter of credit had an outstanding balance of approximately $ 8.4 million.

(c)    <b><u>The Prepetition Intercreditor Agreement</u></b>

The Prepetition ABL Administrative Agent, on behalf of itself and the other Prepetition ABL Lenders, and in its capacity as collateral agent for the Prepetition ABL Lenders, along with the Prepetition CL Administrative Agent, in its capacity as collateral agent for the Prepetition CL Lenders, entered into the Prepetition Intercreditor Agreement dated as of March 9, 2007, which set forth, *inter alia*, the respective rights, liabilities, and priorities of the claims and interests of the Prepetition ABL Administrative Agent, the Prepetition ABL Lenders, the Prepetition CL Administrative Agent and the Prepetition CL Lenders.

The Prepetition Intercreditor Agreement specifically provides, among other things, that all liens and security interests with respect to all Prepetition ABL Priority Collateral securing all

---

(i) all present and future patents and patent license rights, trademarks and trademark license rights, copyrights and copyright license rights, trade secrets and processes and other intellectual property;

(ii) all present and future machinery and other Equipment, Goods, real Property (whether owned or leased), Fixtures, Financial Assets, Investment Property and Commercial Tort Claims;

(iii) the CL Deposit Account (to the extent any Grantor has rights therein) and all cash from time to time on deposit in the CL Deposit Account (to the extent any Grantor has rights therein);

(iv) Chattel Paper, Documents and Instruments;

(v) the CL Cash Collateral and any deposit or investment account established by the Borrower and the Term Loan Agent to hold the CL Cash Collateral;

(vi) General Intangibles and other contract rights, including any indemnification rights; and

(c) all Proceeds (including, without limitation, insurance proceeds) and products of the Property and assets described in the foregoing clauses (a) and (b).

obligations and amounts owed under the Prepetition CL Credit Facility executed in favor of the Prepetition CL Administrative Agent are subordinated, in all respects, to all liens and security interests with respect to the Prepetition ABL Priority Collateral securing all obligations and amounts owed to the Prepetition ABL Administrative Agent and the Prepetition ABL Lenders under the Prepetition ABL Credit Facility.

The Prepetition Intercreditor Agreement further provides, among other things, that all liens and security interests with respect to all Prepetition CL Priority Collateral securing all obligations and amounts owed under the Prepetition ABL Credit Facility executed in favor of the Prepetition ABL Administrative Agent are subordinated, in all respects, to all liens and security interests with respect to the Prepetition CL Priority Collateral securing all obligations and amounts owed to the Prepetition CL Administrative Agent and the Prepetition CL Lenders under the Prepetition CL Credit Facility.

(d)    **The 9.75% Unsecured Senior Subordinated Notes**

In March 2004, The Newark Group completed an offering of $175 million of 9.75% unsecured senior subordinated notes with a maturity date of March 12, 2014 (the "**Prepetition 2014 Notes**").  Interest is payable semiannually on March 15 and September 15 of each year. The Prepetition 2014 Notes rank junior in right of payment to all of the existing and future senior debt and equal in right of payment with all of the existing and future debt that is not senior debt. For purposes of the Prepetition 2014 Notes, "senior debt" includes, among other things, obligations outstanding under the Prepetition ABL Credit Facility and the Prepetition CL Credit Facility; "senior debt" does not include, among other things,  any indebtedness of The Newark Group (i) to any it of its subsidiaries; (ii) to, or guaranteed on behalf of, any shareholder, director, officer or employee of the Company or any of its subsidiaries (other than any shareholder that is a lender under the Prepetition ABL Credit Facility or the Prepetition CL Credit Facility); (iii) constituting trade obligations or incurred in connection with obtaining goods, materials or services, (iv) represented by disqualified capital stock, (v) constituting liabilities for taxes; (vi) incurred in violation of the limitation on indebtedness contained in the indenture governing the Prepetition 2014 Notes, (vii) that is non-recourse to The Newark Group, or (viii) that is expressly subordinated to other debt of The Newark Group.

On January 31, 2010, the aggregate principal amount of the Prepetition 2014 Notes was approximately $175 million plus accrued interest of approximately $23.5 million.  As of March 31, 2010, the accrued interest will be approximately $26.3 million.

(e)    **Mullen Note**

On April 15, 2008, The Newark Group purchased the capital stock of Jackson Drive Corp. from Mullen and, in consideration therefor, assumed Mullen's guaranty of the obligations of Jackson Drive Corp. under the Jackson Drive Mortgage from Mullen and issued to Mullen a promissory note in the principal amount of $197,000.  The Mullen Note bears interest at the prime rate and is payable monthly.  As of January 31, 2010, the principal balance of the Mullen Note was $196,668, and accrued and unpaid interest was equal to $13,633.

(f)    **Von Zuben Subordinated Unsecured Note**

On August 10, 2005, in connection with the termination of his employment with The Newark Group, Von Zuben exercised a right to put certain shares of capital stock owned by him to The Newark Group and, in consideration therefor, The Newark Group issued to Von Zuben a subordinated installment promissory note in the principal amount of $7,875,000. The Von Zuben Subordinated Unsecured Note is subordinated in right of payment to certain obligations of The Newark Group, including all indebtedness or obligations then owing or incurred after the date of the Von Zuben Subordinated Unsecured Note by The Newark Group or any of its subsidiaries to "banking institutions, life insurance companies, similar financial institutions and subsidiaries or affiliates of the foregoing." The Von Zuben Subordinated Unsecured Note bears interest at the prime rate from time to time and, subject to the subordination provisions, is payable in 40 equal quarterly installments of principal and interest. As of January 31, 2010, the principal balance of the Von Zuben Subordinated Unsecured Note was $4.6 million, plus accrued and unpaid interest of $162,000.

(g)    **Other Unsecured Obligations**

As of January 31, 2010, The Newark Group had aggregate unsecured obligations, other than that owed to the parties described above, totaling approximately $75.6 million. These obligations include, but are not limited to, trade payables of approximately $42.4 million, accrued wages, unpaid leave, pension liabilities, swap liabilities, and product replacement claims.

## 2.    **Description of The Newark Group's Prepetition Interests**

As of January 31, 2010, The Newark Group had 6,005,000 shares of common stock outstanding, of which 2,444,597 were held by The Newark Group as treasury stock (the "**Treasury Interests**"). The Newark Group's common stock is not publicly traded. Of the shares not constituting Treasury Interests, approximately 84% was beneficially owned by the Mullen family and their respective affiliates; approximately 16% was owned by The Newark Group Employees' Stock Ownership Plan ("**ESOP**"); and *de minimis* amounts were owned by certain current and former executive officers of The Newark Group.

## F.    **EVENTS LEADING UP TO CHAPTER 11**

A number of factors contributed to the Debtors' decision to restructure its debt obligations and commence the Chapter 11 Cases. Although the Debtors' business is operationally sound, the need to restructure its debt arises from the convergence of multiple factors, including the general slowdown of the United States economy, particularly after the autumn of 2008, which has significantly and adversely affected the Company's operating results.

## 1.    **Reduced Sales Volume and Increased Costs**

The Company's operating results are primarily influenced by sales price and volume, mill capacity utilization, recovered paper cost, energy costs and freight costs. The Newark Group suffered a significant reduction in sales volumes beginning in November 2008, when the

dramatic decline in general economic activity, particularly consumer non-durable goods consumption, coincided with what is normally a seasonal slow period for the Company.

The Newark Group has also been confronted with increased costs. In 2008, the cost of recovered paper for each ton of paperboard produced in North America increased 27% from 2007 and was 45% higher than it was in 2006. In addition, fluctuations in the price of crude oil, escalating costs of diesel fuel and more stringent delivery requirements have had a direct impact on the Company's freight costs for the products it ships and receives. While energy prices have declined since peaking in the summer of 2008, The Newark Group did not fully benefit from the decline because it had hedged a substantial portion of its natural gas purchases through the winter months by entering into forward contracts at a cost that ended up being higher than the market rate.

Cash requirements for The Newark Group's operations have historically been funded with cash flow from operations along with borrowings under the asset-based and credit-linked facilities. However, The Newark Group suffered a significant reduction in borrowing availability under its credit facilities due to reduced sales and accounts receivable, along with a reduction in the value of waste paper inventories. All of these factors combined led to liquidity issues.

### 2.    __Attempts to Improve the Financial Outlook__

In response to these issues and the overall crisis that developed in the United States economy in 2008, The Newark Group developed and implemented right-sizing plans in an effort to bring capacity in line with overall demand. One of the initiatives undertaken by The Newark Group has been an attempt to raise selling prices in response to increases in raw material and energy costs. In an effort to improve cost effectiveness and profitability, The Newark Group also closed higher-cost facilities, otherwise restructured or discontinued certain operations, and implemented cost savings initiatives, including a temporary salary freeze and reductions in both workforce and raw material inventories.

Despite these efforts, TNG Global incurred a net loss of $166.7 million in fiscal 2009, as compared to a net loss of $19.7 million in fiscal 2008. Excluding the non-cash charges and restructuring expenses that TNG Global incurred in fiscal 2009, TNG Global would have posted a net loss in fiscal 2009 of $29.5 million. Decreased sales volumes throughout North America (especially in the last quarter of calendar year 2008), along with elevated input costs, far outweighed advances from the Company's efforts at cost savings and price increases. As a result of the decrease in sales and the increased costs and limited availability under its credit facilities, The Newark Group found it necessary to explore alternatives that would allow it to continue operating on a profitable basis.

### 3.    __Defaults and Forbearances under the Prepetition Credit Facilities__

On February 16, 2009, the Company received a letter from the Prepetition CL Administrative Agent, which gave notice that an event of default had occurred under the Prepetition CL Credit Facility as a result of The Newark Group's failure to comply with its fixed charge coverage ratio and availability test and as a result of similar defaults under the Prepetition

ABL Credit Facility.  As a result of the event of default, the interest rate under the Prepetition CL Credit Facility was increased by 2% per annum and the Prepetition CL Administrative Agent otherwise reserved its rights, but did not accelerate the loan.

On February 20, 2009, The Newark Group, the Prepetition ABL Administrative Agent, and the Prepetition ABL Lenders completed the execution and delivery of the Prepetition ABL Forbearance Agreement, pursuant to which, among other things, the Prepetition ABL Lenders agreed to forbear from exercising certain rights as a result of the occurrence of certain events of default under the Prepetition ABL Credit Facility.  The Prepetition ABL Forbearance Agreement also provides that: (i) all revolving loans after February 6, 2009 would be prime rate loans, not Eurodollar loans; (ii) the interest rate for prime rate loans would be the prime rate plus 4%; (iii) the prime rate would be the greater of (a) the prime rate in effect on such day, (b) the Federal funds effective rate in effect on such day plus 1/2 of 1% and (c) 3%; and (iv) the Prepetition ABL Lenders would receive certain additional fees.  Pursuant to an amendment of the Prepetition ABL Forbearance Agreement, the forbearance period was set to expire on May 31, 2009.

As part of the Prepetition ABL Forbearance Agreement, The Newark Group agreed to enter into a forbearance agreement with the Prepetition CL Lenders by February 24, 2009, but did not enter into a forbearance agreement with the Prepetition CL Lenders by such date.  On June 25, 2009, The Newark Group and the requisite Prepetition ABL Lenders entered into an extension of the Prepetition ABL Forbearance Agreement, effective as of May 29, 2009, to further extend the forbearance expiration period to October 31, 2009, subject to the requirement that there be no further defaults.  The extended forbearance period was designed to give The Newark Group additional time to negotiate changes to its loan facilities and capital structure with the Prepetition ABL Lenders, the Prepetition CL Lenders, and the Prepetition Noteholders.  Pursuant to further amendments to the Prepetition ABL Forbearance Agreement, as of January 31, 2010, the forbearance period was extended to February 26, 2010, and as of April 28, 2010, the forbearance period was extended to May 20, 2010.  As of the date of this Disclosure Statement, neither the Prepetition ABL Lenders nor the Prepetition CL Lenders have taken any action to accelerate the obligations due under their respective agreements.

### 4.        Default and Forbearance under the Prepetition Indenture

On April 3, 2009, The Newark Group and the Holders of approximately 74% of the Prepetition 2014 Notes entered into a Limited Waiver and Forbearance Agreement (the "**Prepetition Noteholders Forbearance Agreement**").  Pursuant to the Prepetition Noteholders Forbearance Agreement, the Prepetition Noteholders agreed to forbear from exercising certain rights as a result of the occurrence of certain events of default under the Prepetition 2014 Notes and the Prepetition Indenture.  The events of default for which the Prepetition Noteholders agreed to forbear relate to The Newark Group's failure to pay the semi-annual interest payment that was due on March 15, 2009 on $175 million of outstanding Prepetition 2014 Notes and its failure to file with the Securities and Exchange Commission its quarterly Form 10-Q report for the quarter ended January 31, 2009.

The Newark Group was entitled to a 30 day grace period with respect to each of the above defaults.  The Prepetition Noteholders Forbearance Agreement extended that grace period

until May 31, 2009, subject to certain conditions.  The extended grace period was designed to give The Newark Group additional time to negotiate changes to its capital structure with the Prepetition Noteholders as well as with the Prepetition ABL Lenders and the Prepetition CL Lenders.  The grace period under the Prepetition Noteholders Forbearance Agreement has not been extended.  The Prepetition Noteholders have not taken any action to enforce their rights under the Prepetition Indenture.

### 5.        Consideration of Restructuring and Recapitalization Alternatives

Starting in late 2008, The Newark Group, with the assistance of its financial advisors, AlixPartners, LLP ("**AlixPartners**") and its investment banker, Jefferies & Co., Inc. ("**Jefferies**"), began exploring restructuring and recapitalization alternatives.  In mid-February, 2009, due to severe liquidity and financing constraints, The Newark Group, primarily through Jefferies, commenced efforts to solicit proposals for debtor-in-possession financing in connection with a potential chapter 11 filing.  Many potential lenders were targeted, a number of whom were provided with information regarding The Newark Group's business and historical financial performance, and others of whom ultimately executed confidentiality agreements for the purpose of obtaining additional information.  Thereafter, several potential lenders submitted term sheets.

In March 2009, a coalition of Prepetition Noteholders began having discussions with The Newark Group regarding the possible restructuring of the Prepetition 2014 Notes through either an out-of-court restructuring or a Chapter 11 reorganization plan.  They subsequently formed the Coalition of Prepetition Noteholders and retained financial advisors and counsel.  The Coalition of Prepetition Noteholders represents approximately 84% of the outstanding Prepetition 2014 Notes, measured as a percentage of the face amount of the issuance.  The Newark Group and the Coalition of Prepetition Noteholders have been in active negotiations for many months regarding a restructuring of the Prepetition 2014 Notes.

The Debtors' proposed Chapter 11 bankruptcy filing is the culmination of the negotiations with the Coalition of Prepetition Noteholders, the Prepetition ABL Lenders and ORIX Finance Corp. ("**ORIX**")[9].  Through the proposed transactions set forth in the Plan, The Newark Group intends to restructure its finances and emerge from Chapter 11 protection with a stronger business that is better able to compete in the industry in which it operates.

### 6.        The Plan Support Agreement

On May 7, 2010, ORIX Finance Corp. ("**ORIX**") for itself; certain of the Prepetition Noteholders (each of the certain Prepetition Noteholders a "**Plan Support Party**," and collectively, the "**Plan Support Parties**"); The Newark Group, the TNG Subsidiaries, and certain Equity Interest Holders party thereto (the "**Plan Support Shareholders**") entered into the

---

[9]  The Debtors, the Coalition of Prepetition Noteholders, and the Prepetition ABL Lenders also engaged in negotiations with the Prepetition CL Lenders.  However, the Prepetition CL Lenders are not parties to the Plan Support Agreement because under the terms of the Plan it is contemplated that the Prepetition CL Claims will be paid in full from the proceeds of the ORIX DIP Facility.

Plan Support Agreement[10], in substantially the form as attached hereto as <u>Exhibit B</u>, pursuant to which ORIX, the Plan Support Parties, and the Plan Support Shareholders (each a "**Party**" and collectively, the "**Parties**") agreed, subject to the terms and conditions contained in the Plan Support Agreement, to support the proposed financial restructuring described in the Plan.

Specifically, subject to the terms and conditions of the Plan Support Agreement, ORIX and the Plan Support Parties agreed, among other things, to:

> (a)    vote, or cause to be voted, all Prepetition 2014 Notes beneficially owned by ORIX or such Plan Support Party or for which it is the nominee, investment manager or advisor for beneficial holders thereof in favor of the Plan in accordance with the applicable procedures set forth herein and in the voting materials, and return a duly-executed Ballot in connection therewith during the Solicitation Period; provided, however, that such vote shall be immediately revoked and deemed void *ab initio* upon termination of the Plan Support Agreement pursuant to the terms hereof;

> (b)    not withdraw or revoke its tender, consent or vote;

> (c)    forbear from the exercise of any rights or remedies it may have under the Prepetition Indenture, the Prepetition 2014 Notes, applicable law or otherwise with respect to any defaults existing as of the date hereof under the Prepetition Indenture, the Prepetition 2014 Notes and any future default under the Prepetition Indenture or the Prepetition 2014 Notes;

> (d)    following the commencement of the Chapter 11 Cases, not:

>> (i)    object to the terms, conditions, nature or amount of the Debtors' proposed debtor-in-possession financing, except to the extent that such terms are materially inconsistent with the Plan, the Disclosure Statement, and the Exhibits thereto (the "**Plan Support Attachments**") and not approved by the Plan Support Parties holding a majority in principal amount of the Prepetition 2014 Notes held by the Prepetition Noteholders who are parties to the Plan Support Agreement (the "**Majority Plan Support Parties**") and ORIX;

>> (ii)    object to the terms, conditions, nature or amounts included in any of the First Day Motions (as defined below),

>> (iii)    object to the Plan, the Disclosure Statement or the vote solicitation procedure, except to the extent that the Plan, the Disclosure Statement or the vote solicitation procedure is altered, modified or amended hereafter in a manner that is not approved by Plan Support Parties holding 66-⅔% of

---

[10]  The Plan Support Agreement attached hereto as <u>Exhibit B</u> does not separately include exhibits A or B to the Plan Support Agreement, or the signature pages.  Exhibits A and B to the Plan Support Agreement are the Plan and this Disclosure Statement, respectively.

the principal amount of the Prepetition 2014 Notes held by the Plan Support Parties as of the date of any determination requiring such approval (the "**Requisite Plan Support Parties**") and ORIX and is materially inconsistent with the Plan Support Attachments;

(iv)    directly or indirectly seek, solicit, support or encourage (x) any objection to the Plan or (y) any other plan of reorganization or liquidation;

(v)    file a motion or application to modify or to terminate the Debtors' exclusive time periods pursuant to Section 1121(c) of the Bankruptcy Code; or

(vi)    file a motion or application  for the appointment of a trustee or an examiner, support the granting of such a motion or application or fail to oppose the granting of such a motion or application; and

(e)    agree to not take any other action, including, without limitation, initiating any legal proceeding that is inconsistent with, or that would delay consummation of, the financial restructuring or the transactions embodied in the Plan Support Attachments, as such documents may be amended, modified, or supplemented from time to time in accordance with the terms thereof and of the Plan Support Agreement, and with such grammatical changes as may be necessary to give them force and effect (the "**Definitive Documents**"), except to the extent that such transactions are altered, amended or modified hereafter, without the approval of the Majority Plan Support Parties and ORIX, so as to be materially inconsistent with those set forth in the Plan Support Attachments.

Notwithstanding the foregoing, nothing in the Plan Support Agreement shall be construed as to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with the Plan Support Agreement.

In addition, subject to the terms and conditions specified in the Plan Support Agreement,:

(f)    The Newark Group and the TNG Subsidiaries agree and covenant that they shall:

(i)    consummate the financial restructuring (the "**Restructuring**") in a manner and in accordance with the timeline contemplated by the Plan Support Agreement,

(ii)    contemporaneously with the filing of the bankruptcy petitions, file a motion or application seeking the entry of an order of the Bankruptcy Court authorizing the assumption of the Plan Support Agreement under Section 365 of the Bankruptcy Code (the "**Assumption Order**"), and use commercially reasonable efforts to obtain the Assumption Order within twenty (20) days of the Petition Date;.

(iii)    provide the Plan Support Parties and ORIX notice of not less than five (5) Business Days of any modification of the Plan Support Attachments, whether material or immaterial, and five (5) Business Days to review any contemplated First Day Motions, including but not limited to any motion for authority to provide adequate protection, such First Day Motions to be in form and substance satisfactory to the Plan Support Parties and ORIX;

(iv)    take, or cause to be taken, all reasonable and appropriate actions in furtherance of the Restructuring, including, without limitation:

(1)    commencing the Section 3(a)(9) Solicitation by May 12, 2010,

(2)    completing the Section 3(a)(9) Solicitation by June 12, 2010,

(3)    filing the Chapter 11 Cases by June 16, 2010,

(4)    taking all steps reasonably necessary and desirable to obtain an order of the Bankruptcy Court confirming the Plan on or before August 15, 2010, and

(5)    taking all steps reasonably necessary and desirable to cause the consummation of the Plan to occur on or before August 30, 2010, obtain any and all required regulatory and/or third-party approvals for the Restructuring;

(v)    use commercially reasonable efforts to avoid the occurrence of any of the Termination Events (as defined below) set forth in paragraph 6 of the Plan Support Agreement;

(vi)    pay all reasonable fees and disbursements of

(1)    Milbank, Tweed, Hadley & McCloy LLP, legal counsel to the Coalition of Prepetition Noteholders,

(2)    PricewaterhouseCoopers LLP, financial advisor to certain Prepetition Noteholders, and

(3)    Goldberg Kohn Ltd., legal counsel to ORIX,

in each case within thirty (30) days of submitting an invoice; provided that all outstanding fees and disbursements will be paid prior to the commencement of the Chapter 11 Cases;

(vii)    not take any other action, including, without limitation, initiating any legal proceeding that is inconsistent with, or that would delay

consummation of, the Restructuring or the transactions embodied in the Definitive Documents, except to the extent that such transactions are materially consistent with those set forth in the Plan Support Attachments; and

(viii)   except as otherwise contemplated in the Plan Support Attachments, do all things reasonably necessary and appropriate to:

(1)   maintain all assets of The Newark Group and the TNG Subsidiaries separate and distinct from the assets of the foreign subsidiaries of The Newark Group (the "**Foreign Subsidiaries**"),

(2)   ensure that all assets of The Newark Group and the TNG Subsidiaries that are currently unencumbered remain unencumbered (unless pledged or encumbered in connection with new financing provided to The Newark Group and the TNG Subsidiaries in accordance with the Plan Support Agreement), and

(3)   ensure that all assets of the Foreign Subsidiaries that are currently unencumbered remain unencumbered (unless pledged or encumbered in connection with new financing provided to the Foreign Subsidiaries or to The Newark Group and the TNG Subsidiaries for the benefit of the Foreign Subsidiaries).

(g)   The Plan Support Shareholders agree and covenant that they shall:

(i)   subject to the conditions that:

(1)   the terms of any applicable agreements implementing the Restructuring embody the terms set forth in the Plan Support Agreement, including the Plan support Attachments and

(2)   all required documents, including without limitation, the Definitive Documents, are not materially inconsistent with the Plan Support Attachments,

vote, or cause to be voted, all shares of The Newark Group stock beneficially owned by such Plan Support Shareholders in favor of the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying voting materials, and return a duly-executed Ballot in connection therewith during the Solicitation Period;

(ii)   not withdraw or revoke their tender, consent or vote;

(iii)    following the commencement of the Chapter 11 Cases, not:

(1)    object to the terms, conditions, nature or amount of the Debtors' proposed debtor-in-possession financing, except to the extent that such terms are either (x) materially inconsistent with the terms contained in the Plan Support Attachments or (y) not approved by the Requisite Plan Support Parties, ORIX and The Newark Group;

(2)    object to the terms, conditions, nature or amounts included in any of the First Day Motions;

(3)    object to the Plan, the Disclosure Statement or the vote solicitation procedure, except to the extent that the Plan, the Disclosure Statement or the vote solicitation procedure is materially inconsistent with the Plan Support Attachments;

(4)    directly or indirectly seek, solicit, support or encourage (x) any objection to the Plan or (y) any other plan of reorganization or liquidation;

(iv)    not take any other action, including, without limitation, initiating any legal proceeding that is inconsistent with, or that would delay consummation of, the Restructuring or the transactions embodied in the Definitive Documents, except to the extent that such transactions are materially inconsistent with those set forth in the Plan Support Attachments; and

(v)    take, or cause to be taken, all reasonable actions to satisfy the timeline set forth in paragraph 4(a)(v) of the Plan Support Agreement.

Notwithstanding the foregoing, nothing in the Plan Support Agreement shall be construed as to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with the Plan Support Agreement.

The Plan Support Agreement automatically terminates on the earlier to occur of the following events (each, an "**Automatic Termination Event**"), unless waived in writing as provided in the Plan Support Agreement:

(a)    If the Section 3(a)(9) Solicitation has not been commenced by 11:59 p.m. prevailing Eastern Time on May 12, 2010 (the "**Outside Commencement Date**");

(b)    if the Section 3(a)(9) Solicitation has not been concluded by 11:59 p.m. prevailing Eastern Time on June 12, 2010;

(c)    if the Debtors fails to commence the Chapter 11 Cases by 11:59 p.m. prevailing Eastern Time on June 16, 2010 (the "**Closing/Filing Deadline Date**");

(d)    If the Debtors fail to obtain approval to assume the Plan Support Agreement by 11:59 p.m. prevailing Eastern Time on July 8, 2010;

(e)    If an order confirming the Plan is not entered by 11:59 p.m. prevailing Eastern Time on August 15, 2010;

(f)    if the Effective Date of the Plan does not occur by 11:59 p.m. prevailing Eastern Time on August 30, 2010 (the "**Outside Termination Date**");

(g)    if the Debtors unilaterally withdraw or publicly announce their intention not to support the Plan,

(h)    if the Debtors

    (i)    move to voluntarily dismiss the Chapter 11 Cases,

    (ii)    move for conversion of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or

    (iii)    move for appointment of an examiner pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Cases; or

(i)    if:

    (i)    a trustee or an examiner with expanded powers is appointed in the Chapter 11 Cases, or

    (ii)    any of the Chapter 11 Cases is converted to a case under chapter 7 of the Bankruptcy Code;

(j)    if, prior to any bankruptcy filing, the Debtors:

    (i)    amend, modify, or supplement the Plan in a manner that is materially inconsistent with the terms of the Plan; or

    (ii)    make a payment to any party (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the treatment of such party under the Plan, provided, however, that the Debtors must provide five (5) Business Days' notice to the Plan Support Parties of any change to the Plan Support Attachments, whether material or immaterial;

(k)    if, after the bankruptcy filing, the Debtors:

    (i)    file a motion with respect to an amendment, modification or supplement to the Plan that is materially inconsistent with the terms of the

Plan or to any order relating to the DIP Facilities that is materially inconsistent with the terms of such order, or

(ii)     file a motion to make or make a payment to any other party (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the treatment of such party under the Plan, provided, however, that the Debtors must provide five (5) Business Days' notice to the Plan Support Parties and ORIX of any change to the Plan Support Attachments, whether material or immaterial;

(l)     if any amendment, modification or supplement to the Plan confirmed by the Bankruptcy Court contains terms that are materially inconsistent with the terms set forth in the Plan and the Disclosure Statement and such amendment, modification or supplement is not consented to by the Majority Plan Support Parties and ORIX;

(m)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regarding to any assets having an aggregate value in excess of $500,000

(n)     if with respect to one or more Foreign Subsidiaries:

(i)     an involuntary petition is commenced, or

(ii)     a voluntary petition is filed or any proceeding is commenced seeking relief under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law and such proceeding is not dismissed within thirty (30) days of the commencement thereof;

(o)     if any court shall enter a final, non-appealable judgment or order declaring the Plan Support Agreement or any material portion thereof to be unenforceable or, prohibits assumption of the Plan Support Agreement by any Debtor in the Chapter 11 Cases; or

(p)     on the Effective Date.

The Plan Support Agreement may be terminated and thereafter shall be of no further force or effect upon the occurrence of one or more of the following events (each, a "**Permissive Termination Event**"):

(a)     Prior to commencement of the Chapter 11 Cases, upon the occurrence of the acceleration of all indebtedness under the Prepetition ABL Credit Facility or the Prepetition CL Credit Facility, or a termination of any commitment letter received for the ABL DIP Facility and/or the ABL Exit Facility, ORIX DIP Facility and/or ORIX Exit Facility, or a termination of the letter dated May 7,

2010 provided to the Debtors by the ABL DIP Facility Lenders indicating their support for the Plan (the "**ABL Support Letter**"); or

(b)      if there shall be a breach by The Newark Group or the TNG Subsidiaries of any material representation, warranty, covenant or agreement contained in the Plan Support Agreement which breach has not been cured within five (5) Business Days of receipt of written notice:

(i)      from The Newark Group and the TNG Subsidiaries to the Plan Support Parties and ORIX or

(ii)      from one or more Plan Support Parties or ORIX to The Newark Group and the TNG Subsidiaries;

in each case of one or more breaches of the Plan Support Agreement.

**7.      ESOP Settlement Agreement**

On May 4, 2010, the ESOP Independent Fiduciary and The Newark Group entered into the ESOP Settlement Agreement, pursuant to which the parties settled all matters related to the ESOP that arose prior to and through the Effective Date.

Specifically, subject to the terms and conditions specified in the ESOP Settlement Agreement, a copy of which is attached hereto as Exhibit H, the parties agreed, among other things, that:

(a)      Each ESOP Beneficiary:

(i)      shall be entitled, with respect to the ESOP Allocated Shares of such ESOP Beneficiary, to the extent required by Code Section 409(e), and in accordance with sections 1125 and 1126 of the Bankruptcy Code, to direct the ESOP as to the manner in which such ESOP Beneficiary's ESOP Allocated Shares are to be voted; and

(ii)      must direct the ESOP to vote all of its ESOP Allocated Shares either (1) to accept the Plan or (2) to reject the Plan.

(b)      Each ESOP Distributee:

(i)      shall be entitled, with respect to the ESOP Distributed Shares of such ESOP Distributee, to vote such ESOP Distributed Shares directly in accordance with the terms of the Plan, and in accordance with sections 1125 and 1126 of the Bankruptcy Code; and

(ii)      must vote all of its ESOP Distributed Shares either (1) to accept the Plan or (2) to reject the Plan.

(c)　　The ESOP (as to the ESOP Beneficiaries) and the ESOP Distributees shall be classified under the Plan as one class, separate from the class in which the other equity holders of the Company are classified, and, in accordance with the terms of the Plan, and as more fully described below in Article VI,

(i)　　the ESOP shall be entitled to one vote for each ESOP Allocated Share held by an ESOP Beneficiary; and

(ii)　　each ESOP Distributee shall be entitled to one vote for each ESOP Distributed Share held by such ESOP Distributee.

(d)　　The ESOP Independent Fiduciary shall direct the ESOP Trustees to vote the ESOP Allocated Shares as follows:

(i)　　with respect to shares for which an ESOP Beneficiary has provided timely voting instructions, to vote such shares in accordance with such voting instructions, unless the ESOP Independent Fiduciary determines that doing so would cause a violation of its fiduciary duties under ERISA; and

(ii)　　with respect to shares for which an ESOP Beneficiary has not provided timely voting instructions, to vote such shares in favor of the Plan, provided that the ESOP Independent Fiduciary determines that doing so is consistent with its fiduciary duties under ERISA.

(e)　　Provided that the class comprised of the ESOP (as to the ESOP Beneficiaries) and the ESOP Distributes votes to accept the Plan and the Plan becomes effective, on the Effective Date:

(i)　　The ESOP and each ESOP Distributee shall each receive its Pro Rata share of 2% of the New Common Stock, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants; provided that, as a condition to receipt of New Common Stock, each Holder of a Class 9 Interest (other than the ESOP), will be required to execute a counterpart of the Reorganized Company Stockholders' Agreement;

(ii)　　to the extent that (1) an ESOP Beneficiary instructs the ESOP Independent Fiduciary to direct the ESOP Trustees to vote the ESOP Beneficiary's ESOP Allocated Shares in favor of the Plan, and (2) an ESOP Distributee votes its ESOP Distributed Shares in favor of the Plan, each such ESOP Participant unconditionally cancels, waives and releases any current or potential claims and interests that it holds, or that could be brought on its behalf by the ESOP or any fiduciary of the ESOP, against the Company and any present or former fiduciaries or administrators of the ESOP (as determined immediately prior to the Effective Date) relating to the ESOP with respect to any and all ESOP Interests, including as

described in Section 10.2 of the Plan, in each case to the extent permitted by the Code, the Bankruptcy Code and ERISA;

(iii)    each Holder of an ESOP Interest, including the ESOP and all ESOP Participants, shall have its ESOP Shares cancelled, annulled and extinguished;

(iv)    in full satisfaction, settlement, release, and discharge of and in exchange for the cancelled ESOP Shares, the ESOP, as amended by the ESOP Plan Amendments, shall be assumed by the Reorganized Company, and the Reorganized Company shall continue to perform its obligations under the ESOP as amended by the ESOP Plan Amendments; and

(f)    The shares of New Common Stock received on the Effective Date by the ESOP Trustees in respect of ESOP Allocated Shares shall:

(i)    be allocated to the ESOP accounts of ESOP Beneficiaries in accordance with the ESOP Allocated shares held in the accounts of such ESOP Beneficiaries immediately prior to the Effective Date as a percentage of the ESOP Shares.

(g)    The shares of New Common Stock received on the Effective Date by the ESOP Trustees in respect of ESOP Distributed Shares shall:

(i)    be distributed to the ESOP Distributees in accordance with the ESOP Distributed Shares held by such ESOP Distributees immediately prior to the Effective Date as a percentage of the ESOP Shares.

(h)    The ESOP, as amended by the ESOP Plan Amendments, shall incorporate the statutory distribution and put option requirements pursuant to Section 409(h) of the Code (the "**ESOP Statutory Put Right**").

(i)    The ESOP Plan Amendments will provide that the put option under the ESOP will be expanded to provide that ESOP Distributees who hold ESOP Distributed Shares during the ESOP plan year ending April 30, 2010, will be eligible for two (2) additional sixty day periods in which to exercise their put rights, the first such period during calendar year 2011 and the second such period during calendar year 2012 (the "**ESOP Additional Put Rights**").

(j)    Effective January 1, 2011, for purposes of ESOP distributions pursuant to the ESOP Statutory Put Right, the ESOP Additional Put Rights, and cash distributions in respect of ESOP Shares (to the extent the ESOP provides for such cash distributions in the future) (together, the "**ESOP Distributions**"), the minimum redemption price or purchase price, as applicable, to be paid by the Company in respect of each share of New Common Stock upon an ESOP Distribution shall be an amount per share equal to:

(i)     the sum of (1) the mid point of the range of total enterprise value of the Company, as determined in good faith by a qualified, independent, third party, in connection with the reorganization of the Company, less (2) outstanding funded indebtedness of the Company, multiplied by:

(ii)    the percentage of outstanding New Common Stock distributed in respect of the ESOP Shares, divided by:

(iii)   the number of ESOP Shares,

in each case as of the Effective Date and on a consolidated basis (the "**ESOP Floor Price**").

(k)     For purposes of ESOP Distributions occurring on or after January 1, 2011 (including ESOP Distributions that were scheduled to be distributed from the ESOP in 2009 and in 2010 prior to the Effective Date but that have not yet been distributed), the applicable share value shall be the greater of

(i)     the ESOP Floor Price, or

(ii)    the fair market value of such shares pursuant to the terms of the ESOP;

(l)     For purposes of ESOP Distributions occurring prior to January 1, 2011, the applicable share value shall be the fair market value of such shares pursuant to the terms of the ESOP.

(m)     ESOP Participants shall not be entitled to receive ESOP Distributions prior to the 2011 calendar year with respect to any share value in excess of the fair market value of such shares pursuant to the terms of the ESOP, and, upon consummation of the Plan on the Effective Date, each ESOP Participant who provides voting instructions with respect to his or her ESOP Allocated Shares in favor of the Plan and each ESOP Distributee who votes his or her ESOP Distributed Shares in favor of the Plan will be deemed to have consented to the foregoing.

(n)     The ESOP Independent Fiduciary acknowledges and agrees to the releases set forth in the Plan applicable to each Holder of a Claim or Interest who votes to accept the Plan.

(o)     With respect to ESOP Interests, neither the ESOP nor the ESOP Beneficiaries (prior to any distribution of shares) will be a party to the Reorganized Company Stockholders' Agreement.  However, (1) the Reorganized Company Stockholders' Agreement shall provide that, with respect to any "tag-along" rights and "piggyback registration" rights created under the Reorganized Company Stockholders' Agreement for other holders of New Common Stock, substantially similar rights shall be applicable to the shares of New Common Stock held by the ESOP and distributed to ESOP Beneficiaries; provided,

however, that any "tag-along" rights shall only be applicable to the shares of New Common Stock held by the ESOP and distributed to ESOP Beneficiaries if the transaction or series of related transactions that would trigger such rights involves the transfer of more than 25% of the outstanding shares of New Common Stock; and (2) the ESOP Plan Amendments will provide that the shares of New Common Stock held by the ESOP will be subject, to the extent permitted by the Code and ERISA, and shares of New Common Stock distributed to ESOP Beneficiaries will be subject, to "drag-along" obligations substantially similar to those created under the Reorganized Company Stockholders' Agreement for other holders of New Common Stock, provided, however, that the application at any time of the drag-along obligation to shares of New Common Stock held by the ESOP shall be subject to the determination by a fiduciary of the ESOP that:

> (i)    entering into the transaction with respect to which such drag-along obligation is being enforced is prudent and for the exclusive benefit of the ESOP Beneficiaries,

> (ii)    the consideration in such transaction for the New Common Stock held by the ESOP is not less than adequate consideration, and

> (iii)    entering into such transaction is consistent with the fiduciary obligations of such fiduciary under ERISA.

**8.    The Von Zuben Settlement Agreement**

Von Zuben and The Newark Group entered into the Von Zuben Settlement Agreement, effective May 7, 2010, pursuant to which the parties settled all matters related to the Von Zuben Subordinated Unsecured Note.

Specifically, subject to the terms and conditions specified in the Von Zuben Settlement Agreement, the parties agreed, among other things, that:

(a)    The Newark Group will:

> (i)    classify the Von Zuben Subordinated Unsecured Note Claim as Class 7 pursuant to the Plan;

> (ii)    classify Von Zuben's ESOP Interests, including both ESOP Allocated Shares and ESOP Distributed Shares, as Class 9 pursuant to the Plan;

(b)    Von Zuben will:

> (i)    vote his Class 7 Interests to accept the Plan;

> (ii)    vote his Class 9 ESOP Distributed Shares to accept the Plan;

> (iii)    direct the ESOP Independent Fiduciary to instruct the ESOP Trustees to vote his Class 9 ESOP Allocated Shares to accept the Plan.

(c)    In full satisfaction, settlement, release, and discharge of and in exchange for the von Zuben Subordinated Unsecured Note Claim, Von Zuben shall be entitled to:

(i)    a cash payment in the amount of $250,000, payable not later than three (3) Business Days after the Effective Date;

(ii)    the Von Zuben New Subordinated Notes in the principal amounts of $800,000 and $550,000, substantially in the forms attached to the Disclosure Statement as Exhibit E; and

(iii)    a Cash payment of not more than $15,000, payable not later than the later of (x) three (3) Business Days after the Effective Date and (y) receipt by the Reorganized Debtor of an invoice therefor in respect of the fees and expenses of counsel to Von Zuben incurred in connection with negotiation of the Von Zuben Settlement Agreement.

(d)    In full satisfaction, settlement, release, and discharge of and in exchange for Von Zuben's ESOP Interests, Von Zuben shall receive, on the Effective Date, his Pro Rata share of 2% of the New Common Stock, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants, as follows:

(i)    in respect of Von Zuben's ESOP Allocated Shares, the ESOP Trustees shall receive Von Zuben's Pro Rata share of 2% of the New Common Stock (subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants) to be allocated to Von Zuben's ESOP account in accordance with the ESOP Allocated Shares held in Von Zuben's ESOP account immediately prior to the Effective Date; and

(ii)    in respect of Von Zuben's ESOP Distributed Shares, Von Zuben shall receive his Pro Rata share of 2% of the New Common Stock (subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants) in accordance with the ESOP Distributed Shares held by Von Zuben immediately prior to the Effective Date.

(e)    The distributions made to the Holders of the Von Zuben Subordinated Unsecured Note Claim will not be subject to any of the subordination provisions contained in the Von Zuben Subordinated Unsecured Note.

(f)    On the Effective Date, the Von Zuben Subordinated Unsecured Note shall be cancelled.

**ARTICLE IV.**        **EVENTS DURING THE ANTICIPATED CHAPTER 11 CASES**

On the Petition Date, the Debtors intend to file voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  From and after the Petition Date, the Debtors will continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors also intend to seek relief in the form of various "first day orders" from the Bankruptcy Court as to various matters, certain of which are described below (the "**First Day Motions**").  The Debtors believe that each of these requests, if granted, would facilitate the Chapter 11 Cases and enable the Debtors to transition in and out of the Chapter 11 Cases with as little disruption to the business as possible.  There can be no assurance, however, that the Bankruptcy Court will grant such relief.  The following list and discussion of First Day Motions is not exhaustive, and the Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent the Debtors, with the consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or not to seek portions of the relief described below.

**A.**    **FIRST DAY RELIEF**

**1.**    **Joint Administration of Debtors' Chapter 11 Cases**

On the Petition Date, the Debtors intend to file the Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases, which requests procedural consolidation of the Chapter 11 Cases for ease of administration.  Such joint administration will consolidated under a single case name, in a single docket, the separate filings that would otherwise result if the Bankruptcy Court maintained entirely separate dockets for each of the Chapter 11 Cases.  This relief will, among other things, reduce costs for parties making filings with the Bankruptcy Court and obviate the need for duplicate pleadings and files maintained by the Bankruptcy Court.

**B.**    **ADDITIONAL FIRST-DAY RELIEF**

The Debtors also intend to file additional motions, such as motions seeking authority to, among other relief, (i) pay prepetition wages and other benefits to their employees, (ii) make payments to prepetition creditors in the ordinary course of business, (iii) continue use of the existing cash management system, bank accounts and business forms, (iv) make tax payments to federal, state and local taxing authorities on an uninterrupted basis (v) prohibit utility companies from discontinuing, altering or refusing service, (vi) waive the requirement to file schedules and statements of financial affairs, (vii) obtain postpetition financing, (viii) retain certain professionals; (ix) establish case management procedures; and (xi) schedule a confirmation hearing for the Plan.  Finally, on the Petition Date, the Debtors intend to file the Plan and this Disclosure Statement.

A description of the relief to be requested in each of the motions intended to be filed on the Petition Date follows.

### 1.    <u>Approval of Disclosure Statement and Scheduling a Confirmation Hearing</u>

The Debtors intend to file a motion for an order approving this Disclosure Statement, approving the Solicitation Package and distribution procedures, and scheduling a hearing to consider confirmation of the Plan, as well as establishing notice and objection procedures in respect of confirmation of the Plan. The Debtors will seek the earliest possible date permitted by applicable rules, subject to the Bankruptcy Court's calendar, for such a hearing.

### 2.    <u>Post-Petition Financing</u>

In order to ensure sufficient liquidity to continue their operations during the pendency of the Chapter 11 Cases, on the Petition Date, the Debtors will file a motion with the Bankruptcy Court seeking authority to enter into (a) the ABL DIP Facility Credit Agreement, together with all related documents, instruments, and agreements delivered pursuant to or in connection therewith, including, without limitation, the budget annexed thereto, as may be amended, supplemented, or otherwise modified from time to time, pursuant to which the Debtors would be authorized to borrow up to $50 million; and (b) the ORIX DIP Facility Credit Agreement, together with all related documents and instruments delivered pursuant to or in connection therewith, as may be amended from time to time, pursuant to which the Debtors would be authorized to borrow up to $110 million. The Debtors believe that the committed amount of the DIP Facilities will meet the Debtors' financing needs during the Chapter 11 Cases.

The foregoing documents shall be in form and substance acceptable to the Company, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent.

(a)    ABL DIP Facility

The ABL DIP Facility Credit Agreement will amend and restate the Prepetition ABL Credit Facility. The ABL DIP Facility is an asset-based senior secured revolving credit facility pursuant to which the ABL DIP Facility Lenders will provide a revolving line of credit in the aggregate principal amount of up to $50 million (subject to certain borrowing base limitations), up to €15 million of which may be borrowed directly by NGI and up to $15 million of which may be used for letters of credit and other financial accommodations.

The term of the ABL DIP Facility Credit Agreement will be the earlier of (i) the date that is one hundred and eighty (180) days after the commencement of the Chapter 11 Cases, (ii) the date that is sixty (60) days after the entry of the Interim DIP Order if the Final DIP Order has not been entered prior to the expiration of such 60-day period, (iii) the date of confirmation of the Plan and (iv) the date when all obligations under the ABL DIP Facility Credit Agreement are paid and satisfied in full in immediately available funds.

Pursuant to the ABL DIP Facility, The Newark Group will grant the ABL DIP Facility Administrative Agent, on behalf of the ABL DIP Facility Lenders, a first priority lien on all of its

accounts receivable, inventory and certain other personal property (the "**ABL DIP Priority Collateral**") and a second priority lien on substantially all of its other assets (including certain capital stock owned by it), except for real property.  Additionally, as further security, The Newark Group will guarantee the obligations of NGI under the ABL DIP Facility.  The ABL DIP Facility will specifically provide that NGI has not guaranteed the obligations of The Newark Group and shall not be required to repay or prepay, or to guarantee, nor shall any amount paid by NGI be applied to, any obligations of The Newark Group under the ABL DIP Facility.

For a more detailed understanding of the ABL DIP Facility, including applicable interest rates, covenants and conditions to the effectiveness of such facility, see the form of ABL DIP Facility Credit Agreement attached hereto as <u>Exhibit C</u>.

(b)    ORIX DIP Facility

The ORIX DIP Facility is a term loan with an aggregate principal amount of $110 million.  The Newark Group is the borrower under the ORIX DIP Facility Credit Agreement, and Cogen and certain domestic subsidiaries of The Newark Group are guarantors.  The ORIX DIP Facility will repay all amounts due under the Prepetition CL Credit Facility.  The term of the ORIX DIP Facility Credit Agreement will be the earlier of (i) the date that is one hundred and eighty (180) days after the commencement of the Chapter 11 Cases, (ii) the date that is sixty (60) days after the entry of the Interim DIP Order if the Final DIP Order has not been entered prior to the expiration of such 60-day period, (iii) the date of confirmation of the Plan and (iv) the date when all obligations under the ORIX DIP Facility Credit Agreement are paid and satisfied in full in immediately available funds.

Pursuant to the ORIX DIP Facility, The Newark Group will grant the ORIX Facility Agents, on behalf of the ORIX Facility Lenders, a first priority lien on all present and after-acquired personal property (excluding the ABL DIP Priority Collateral), including, but not limited to, certain real property; the outstanding capital stock of The Newark Group (if there is a holding company for The Newark Group) and of certain direct subsidiaries of The Newark Group (limited to a pledge of 65% of the voting equity and 100% of the non-voting equity of each first tier foreign subsidiary) and a second priority lien on the ABL DIP Priority Collateral.

For a more detailed understanding of the ORIX DIP Facility, including applicable interest rates, covenants and conditions to the effectiveness of such facility, see the ORIX DIP Facility Term Sheet attached hereto as <u>Exhibit I</u>.

### 3.    Assumption of the Plan Support Agreement

In accordance with the Plan Support Agreement, the Debtors will file a motion requesting authority to assume their obligations under the Plan Support Agreement pursuant to 11 U.S.C. § 365.

### 4.    Employee Compensation.

The Debtors rely on their employees for day-to day business operations.  The Debtors believe that any delay in paying any of their employees' compensation, deductions, reimbursement and benefits could severely disrupt the Debtors' relationship with their

employees, thereby creating the risk that operations could be severely impaired.  As a result, through the Motion for Authority to Pay Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses, the Debtors will request Bankruptcy Court authorization to pay certain prepetition wages and other benefits to their employees.

### 5.    Payment of Creditors in Ordinary Course of Business

To minimize the disruption of service from their vendors and suppliers, through the Motion for Authority to (a) Pay Unimpaired Claims of General Unsecured Creditors in the Ordinary Course of Business and (b) Direct Banks and Other Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief, the Debtors will seek entry of an order authorizing them, in their discretion, to pay the Claims of General Unsecured Creditors in the ordinary course of business.

### 6.    Cash Management

The Debtors utilize a centralized cash management system to collect funds for their domestic operations and to pay the operating and administrative expenses in connection therewith.  In order to, among other things, avoid administrative inefficiencies, through the Motion for Authority to (a) Maintain Existing Bank Accounts, (b) Continue Use of Existing Business Forms, (c) Continue Use of Existing Investment Guidelines, and (d) Continue Funding Foreign Subsidiaries, the Debtors intend to request entry of an order authorizing and approving the continued use of the existing cash management system, authorizing the continued use of existing bank accounts and business forms, and authorizing deposit practices and waiving the requirements of section 345(b) in connection therewith on an interim basis.

### 7.    Taxes

The Debtors believe that, in some cases, certain authorities have the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet obligations imposed upon them to remit certain taxes and fees.  Accordingly, through the Motion for Order (a) Authorizing the Debtors to Pay Prepetition Taxes and (b) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief, the Debtors intend to request Bankruptcy Court authorization to pay certain sales, use, and property taxes that are payable directly to various state and local taxing authorities as such payments become due.

### 8.    Utilities

In connection with the operation of their business and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telecom service, data service, fiber transmission, waste disposal and other similar services.  Because uninterrupted utility services are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts, through the Motion for Order (a) Establishing Procedures for Utilities to Request Adequate Assurance of Payment, and (b) Establishing Procedures for Resolving Disputes Relating to Adequate Assurance Requests, the Debtors will request entry of an order prohibiting the utility providers from altering, refusing, or discontinuing service to the Debtors on account of prepetition invoices, including the making of demands for security deposits or accelerated

payment terms; providing that the utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based on, among other things, the Debtors' payment of a deposit in an amount equal to the Debtors' estimated cost of utility service for two weeks; and the establishment of procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the utility providers.

### 9.    Schedules and Statements

Section 521 of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules require the Debtors to prepare and file schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**Statements**") with the Bankruptcy Court within 15 days after the Petition Date, unless otherwise ordered by the Bankruptcy Court.    This requirement is to provide the Debtors' creditors, Interest Holders, and other interested parties with sufficient information to make informed decisions with respect to the Debtors' planned reorganization.    Due to the number of the Debtors' creditors, the size and complexity of the Debtors' business, the diversity of its operations and assets, and the staffing available to gather, process and complete the Schedules and Statements, the Debtors anticipate that they will need additional time to complete the Schedules and Statements.    Accordingly, through the Motion for (a) Additional Time to File Schedules and Statements of Financial Affairs, and (b) a Permanent Waiver of the Requirement to File Schedules and Statements of Financial Affairs Upon Confirmation of the Debtors' Plan of Reorganization, the Debtors intend to request an extension of 60 additional days (for a total of 75 days from the Petition Date) to prepare and file the Schedules and Statements.    The Debtors also anticipate requesting a waiver of the requirement to file Schedules and Statements in the event the Plan is confirmed within 75 days before the Schedules and Statements are due, in light of the nature of these Chapter 11 Cases and in light of the Debtors' decision not to impair General Unsecured Creditors.

### 10.    Retention of Professionals

The Debtors intend to apply for entry of an order authorizing the retention of Lowenstein Sandler P.C. as its general reorganization and bankruptcy counsel under section 327(a) of the Bankruptcy Code.

The Debtors also anticipate filing an application to retain AlixPartners as their financial advisors and Jefferies as their investment banker.    To further assist them in carrying out their duties as debtors-in-possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also intend to seek to retain Deloitte and Touche LLP as their auditor and Grant Thornton as their tax advisor.    The Debtors also intend to request authority to employ Kurtzman Carson Consultants, LLC ("**KCC**") as their claims and voting agent.    Finally, the Debtors intend to seek to employ various "ordinary course professionals" to assist them in operating their business.

11.     **Notice, Case Management, and Administrative Procedures**

To streamline the administration of the Chapter 11 Cases, the Debtors intend to apply for an order setting forth the procedures for processing notices, managing the Chapter 11 Cases, and other administrative procedures.

## ARTICLE V.        THE PLAN OF REORGANIZATION

A.     **GENERAL**

THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN.  THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.  THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY.  IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE PLAN BECOMES EFFECTIVE, THE PLAN WILL BIND ALL CLAIM AND INTEREST HOLDERS.

B.     **CLASSIFICATION AND ALLOWANCE OF CLAIMS & INTERESTS GENERALLY**

1.     **Classification and Allowance**

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests.  These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests.  Only Holders of Allowed Claims are entitled to vote on and receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

C.    **PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP FACILITY CLAIMS AND PRIORITY TAX CLAIMS**

1.    **Administrative Expense Claims**

Administrative Expense Claims are Claims against the Debtors for costs and expenses of administration of the Chapter 11 Cases (including, without limitation, Claims arising under sections 328, 330, 363, 364(c)(1), 365, 503(b), and 507(a)(2) and 1114(e) of the Bankruptcy Code) including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors; (b) all compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330 or 503(b) of the Bankruptcy Code; (c) all Coalition Advisor Claims, without any requirement for the filing of retention applications or fee applications in the Chapter 11 Cases; (d) any indebtedness or obligations incurred or assumed by the Debtors, as debtors-in-possession, during the Chapter 11 Cases; (e) any payment to be made under the Plan or Order of this Court to cure a default on an assumed executory contract or unexpired lease; (f) all Prepetition Indenture Trustee Claims without any requirement for filing fee applications in the Chapter 11 Cases; and (g) the DIP Facility Claims (which, in accordance with the terms of the DIP Financing Order, are granted super-priority claims status).  All fees and charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the United States Code are excluded from the definition of Administrative Expense Claims and shall be paid in accordance with Section 12.7 of the Plan.

The Bankruptcy Code does not require that Administrative Expense Claims be classified under a plan.  It does, however, require that Allowed Administrative Expense Claims be paid in full in cash in order for a plan to be confirmed, unless the Holder of such Claim consents to different treatment.

Pursuant to the Plan, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim will receive payment in full and in Cash of any unpaid portion of such Allowed Administrative Expense Claim as follows:

(a)    the Coalition Advisor Claims shall be Allowed Claims and paid in full, in the ordinary course of business but no later than the Effective Date, without the requirement to file a retention application or fee application with the Bankruptcy Court.  Any unused portion of the retainers held by the Coalition Advisors shall be refunded to the Debtors within forty-five (45) days of the Effective Date.

(b)    in the case of professional advisors, subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code and the Interim Compensation Order, as soon as practicable after Bankruptcy Court approval thereof;

(c)    in the case of the Prepetition Indenture Trustee, (x) payment in the ordinary course of business (subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith and without the requirement to file a fee application with the Bankruptcy Court), but no later than the Effective

Date, of the Prepetition Indenture Trustee Claims, provided that such fees, costs and expenses are reimbursable under the terms of the Prepetition Indenture and (y) payment in the ordinary course of business (subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith) of all reasonable fees, costs, and expenses incurred by the Prepetition Indenture Trustee after the Effective Date, to the extent the Prepetition Indenture Trustee is involved in making distributions on account of the Prepetition Notes Claims; and

(d)      with respect to each other Allowed Administrative Expense Claim, (x) payment in the ordinary course of business as such Claims become due; provided, however, that Allowed Administrative Expense Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, (y) such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Debtors, or (z) as provided for in a Final Order.

## 2.      **DIP Facility Claims**

The DIP Facility Claims shall be deemed Allowed in their entirety for all purposes of the Plan and the Chapter 11 Cases and, for the avoidance of doubt, shall not be subject to avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person.  DIP Facility Claims are all Claims arising from or in connection with the DIP Facility Credit Agreements.

Pursuant to the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed ABL DIP Facility Claim, each Holder of an Allowed ABL DIP Facility Claim shall either be paid in full and in Cash from the proceeds of the ABL Exit Facility or otherwise or receive such treatment as to which the Holders of any ABL DIP Facility Claims shall have agreed upon in writing and all commitments under the ABL DIP Facility Credit Agreement shall be cancelled.  Notwithstanding anything to the contrary herein, the liens and security interests securing the ABL DIP Facility Claims shall continue in full force and effect in accordance with the terms, conditions, and covenants of the ABL Exit Facility Credit Agreement, or until such time as the Allowed ABL DIP Facility Claims have been indefeasibly paid in full and in Cash and all commitments under the ABL DIP Facility are cancelled, after which such liens and security interests shall be deemed cancelled in accordance with the terms of the ABL DIP Facility Credit Agreement.  Each Allowed ABL DIP Facility Claim shall include all unpaid interest accrued at the rates provided for in the ABL DIP Facility Credit Agreement up to the Effective Date, plus fees, costs, and other charges provided for under the ABL DIP Facility Credit Agreement up to the Effective Date.

Pursuant to the Plan, on the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed ORIX DIP Facility Claim, each Holder of an Allowed ORIX DIP Facility Claim shall be paid in full and in Cash from the proceeds of the

ORIX Exit Facility or otherwise receive such treatment as to which the Holders of any ORIX DIP Facility Claims shall have agreed upon in writing and all commitments under the ORIX DIP Facility Credit Agreement shall be cancelled. Notwithstanding anything to the contrary herein, the liens and security interests securing the ORIX DIP Facility Claims shall continue in full force and effect in accordance with the terms, conditions, and covenants of the ORIX Exit Facility Credit Agreement or, if the ORIX Exit Facility Agreement is not entered into, until such time as all of the Allowed ORIX DIP Facility Claims have been indefeasibly paid in full and in Cash and all commitments under the ORIX DIP Facility are cancelled, after which such liens and security interests shall be deemed terminated in accordance with the terms of the ORIX DIP Facility Credit Agreement. Each Allowed ORIX DIP Facility Claim shall include all unpaid interest, fees, costs, and other charges through to the Effective Date, accrued at the rates provided for in the ORIX DIP Facility Credit Agreement.

### 3. Priority Tax Claims

Priority Tax Claims are Claims against the Debtors of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

The taxes entitled to priority are: (a) taxes on income or gross receipts that meet the requirements of section 507(a)(8)(A); (b) property taxes meeting the requirements of section 507(a)(8)(B); (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C); (d) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to section 507(a)(4), to the extent such taxes also meet the requirements of section 507(a)(8)(D); (e) excise taxes of the kind specified in section 507(a)(8)(E); (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F); and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G).

The Bankruptcy Code does not require that priority tax claims be classified under a plan. It does, however, require that such claims receive the treatment described below in order for a plan to be confirmed, unless the holder of such claims consents to different treatment.

Pursuant to the Plan, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, in the ordinary course of business as such Claims become due, each Holder of an Allowed Priority Tax Claim shall receive, at the election of the Debtors: (i) Cash equal to the amount of such Priority Tax Claim; (ii) such other treatment as to which the Debtors or the Reorganized Debtors and the Holder of such Allowed Priority Tax Claims shall have agreed upon in writing; or (iii) such other treatment as will cause such Claims not to be Impaired; provided, however, that any Allowed Priority Tax Claim not due and owing on the Effective Date will be paid when such Claim becomes due and owing.

### D. NON-SUBSTANTIVE CONSOLIDATION AND INTERCOMPANY CLAIMS

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be

substantively consolidated for purposes thereof.  Except as specifically set forth in the Plan, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any Claim against any other Debtor.

Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as a separate Claim against each Debtor's Estate, provided, however, that no Holder shall be entitled to receive more than payment in full of its Allowed Claim, and such Claims will be administered and treated in the manner provided in the Plan.

Notwithstanding anything else in the Plan, Intercompany Claims and Intercompany Interests held by and between the Debtors and the Non-Debtor Affiliates shall be Unimpaired and shall remain in full force and effect on or after the Effective Date.

Notwithstanding anything to the contrary contained in the Plan, Interests of any Debtor held in the treasury of such Debtor shall be cancelled, annulled and extinguished without consideration on the Effective Date.

## E.    CLASSIFICATION OF CLAIMS

The categories of Claims and Interests listed below, which exclude Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims, in accordance with section 1123(a)(1) of the Bankruptcy Code, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Prepetition ABL Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Prepetition CL Claims | Unimpaired | No (deemed to accept) |
| Class 5 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 6 | Prepetition Notes Claims | Impaired | Yes |
| Class 7 | Von Zuben Subordinated Unsecured Note Claim | Impaired | Yes |
| Class 8 | Equity Interests[11] | Impaired | Yes |
| Class 9 | ESOP Interests | Impaired | Yes |

---

[11]  Pursuant to Section 3.5 of the Plan, the Interests in Debtors Jackson Drive Corp. and NP Cogen, Inc. owned by the Newark Group will not be Impaired.  Therefore, the Intercompany Interests owned by the Newark Group in Jackson Drive Corp. and NP Cogen, Inc. are not entitled to, and will not, vote on the Plan.

## F.   PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

The classification and treatment of Claims against and Interests in the Debtors is set forth in detail in Sections II and III of the Plan.  A summary of that treatment is provided below.

### 1.   Priority Non-Tax Claims (Class 1)

Priority Non-Tax Claims are Claims against the Debtor other than Administrative Expense Claims or Priority Tax Claims, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

Pursuant to the Plan, each Holder of an Allowed Priority Non-Tax Claim shall have its Claim Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Effective Date.

### 2.   Other Secured Claims (Class 2)

Other Secured Claims are Secured Claims other than Claims arising pursuant to or in connection with the DIP Facilities, Administrative Expense Claims, Prepetition ABL Claims, and Prepetition CL Claims.

Pursuant to the Plan, each Holder of an Allowed Other Secured Claim shall have its Claim Reinstated and shall retain its Lien on the property that secures such Claim.

### 3.   Prepetition ABL Claims (Class 3)

Prepetition ABL Claims are Claims arising under or in connection with the Prepetition ABL Credit Facility and related documents.

Pursuant to the Plan, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition ABL Claim, to the extent such Allowed Prepetition ABL Claim has not been previously indefeasibly paid in full, satisfied and released, each Holder of an Allowed Prepetition ABL Claim shall have been paid in full and in Cash from the proceeds of the ABL DIP Facility or otherwise on the day the DIP Financing Order is entered, in accordance with the terms of the ABL DIP Facility, including, without limitation, a release and discharge of each Holder of an Allowed Prepetition ABL Claim.  Each Allowed Prepetition ABL Claim shall include all unpaid interest accrued at the rate provided for in the Prepetition ABL Credit Facility up to the date the DIP Financing Order is entered, plus fees, costs and other charges provided for under the Prepetition ABL Credit Facility up to the day the DIP Financing Order is entered.

On the day the ABL DIP Facility closes, the Prepetition ABL Credit Agreement shall be paid in full, and shall be amended and restated by the ABL DIP Facility Credit Agreement. Thereafter, on the Effective Date, the ABL DIP Facility Credit Agreement and all Claims arising thereunder shall be paid by and replaced with the ABL Exit Facility or otherwise.

4.      **Prepetition CL Claims (Class 4)**

Prepetition CL Claims are Claims arising under or evidenced by the Prepetition CL Credit Facility and related documents.

Pursuant to the Plan, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition CL Claim (to the extent such Allowed Prepetition CL Claim has not been previously indefeasibly paid in full, satisfied and released), each Holder of an Allowed Prepetition CL Claim shall be paid in full and in Cash from the proceeds of the ORIX DIP Facility or otherwise, on the day the ORIX DIP Facility closes, or shall have received such treatment as to which each Holder of an Allowed Prepetition CL Claim shall have agreed upon, in accordance with the terms of the ORIX DIP Facility, including, without limitation, a release and discharge of each Holder of an Allowed Prepetition CL Claim.  Each Allowed Prepetition CL Claim shall include all unpaid interest accrued at the rate provided for in the Prepetition CL Credit Facility up to the day the Prepetition CL Claims are paid.

On the day the ORIX DIP Facility closes, the Prepetition CL Credit Agreement shall be cancelled, provided, however, that those provisions contained in the Prepetition CL Credit Agreement shall continue in effect solely for the purposes of (a) allowing the Prepetition CL Administrative Agent or the Disbursing Agent, as applicable, to make distributions or take any other action necessary to effectuate the Class 4 treatment under the Plan, and to perform such other necessary administrative functions with respect thereto, and (b) permitting such parties to maintain any rights (but not any liens) they may have for fees, costs, and expenses thereunder, which provisions shall continue in accordance with the terms of the Prepetition Indenture.

5.      **General Unsecured Claims (Class 5)**

A General Unsecured Claim is any Claim against any of the Debtors that is <u>not</u> an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Prepetition ABL Claim, a Prepetition CL Claim, a Prepetition Notes Claim, a Von Zuben Subordinated Unsecured Note Claim, or a Claim arising from an Equity Interest or an ESOP Interest, and shall include, without limitation, all Claims held by current and former employees of The Newark Group under any employee agreement or arrangement (other than Claims and Interests arising from the ESOP), including all accrued but unpaid obligations under the SARP, but shall not include Claims that are disallowed or released, whether by operation of law or pursuant to an order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

Pursuant to the Plan, on the Effective Date all Allowed General Unsecured Claims shall be Reinstated to the extent that such Claim is not paid in the ordinary course of business prior to the Effective Date.

6.      **Prepetition Notes Claims (Class 6)**

Prepetition Notes Claims are any Claim against the Company arising under or in connection with the Prepetition 2014 Notes and the Mullen Note.  The Prepetition Notes Claims shall be deemed Allowed for all purposes of the Plan and the Chapter 11 Cases.

On the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Prepetition Notes Claim, each Holder of an Allowed Prepetition Notes Claim shall receive its Pro Rata share of 96.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Equity Warrants and the Management Warrants; provided that, as a condition to receipt of New Common Stock, each Holder of a Prepetition Notes Claim will be required to execute a counterpart of the Reorganized Company Stockholders' Agreement. The Debtors shall pay all Coalition Advisor Claims and the reasonable fees and expenses of any counsel for the Prepetition Indenture Trustee incurred in connection with the Chapter 11 Cases, in each case, without the need for any application to the Bankruptcy Court. All contractual subordination provisions shall remain in place and shall continue to be enforceable on and after the Effective Date. On the Effective Date, the Prepetition Indenture shall be cancelled, provided, however, that those provisions contained in the Prepetition Indenture shall continue in effect solely for the purposes of (a) allowing the Prepetition Indenture Trustee or the Disbursing Agent, as applicable, to make distributions on account of Class 6, and to perform such other necessary administrative functions with respect thereto, and (b) permitting such parties to maintain any rights (but not any liens) they may have for fees, costs, and expenses thereunder, which provisions shall continue in accordance with the terms of the Prepetition Indenture. On the Effective Date, the Mullen Note shall be cancelled.

## 7.    Von Zuben Subordinated Unsecured Note Claim (Class 7)

The Von Zuben Subordinated Unsecured Note Claim is the claim of Von Zuben arising under the Subordinated Installment Promissory Note dated August 10, 2005 between The Newark Group, Inc., as maker, and Von Zuben, as payee (the "**Von Zuben Subordinated Unsecured Note**"). The Von Zuben Subordinated Unsecured Note Claim shall be deemed Allowed for all purposes of the Plan and the Chapter 11 Cases.

In full satisfaction, settlement, release, and discharge of and in exchange for the Von Zuben Subordinated Unsecured Note Claim, Von Zuben shall be entitled to receive: (a) a Cash payment of $250,000 payable not later than three (3) Business Days after the Effective Date; (b) two subordinated notes to be issued by the Reorganized Debtor to Von Zuben on the Effective Date in the principal amounts of $800,000 and $550,000, substantially in the forms attached hereto as Exhibit E (the "**Von Zuben New Subordinated Notes**"); and (c) a Cash payment of not more than $15,000, payable not later than the later of (x) three (3) Business Days after the Effective Date and (y) receipt by the Reorganized Debtor of an invoice therefor in respect of the fees and expenses of counsel to Von Zuben incurred in connection with negotiation of the Von Zuben Settlement Agreement. The distributions made to the Holders of the Von Zuben Subordinated Unsecured Note Claim will not be subject to any of the subordination provisions contained in the Von Zuben Subordinated Unsecured Note. On the Effective Date, the Von Zuben Subordinated Unsecured Note shall be cancelled.

## 8.    Equity Interests (Class 8)

Equity Interests are, without limitation, any equity security in any Debtor that is of a kind specified in section 101(16) of the Bankruptcy Code, and any options, warrants, puts, calls, subscriptions or other similar rights or other agreements, commitments, or outstanding securities,

contractual or otherwise, obligating the Debtors to issue, transfer, purchase, redeem, or sell any shares of capital stock or other securities, and/or obligating the Debtors to acquire any such Equity Interest or to convert into any such Equity Interest, any claims arising out of any appraisal or dissenter's rights, any claims arising from rescission of a purchase, sale or other acquisition of any common stock or other equity security (or any right, claim, or interest in and to any common stock or equity security) of the Debtors, and any claims for damages or any other relief arising from any such purchase, sale, or other acquisition of such common stock or other equity security; provided, however, that for the purposes of treatment under the Plan, "Equity Interest" shall not include any Intercompany Interests held by The Newark Group in Jackson Drive Corp. and NP Cogen, Inc., Treasury Interests, or any Interests arising under the ESOP that are classified as Class 9 ESOP Interests.

Pursuant to the Plan, each Holder of an Equity Interest shall have its Equity Interest cancelled, annulled and extinguished on the Effective Date.  On the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Equity Interest, each Holder of an Equity Interest shall receive its Pro Rata Share of (x) 1.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Equity Warrants and the Management Warrants, and (y) five-year Equity Warrants to purchase 15% of the New Common Stock to be issued on the Effective Date (calculated by including the aggregate number of shares issuable upon exercise of the Equity Warrants, but not including the shares issuable upon exercise of the Management Warrants), subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Management Warrants, at a price based on an equity value of $157.5 million in consideration of the cancellation of its Equity Interests; provided that, as a condition to receipt of New Common Stock, each Holder of a Class 8 Interest will be required to execute a counterpart of the Reorganized Company Stockholders' Agreement.

## 9.    ESOP Interests (Class 9)

ESOP Interests are, without limitation, all Interests directly arising from, under, or relating in any way to, the ESOP, including the ESOP, all ESOP Allocated Shares, and all ESOP Distributed Shares, including shares of The Newark Group distributed to ESOP Participants and as to which the ESOP Participants have not received payment from the exercise of their put rights under the ESOP and have not submitted a proof of Claim, and all Claims arising out of or relating thereto.

Pursuant to the Plan, on the Effective Date, (i) each Holder of an ESOP Interest, including the ESOP and all ESOP Participants, shall have its ESOP Shares cancelled, annulled and extinguished; (ii) in full satisfaction, settlement, release, and discharge of and in exchange for the cancelled ESOP Shares, the ESOP, as amended by the ESOP Plan Amendments, shall be assumed by the Reorganized Debtor, and the Reorganized Debtor shall continue to perform its obligations under the ESOP as amended by the ESOP Plan Amendments; (iii) the ESOP Participants shall receive their Pro Rata share of 2% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants, provided, however, that the New Common Stock to be issued on account of the ESOP Allocated Shares shall be distributed to the ESOP and allocated to the accounts of the ESOP Beneficiaries on a Pro Rata basis, and

each Holder of a Class 9 Interest (other than the ESOP) will be required, as a condition to such Holder's receipt of New Common Stock, to execute a counterpart of the Reorganized Company Stockholders' Agreement; and (iv) to the extent that (a) with respect to an ESOP Beneficiary's ESOP Allocated Shares, the ESOP Beneficiary instructs the ESOP Independent Fiduciary to direct the ESOP Trustees to vote such shares in favor of the Plan, and (b) with respect to an ESOP Distributee's ESOP Distributed Shares, the ESOP Distributee votes such shares in favor of the Plan, such ESOP Beneficiary and ESOP Distributee will unconditionally cancel, waive and release any current or potential claims and interests that it holds, or that could be brought on its behalf by the ESOP or any fiduciary of the ESOP, against the Company and any present or former fiduciaries or administrators of the ESOP (as determined immediately prior to the Effective Date) relating to the ESOP with respect to any and all ESOP Interests, including as described in Section 10.2 of the Plan, in each case to the extent permitted by the Code, the Bankruptcy Code and ERISA.

## G.    IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS THAT ARE IMPAIRED; ACCEPTANCE OR REJECTION OF THE PLAN

### 1.    Holders of Claims Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy or defaults of a kind that does not require cure), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim or such interest arises from a failure to perform non-monetary obligations, other than a default arising from a failure to operate a nonresidential real property lease, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure and (e) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Classes 1, 2, 3, 4, and 5 are Unimpaired by the Plan. Under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to accept the Plan, and thus the votes of the Holders of such Claims will not be solicited.

Except as otherwise explicitly provided in the Plan or any Plan Documents, nothing shall affect, diminish or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Unimpaired Claims.  In addition, the Debtors and the Reorganized Debtors reserve their rights to assert any and all Claims that they may have against the Holder of any Unimpaired Claims, except to the extent explicitly provided in the Plan or any Plan Documents.

Classes 6, 7, 8, and 9 are Impaired by the Plan.  Accordingly, only the votes of Holders of Claims and Interests in Classes 6, 7, 8, and 9 will be solicited with respect to the Plan.

**2.**      **Acceptance by an Impaired Class**

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan. In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the Plan is accepted by Holders of at least two-thirds (2/3) in amount of Allowed Interests of such Class that have timely and properly voted to accept or reject the Plan.

**3.**      **Nonconsensual Confirmation**

If any Impaired Class fails to accept the Plan by the requisite statutory majorities, the Debtors, with the consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, reserve the right (i) to confirm the Plan by a "cram-down" of such non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code other than with respect to Class 6 Prepetition Notes Claims and (ii) to propose any modifications to the Plan and to confirm the Plan as modified, without re-solicitation, to the extent permitted by the Bankruptcy Code.

**H.**      **MEANS OF IMPLEMENTATION**

**1.**      **Reorganized Company Securities**

(a)      <u>Issuance of New Common Stock</u>.  On the Effective Date, the Reorganized Company shall issue an aggregate of 28,730,100 shares of New Common Stock. Each Holder of an Allowed Prepetition Notes Claim will receive, in consideration of the cancellation of its Allowed Prepetition Notes Claim, its Pro Rata share of 96.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Equity Warrants and the Management Warrants; provided that, as a condition to receipt of New Common Stock, each Holder of a Prepetition Notes Claim will be required to execute a counterpart of the Reorganized Company Stockholders' Agreement.  In addition, each Holder of an Equity Interest shall receive, in consideration of the cancellation of its Equity Interests, its Pro Rata Share of (i) 1.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Equity Warrants and the Management Warrants, and (ii) five year Equity Warrants to purchase 15% of the New Common Stock to be issued on the Effective Date, (calculated by including the aggregate number of shares issuable upon exercise of the Equity Warrants, but not including the shares issuable upon

exercise of the Management Warrants), subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Management Warrants, at a price based on an equity value of $157.5 million in consideration of the cancellation of shares of its Equity Interests; and the ESOP and each ESOP Distributee shall receive, in consideration of: (1) the cancellation of its ESOP Shares; and (2) if the ESOP Participant provided voting instructions to vote in favor of the Plan or voted directly in favor of the Plan, the cancellation, waiver, and release of the claims described in Section 10.2 of the Plan; its Pro Rata share of 2% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants; provided that, as a condition to receipt of New Common Stock, each Holder of a Class 8 Interest or a Class 9 Interest, other than the ESOP, will be required to execute a counterpart of the Reorganized Company Stockholders' Agreement.  As of the Effective Date, all Interests that have been authorized to be issued but that have not been issued and all Treasury Interests shall be deemed cancelled and extinguished without any further action of any party.  The New Common Stock shall not be registered under the Securities Act of 1933, as amended, and shall not be listed for public trading on any securities exchange.  Distribution of such New Common Stock shall be made by delivery of one or more certificates representing such shares as described herein or made by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, as provided in Section 6.5 of the Plan.  The Certificate of Incorporation will set forth the rights and preferences under the New Common Stock.  On the Effective Date, except as otherwise provided for herein, all Interests, including any stockholder agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any obligations of any Debtor that relate to Interests that are Impaired under the Plan shall be cancelled, and the obligations of the Debtors under any stockholder agreements, registration rights agreements, repurchase agreements and repurchase arrangements shall be discharged.  The issuance of the New Common Stock and any other securities pursuant to the Plan and any subsequent sales, resales, transfers, or other distributions of such securities shall be exempt from any federal or state securities laws registration requirements pursuant to Bankruptcy Code section 1145.

(b)    <u>Reorganized Company Stockholders' Agreement</u>.  On the Effective Date, the Reorganized Company and all Holders of New Common Stock, other than Holders of New Common Stock received as a result of ESOP Interests that do not arise from, under, or relate to ESOP Distributed Shares, shall enter into (or be deemed to enter into as provided below) the Reorganized Company Stockholders' Agreement, which shall be in form and substance satisfactory to the Company, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, substantially in the form attached hereto as <u>Exhibit F</u>.  The Reorganized Company Stockholders' Agreement shall be binding on all parties

entitled to receive New Common Stock under the Plan, other than Holders of New Common Stock received as a result of ESOP Interests that do not arise from, under, or relate to ESOP Distributed Shares, and upon all successors and assigns of such parties, regardless of whether such parties execute the Reorganized Company Stockholders' Agreement.  The Reorganized Company Stockholders' Agreement shall contain provisions governing the rights of Holders of the New Common Stock including, without limitation, access to information, certain transfer restrictions such as drag-along and tag-along rights and limits on the number of record Holders.

**2.      Continued Corporate Existence; Reincorporation of The Newark Group; and Vesting of Assets in the Reorganized Debtors**

On the Effective Date, the Reorganized Debtors shall continue to exist as separate corporate entities in accordance with the applicable laws in the respective jurisdictions in which they are incorporated or organized and pursuant to their respective certificates, articles of incorporation and by-laws in effect prior to the Effective Date, except to the extent such certificates, articles of incorporation and by-laws are to be amended pursuant to the terms of the Plan; provided, however, notwithstanding the foregoing, the Reorganized Company may be reincorporated as a Delaware corporation in accordance with the Reincorporation Transactions Document, in substantially the form to be included as part of the Plan Supplement, which shall be in form and substance satisfactory to the Coalition of Prepetition Noteholders

Notwithstanding anything to the contrary in the Plan, Reinstated Claims against a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor following the Effective Date and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.

Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all Causes of Action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, liens, charges, other encumbrances and interests, provided however, neither the Debtors nor the Reorganized Debtors shall pursue any Chapter 5 Claims and all such Chapter 5 Claims are released pursuant to Section X of the Plan. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

**3.      Corporate Governance, Directors, Officers and Corporate Action**

(a)      Certificate of Incorporation and By-Laws

On the Effective Date, The Newark Group intends, but shall not be required, to reincorporate as a Delaware corporation by means of the transactions described in the Reincorporation Transactions Document, and the Certificate of Incorporation and By-Laws of the Reorganized Company shall go into effect and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (ii) authorize a sufficient number of shares of New Common Stock to allow for the issuance of the shares of New Common Stock and Warrants contemplated by the Plan.  On or prior to the Effective Date, The Newark Group shall make such filings in the states of Delaware and New Jersey as shall be necessary or desirable to effect any such reincorporation and to provide for the effectiveness on the Effective Date of the Certificate of Incorporation.  In addition, on or about the Effective Date, the certificates, articles of incorporation, and by-laws of the Reorganized Debtors shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.  After the Effective Date, the Reorganized Company may amend and restate its Certificate of Incorporation and By-Laws as permitted by applicable law and applicable provisions of the Reorganized Company Stockholders' Agreement.

(b)    Directors and Officers of the Reorganized Company

On the Effective Date, the term of the current members of the board of directors of the Company shall expire.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, on the Effective Date, the initial board of directors of the Reorganized Company will consist of five (5) directors.  Four (4) of the board members shall be designated by the Coalition of Prepetition Noteholders.  The identity of the four board members designated by the Coalition of Prepetition Noteholders shall be set forth in the Plan Supplement.  On the Effective Date, Robert Mullen shall continue to serve as the chief executive officer of the Company and shall be the fifth member of the board of directors so long as he remains chief executive officer of the Reorganized Debtors.  Attached hereto as Exhibit L is the Terms of Management Compensation and Employment for Reorganized The Newark Group, Inc., setting forth the terms of employment and compensation of certain executives of The Newark Group after the Effective Date.  Each member of the Current Management Group will be employed by the Reorganized Company on and after the Effective Date on an at-will basis, except Mullen and Joseph Byrne, each of whom will receive employment, compensation, and severance contracts as detailed in the Terms of Management Compensation and Employment for Reorganized The Newark Group, Inc.  All other employment and severance contracts, if any, between the Company and any directors and officers of the Company, will be rejected as of the Effective Date.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation, the other constituent documents of the Reorganized Company, and applicable law.  Thereafter, the Certificate of Incorporation, By-Laws, and the Reorganized Company Stockholders' Agreement shall govern the designation of directors.  In addition, the boards of directors of Jackson, Cogen, and the Non-Debtor Affiliates shall be comprised of members of the board of directors of the Reorganized Company, or such other persons as are designated by the board of directors of the Reorganized Company.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identities of the directors and the officers of the Reorganized Company will be set forth in the Plan Supplement, together with all the other information that may be required by § 1129(a)(5).

(c)     Corporate Action

On the Effective Date, any reincorporation of the Reorganized Company as a Delaware corporation, the adoption of the Certificate of Incorporation or similar constituent documents, the adoption of the By-Laws, the selection of directors and officers of the Reorganized Company and the other Reorganized Debtors, and all other actions contemplated by the Plan, including all actions required to be taken by the board of directors of the Debtors or the Reorganized Debtors, that the transactions contemplated herein shall not constitute a Change in Control for purposes of any employee agreements or arrangements (including the passage of any required resolutions), shall be authorized and approved in all respects or shall have otherwise occurred (subject to the provisions of the Plan). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security Holders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the board of directors of the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors.

**4.      Termination of Liens**

Except as otherwise provided in the Plan, any Plan Documents, or in the Exit Facility Credit Agreements, on the Effective Date, any Lien securing any Secured Claim (other than a Lien securing a Secured Claim that is Reinstated pursuant to Section 3.2 of the Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

**5.      Exit Financing**

As more fully described below, on the Effective Date, without any requirement of further action by Holders or directors of the Debtors or the Reorganized Debtors, the Reorganized Company shall be authorized and directed to enter into the Exit Facility Credit Agreements as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of Liens securing the obligations under the Exit Facilities, provided the Exit Facilities. The foregoing documents shall be in form and substance acceptable to the Company, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent.

      (a)      ABL Exit Facility

On the Effective Date, The Newark Group and NGI as borrowers, and Cogen as guarantor, will enter into the ABL Exit Facility Credit Agreement, which agreement will amend and restate the ABL DIP Facility Credit Agreement. The ABL Exit Facility is an asset-based senior secured revolving credit facility pursuant to which the ABL Exit Facility Lenders provide a revolving line of credit in the aggregate principal amount of up to $50 million (subject to certain borrowing base limitations), up to €15 million of which may be borrowed directly by NGI and up to $15 million of which may be used for letters of credit and other financial accommodations. The ABL Exit Facility also includes an accordion feature, pursuant to which the maximum amount of the ABL Exit Facility may be increased to the aggregate amount of up to $85 million, upon the terms and conditions of, and with the required consents as provided in, the ABL Exit Facility Credit Agreement.

The term of the ABL Exit Facility Credit Agreement will be the earlier of (i) the date that is three (3) years following the Closing Date and (ii) the date when all Obligations are paid and satisfied in full in immediately available funds.

Pursuant to the ABL Exit Facility and the Intercreditor Agreement, The Newark Group will grant the ABL Exit Facility Administrative Agent, on behalf of the ABL Exit Facility Lenders, a first priority lien on all of its accounts receivable, inventory and certain other personal property (the "**ABL Exit Priority Collateral**"), a second priority lien in certain capital stock owned by it and a third priority lien on substantially all of its other assets, except for real property. Additionally, as further security, The Newark Group will guarantee the obligations of NGI under the ABL Exit Facility. The ABL Exit Facility will specifically provide that NGI has not guaranteed the obligations of The Newark Group and shall not be required to repay or prepay, or to guarantee, nor shall any amount paid by NGI be applied to, any obligations of The Newark Group under the ABL Exit Facility.

For a more detailed understanding of the ABL Exit Facility, including applicable interest rates, covenants and conditions to the effectiveness of such facility, see the form of ABL Exit Facility Credit Agreement attached hereto as Exhibit D.

      (b)      ORIX Exit Facility

On the Effective Date, The Newark Group as borrower, and Cogen and certain domestic subsidiaries of The Newark Group as guarantors, will enter into the ORIX Exit Facility Credit Agreement, a copy of which is attached hereto as Exhibit G[12]. Pursuant to the ORIX Exit Facility, the ORIX Exit Facility Lenders will provide a term loan in an aggregate principal amount of $110 million. The ORIX Exit Facility Credit Agreement will have a maturity date of March 31, 2014.

---

[12] As of the date of this Disclosure Statement, the ORIX Exit Facility Credit Agreement attached hereto as Exhibit G is subject, in all respects, to further revision and review by all of the contemplated parties thereto, including ORIX and the other lenders.

Pursuant to the ORIX Exit Facility and the ORIX DIP Facility, The Newark Group will grant the ORIX Facility Agents, on behalf of the ORIX Facility Lenders, a first priority lien on all present and after-acquired personal property (excluding the ABL Exit Priority Collateral), including, but not limited to, certain real property; the outstanding capital stock of The Newark Group (if there is a holding company for The Newark Group) and of certain direct subsidiaries of The Newark Group (limited to a pledge of 65% of the voting equity and 100% of the non-voting equity of each first tier foreign subsidiary (the "**ORIX Priority Collateral**"); and a second priority lien on the ABL Exit Priority Collateral.

For a more detailed understanding of the ORIX Exit Facility, including applicable interest rates, covenants and conditions to the effectiveness of such facility, see the form of ORIX Exit Facility Credit Agreement attached hereto as Exhibit G.

### 6. **Intercreditor Agreement**

Simultaneous with the execution of the DIP Facility Credit Agreements, The Newark Group, NGI, and certain domestic subsidiaries of The Newark Group, as borrowers, certain domestic subsidiaries of The Newark Group as guarantors; ORIX Finance Corp. in its capacity as administrative agent for the ORIX DIP Facility Credit Agreement and the ORIX Exit Facility Credit Agreement; and Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent for the ABL DIP Facility Credit Agreement and the ABL Exit Facility Credit Agreement, shall enter into the Intercreditor Agreement, substantially in the form attached hereto as Exhibit M.

The Intercreditor Agreement shall govern, among other things, the respective rights, liabilities and lien and payment priorities of the DIP Facility Claims and, upon the Effective Date, shall be re-executed in the same form to govern, among other things, the lien and payment priorities of Claims arising under the Exit Facilities.

The Intercreditor Agreement specifically provides, *inter alia*, that all liens and security interests upon the Prepetition ABL Priority Collateral securing all obligations and amounts owed pursuant to the ABL DIP Facility Credit Agreement and the ABL Exit Facility Credit Agreement shall have priority over the liens and security interests upon the Prepetition ABL Priority Collateral securing the obligations and amounts owed pursuant to the ORIX DIP Facility Credit Agreement and the ORIX Exit Facility Credit Agreement; and that all liens and security interests upon the ORIX Priority Collateral securing all obligations and amounts owed pursuant to the ORIX DIP Facility Credit Agreement and the ORIX Exit Facility Credit Agreement shall have priority over the liens and security interests upon the ORIX Priority Collateral securing the obligations and amounts owed pursuant to the ABL DIP Facility Credit Agreement and the ABL Exit Facility Credit Agreement.

### 7. **Management Incentive Plan**

An additional amount of up to 5% of the fully diluted New Common Stock, determined in each case at the time of exercise, may be granted to any successors of the Current Management Group and to other members of management of the Reorganized Company from

time to time, at the discretion of the Board of Directors of the Reorganized Company pursuant to a management incentive plan that may be enacted after the Effective Date.

**8.**   **Warrants**

The terms of the Management Warrants to be issued to the Current Management Group on the Effective Date and the terms of the Equity Warrants to be issued to Class 8 Equity Interests on the Effective Date will be set forth in the applicable Warrant Agreement, which will be substantially in the form set forth in the Warrant Agreement attached hereto as Exhibit N.

On the Effective Date, each member of the Current Management Group will be granted, pursuant to the terms of the Warrant Agreement, the percentage of Management Warrants representing the percentage of fully diluted New Common Stock set forth opposite such member's name in the table below.

| Name | Percent of 5% Management Warrants |
|------|-----------------------------------|
| Robert H. Mullen | 23% |
| Joseph E. Byrne | 14% |
| William D. Harper | 10% |
| Richard M. Poppe | 10% |
| Johnny Gold | 10% |
| Philip B. Jones | 10% |
| Jim Carbine | 10% |
| Carl Crook | 8% |
| Lynn M. Herro | 5% |
| **Total** | **100%** |

The Management Warrants to be issued to the Current Management Group will be issued pursuant to the terms of the Warrant Agreement.  The Management Warrants will be exercisable in accordance with the applicable Management Warrant Vesting Percentage.  For purposes hereof, the "Management Warrant Vesting Percentage" means:

(a)     0% from the Effective Date through but excluding the first anniversary of the Effective Date,

(b)     33-1/3% from the first anniversary of the Effective Date through but excluding the second anniversary of the Effective Date;

(c)     66-2/3% from the second anniversary of the Effective Date through but excluding the third anniversary of the Effective Date; and

(d)     100% from and after the third anniversary of the Effective Date.

Notwithstanding the Management Warrant Vesting Percentage, the Management Warrants vest 100%:  (i) immediately upon termination, if the Executive's employment has been terminated by the Executive for good reason or by the Reorganized Company without cause; and (ii)

immediately prior to any "Triggering Event," which shall have the meaning set forth in the Warrant Agreement.[13] Further, upon death or disability while employed by the Company, the Management Warrant Vesting Percentage will include partial vesting for the annual vesting period in which such death or disability occurs, based on the number of days in such vesting period that precede the date of death or disability.

### 9.    Deferred Compensation Agreement

In addition, on the Effective Date, the Reorganized Company shall enter into the Deferred Compensation Agreement, substantially in the form as attached hereto as Exhibit O, pursuant to which each member of the Current Management Group (each, an "**Executive**") will be granted, upon the occurrence of certain events as set forth in the Deferred Compensation Agreement, a share of the deferred compensation pool equal to that percentage set forth opposite such Executive's name in the table below of the aggregate amount of the deferred compensation pool.  The deferred compensation pool is equal to the lesser of (x) $3.5 million and (y) 5% of the excess of the equity value of the Reorganized Company on the date of determination over $87.5 million.

| Executive Name | Percent of Deferred Compensation Pool |
|---|---|
| Robert H. Mullen | 23% |
| Joseph E. Byrne | 14% |
| William D. Harper | 10% |
| Richard M. Poppe | 10% |
| Johnny Gold | 10% |
| Philip B. Jones | 10% |
| Jim Carbine | 10% |
| Carl Crook | 8% |
| Lynn M. Herro | 5% |
| **Total** | **100%** |

In each case, upon the occurrence of certain events, such Executive will be entitled to receive an amount of deferred compensation equal to (a) the maximum deferred compensation amount calculated according to the table above multiplied by (b) the applicable Deferred Compensation Vesting Percentage (as defined below).

For purposes hereof, the "**Deferred Compensation Vesting Percentage**" means:

(a)    100% if the Executive's employment has been terminated by the Executive for good reason or by the Reorganized Company without cause;

(b)    100% if a change in control event has occurred; and

---

[13] Generally, "Triggering Event" means any of the following: a public offering of the Common Stock of the Reorganized Company; a merger or similar transaction; or the sale or disposition of all or substantially all of the Reorganized Company's assets.  A complete definition of "Triggering Event" is set forth in the Warrant Agreement, which definition controls for all purposes.

(c)     If the Executive has resigned other than for good reason or if the Executive's employment has been terminated for cause:

(i)      0% from the Effective Date through but excluding the first anniversary of the Effective Date,

(ii)     in the case of Messrs. Jones and Crook, 100% from and after the first anniversary of the Effective Date, and in the case of the other members of the Current Management Group, 50% from the first anniversary of the Effective Date through but excluding the second anniversary of the Effective Date,

(iii)    75% from the second anniversary of the Effective Date through but excluding the third anniversary of the Effective Date, and

(iv)    100% from and after the third anniversary of the Effective Date.

Further, if the member of the Current Management Group dies or becomes disabled while employed by the Company, the Deferred Compensation Vesting Percentage shall be the Deferred Compensation Vesting Percentage determined in the manner set forth above plus partial vesting for the annual vesting period in which such death or disability occurs, based on the number of days in such vesting period that precede the date of death or disability.

## 10.    **Management Bonus**

On the Effective Date, the Reorganized Company shall pay from assets of the Reorganized Company an aggregate amount of $500,000.00 in Cash to certain members of the Current Management Group in consideration for successfully achieving the consummation of the Plan.  The amount of the management bonus to be paid to those certain members of the Current Management Group is set forth in column (C) of the table in Item 7 of the Terms of Management Compensation and Employment for Reorganized The Newark Group, Inc.

## 11.    **Additional Transactions Authorized Under the Plan**

On or prior to the Effective Date, the Debtors, with the consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, shall be authorized to take any such actions as may be necessary or appropriate to Reinstate Claims or render Claims not Impaired, as provided for under the Plan.

## I.    **PROVISIONS GOVERNING DISTRIBUTIONS**

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

1.    **Distributions for Claims in Classes 6 and 7 and Interests in Classes 8 and 9**

Unless the Holder of a Class 6 Claim, a Class 7 Claim, a Class 8 Equity Interest, or a Class 9 ESOP Interest agrees to a different Distribution Date or except as otherwise provided herein or in the Plan, or as ordered by the Bankruptcy Court, distributions to be made on account of Claims in Class 6, Claims in Class 7, Interests in Class 8 and Interests in Class 9 shall be made on the Effective Date.  Notwithstanding the date on which any distribution of New Common Stock, Warrants, or the Von Zuben New Subordinated Notes is actually made to a Holder of a Claim in Class 6 or Class 7 or an Interest in Class 8 or Class 9, as of the date of the distribution such Holder shall be deemed to have the rights of a Holder of such securities distributed as of the Effective Date.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

2.    **Interest on Claims**

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the DIP Financing Order), or unless required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims (other than Secured Claims), and no Holder of a Claim (other than the Holder of a Secured Claim) shall be entitled to interest accruing on or after the Petition Date on any Claim.

3.    **Distributions by Disbursing Agent**

Other than as specifically set forth in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan, provided, however, that: (i) distributions to the Prepetition CL Lenders, the Prepetition ABL Lenders, the ABL DIP Facility Lenders, and the ORIX DIP Facility Lenders, shall be made to, respectively, the Prepetition CL Administrative Agent, the Prepetition ABL Administrative Agent, and the ABL DIP Facility Administrative Agent, and the ORIX DIP Facility Agent, each of whom shall deliver such distributions to the Holders of Claims in accordance with the provisions of the Plan and in accordance with the terms of the relevant governing agreement; and (ii) distributions on account of the Prepetition Notes Claims will be made (x) to Mullen in the case of Prepetition Notes Claims arising under the Mullen Note and (y) to the Prepetition Indenture Trustee in the case of Prepetition Notes Claims arising under the Prepetition Indenture and Prepetition 2014 Notes.  The Prepetition Indenture Trustee shall deliver such distributions in accordance with the provisions of the Plan and the terms of the Prepetition Indenture.  The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other Persons or Entities to assist in or make the distributions required by the Plan.

4.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Claims.

(a)    _Delivery of Distributions in General_.  Subject to Bankruptcy Rule 9010, all distributions to Holders of Claims in Class 7 and Interests in Classes 8 and 9 shall be made at the addresses set forth in the Debtors' books and records unless

such addresses are superseded by proofs of Claims or Interests or transfers of Claims or Interests, if any, Filed pursuant to Bankruptcy Rule 3001. In the case of Class 6 Prepetition Notes Claims, all distributions will be made to (x) Mullen in the case of Prepetition Notes Claims arising under the Mullen Note and (y) the Prepetition Indenture Trustee for the benefit of the Holders of Prepetition 2014 Notes and for distribution to the Holders of Prepetition Notes Claims arising thereunder. In the case of Class 9 ESOP Interests, the distributions will be made as provided in Section 3.3B of the Plan.

(b)     Undeliverable and Unclaimed Distributions

(i)     Holding and Investment of Undeliverable and Unclaimed Distributions.  If the distribution to any Holder of a Claim in Class 6 or Class 7 or an Interest in Class 8 or Class 9 is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent is notified in writing of such Holder's then current address.

(ii)    Failure to Claim Undeliverable Distributions.  Any Holder of a Claim in Class 6 or Class 7 or an Interest in Class 8 or Class 9 that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property  Any New Common Stock for distribution on account of such Claim or Interest shall be canceled and will be of no further force or effect.  Nothing contained in the Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Company, to attempt to locate any Holder of an Allowed Claim or Interest.

**5.      Record Date for Distributions**

The record date for distributions under the Plan shall be the Distribution Record Date.

(a)     The Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim in Class 6 or Class 7 or Interest in Class 8 or Class 9 that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Claims in Class 6 and Class 7 and Interests in Class 8 and Class 9 that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors and the Disbursing Agent shall recognize and deal for all purposes under the Plan with only those record Holders as follows:

(i)      Mullen, as Holder of the Class 6 Prepetition Notes Claims arising under the Mullen Note, and Holders of the Class 6 Prepetition Notes Claims whose names (or the names of whose nominees) appear as of the Distribution Record Date in the list of Holders maintained by the Prepetition Indenture Trustee, or in the list of participants provided by the DTC;

(ii)     Von Zuben, as the Holder of the Class 7 Von Zuben Subordinated Unsecured Note Claim as of the Distribution Record Date;

(iii)    Holders of Class 8 Equity Interests whose names appear in the Debtors' records as of the Distribution Record Date;

(iv)     Holders of Class 9 ESOP Interests arising in respect of ESOP Allocated Shares according to the records maintained by the ESOP Trustees as of the Distribution Record Date; and

(v)      Holders of Class 9 ESOP Interests arising in respect of ESOP Distributed Shares whose names appear in the Debtors' records as of the Distribution Record Date.

(b)      Distributions of New Common Stock to Holders of Class 6 Prepetition Notes Claims administered by the Prepetition Indenture Trustee or to be distributed directly to Mullen may, in the discretion of the Disbursing Agent, be made by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable. In connection with such book-entry exchange, the Prepetition Indenture Trustee shall deliver instructions to DTC to effect distributions on a Pro Rata basis as provided under the Plan with respect to the Prepetition Notes Claims arising under the Prepetition 2014 Notes.

**6.      Allocation of Plan Distributions between Principal and Interest**

Except as otherwise expressly provided in the Plan, to the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**7.      Means of Cash Payment**

Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfer from a bank selected by the Reorganized Debtors.  Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8. **Sources of Cash for Plan Distributions**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan may be obtained from existing Cash balances, Cash generated from the operations of the Debtors and the Reorganized Debtors, or from the proceeds of the Exit Facilities. The Reorganized Debtors may also make such payments using Cash received from their subsidiaries through the Reorganized Company's consolidated cash management systems.

9. **Withholding and Reporting Requirements**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions thereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to affect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan, (a) each Holder of a Claim in Class 6 or Class 7 an Interest in Class 8 or Class 9 that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations.

10. **Setoffs**

The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy laws, but shall not be required to, set off against any Claim (excluding Prepetition Notes Claims), the payments or other distributions to be made pursuant to the Plan in respect of such Claim, or Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim thereunder shall constitute a waiver or release by the Reorganized Debtors of any such Claim that the Debtors or the Reorganized Debtors may have against such Holder.

11. **Fractional Shares**

No fractional shares of New Common Stock shall be distributed. When a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock, or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock. The total number of shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided for herein.

### 12.   Exemption for Securities Law

The issuance of the New Common Stock, Warrants and any additional shares of New Common Stock issuable upon exercise of the Warrants pursuant to the Plan and any subsequent sales, resales, transfers, or other distributions of such securities shall be exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

### 13.   Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, Chapter 5 Claims and all other Claims released pursuant to the Releases provided by Section X of the Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.   The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Documents, or the Disclosure Statement, to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.   Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.   Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, any Plan Document, or in a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan, or the occurrence of the Effective Date.

## J.   TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND PENSION PLANS

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS GOVERNING THE TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

### 1.   General Treatment

Pursuant to Section VII of the Plan, on the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such

executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors pursuant to an order entered by the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms, or (iii) is an executory contract to be rejected by the Debtors, after consultation with, and with the approval of, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX DIP Facility Agent, and the ABL DIP Facility Administrative Agent. Entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to Section VII of the Plan shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.

## 2.     Cure of Defaults

Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree, with the approval of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX DIP Facility Agent, and the ABL DIP Facility Administrative Agent. In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the respective Debtor unless otherwise ordered by the Bankruptcy Court.

## 3.     Post-Petition Contracts and Leases

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

## 4.     Savings and Pension Plans

In furtherance of, and without in any way limiting Section 7.5 of the Plan, from and after the Effective Date, the Reorganized Debtors shall assume the obligations and shall continue to make the payment of all retiree benefits (if any), as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to section 1114(e)(1)(B) or (g), at any time prior to the Confirmation Date, for the duration of the period (if any) that the Debtors are obligated to provide such benefits. Notwithstanding anything in the Plan to the contrary, the Savings and Pension Plans shall become obligations of the Reorganized Debtors and shall otherwise be unaffected by confirmation of the Plan, and any Claims arising under the Savings and Pension Plans shall not be discharged or released or otherwise affected by the Plan or by these proceedings.

### 5.    Compensation and Benefit Programs

Except as otherwise expressly provided in Section III, Section VII, or any other provisions of the Plan (and except as may otherwise be agreed between an employee and the Board of Directors of the Reorganized Company), the Reorganized Company shall continue to perform its obligations under all employment and severance contracts and policies, and all compensation and benefit plans, policies and programs of the Company applicable to its employees, retirees and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans (including, but not limited to, the Savings and Pension Plans), the ESOP as amended by the ESOP Plan Amendments, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans. Nothing herein shall restrict the rights of the Board of Directors of the Reorganized Company to change or modify any such policy, plan or program in accordance with its terms and applicable law.

### 6.    Rejection Claims

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not previously evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interest in property as agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served on counsel for the Debtors and the Reorganized Debtors on or before the date to be set by the Bankruptcy Court for filing such Claims.

## K.    PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND DISPUTED INTERESTS

THE FOLLOWING IS A SUMMARY OF THE PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS AND DISPUTED INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

### 1.    Resolution of Disputed Claims

Except as provided otherwise in the Plan or by order of the Bankruptcy Court, Holders of Claims shall not be required to file proofs of Claim with the Bankruptcy Court. The amount and validity of any disputed, contingent and/or unliquidated Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; provided, however, that the Debtors reserve the right to file with the Bankruptcy Court, on or before any claims objection deadline, if any, an objection to any Claim as to which the Holder of such Claim has Filed a proof of Claim in these Chapter 11 Cases. The Debtors shall be authorized to, and shall, with the consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, which consent shall not be unreasonably withheld, resolve all disputed Claims by

withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court, or such other court having jurisdiction, the validity, nature and/or amount thereof.

### 2. Objections to and Estimation of Claims

Only the Debtors or the Reorganized Debtors may object to the allowance of any Claim, including, without limitation, any Administrative Expense Claim. After the Effective Date, the Reorganized Debtors shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court. In addition, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim.

### 3. Preservation of Rights to Settle Claims

Except as otherwise provided in the Plan, the Confirmation Order, or in any other contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person or Entity, without the approval of the Bankruptcy Court. The Reorganized Debtors or their successor(s) may enforce, sue on, settle, compromise, and/or pursue (or decline to do any of the foregoing) such retained Claims, rights, or Causes of Action, suits, or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights, other than the Chapter 5 Claims which neither the Debtors nor the Reorganized Debtors may pursue, sue on, settle, or compromise.

### 4. No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### 5. Distributions on Account of Disputed Claims Once they are Allowed

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

6.      **Reinstated Claims**

Notwithstanding anything contained herein to the contrary, nothing shall affect, diminish or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstated Claims.

L.      **CONFIRMATION AND CONSUMMATION OF THE PLAN**

1.      **Conditions to Confirmation**

The Plan shall not be confirmed unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

> (a)      The Confirmation Order confirming the Plan shall have been entered by the Bankruptcy Court.
>
> (b)      The Plan Support Agreement shall have been assumed by the Debtors and shall have remained in full force and effect and shall not have been terminated in accordance with the terms thereof.

2.      **Conditions to Effective Date**

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

> (a)      The Confirmation Order confirming the Plan shall have been entered by the Bankruptcy Court and shall have become a Final Order.
>
> (b)      The Exit Facility Credit Agreements and all related documents provided for therein or contemplated thereby shall be in form and substance acceptable to the Company, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, and shall have been duly and validly executed and delivered by all parties thereto, all conditions precedent thereto shall have occurred or shall have been satisfied and the Reorganized Debtors will have access to funding under the Exit Facilities as set forth in the Plan.
>
> (c)      The Plan Support Agreement shall have been assumed by the Debtors and shall have remained in full force and effect and shall not have been terminated in accordance with the terms thereof.
>
> (d)      All documents and agreements necessary to implement the Plan on the Effective Date, including, but not limited to, the Plan Supplement and the Plan Documents, shall have been Filed in form and substance reasonably satisfactory to the Company, the Coalition of Prepetition Noteholders, the ORIX DIP Facility

Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, and duly and validly executed and delivered by all parties thereto.

(e)      All other actions, documents, and agreements determined by the Debtors, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent to be necessary to implement the Plan shall have been effected or executed and shall be in form and substance acceptable to the Debtors, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent.

(f)      All corporate actions required to be taken by Section VII of the Plan shall have been taken.

(g)      Any material alteration to, or interpretation of, any term or provision of the Plan by the Bankruptcy Court shall have been acceptable to the Debtors, the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, each in their sole discretion.

(h)      The Reorganized Company Stockholders' Agreement, the Certificate of Incorporation and the By-Laws of the Reorganized Company shall have been adopted and filed as necessary with the applicable authorities of the relevant jurisdiction(s) of incorporation or organization and shall have become effective in accordance with the corporate laws of such jurisdiction(s).

(i)      All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

(j)      The Effective Date shall have occurred not later than one hundred fifteen (115) days after the Petition Date.

### 3.      <u>Waiver of Conditions</u>

Each of the conditions set forth in Sections 9.1 and 9.2 of the Plan, other than Subsection 9.1A, may be waived in whole or in part by the Debtors, with the prior written consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility

Administrative Agent, and the ABL Exit Facility Administrative Agent, without any notice to the Bankruptcy Court or parties in interest and without the need for a hearing.

### 4.    Effect of Non-Occurrence of Conditions to Effective Date

If each of the conditions specified in Sections 9.1 and 9.2 of the Plan has not been satisfied or waived in the manner provided in Section 9.3 of the Plan, then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims and Interests in the Debtors shall be restored to the status *quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (iv) all of the Debtors' obligations with respect to the Claims and Interests shall remain unaffected by the Plan, and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors and the Plan shall be deemed withdrawn; and (v) the Plan Support Agreement shall be terminated, and the parties thereto shall have all rights and remedies under the terms thereof and under applicable law for such termination and any related covenant breach(es).    Upon such occurrence, the Debtors shall file a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

## M.    EFFECT OF PLAN CONFIRMATION

### 1.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

### 2.    Exculpations and Releases

#### (a)    Exculpation

**To the extent permitted by applicable law and approved by the Bankruptcy Court, from and after the Effective Date, the Released Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, formulating, negotiating or implementing the Plan Support Agreement and the Plan, the solicitation of acceptances of the Plan, the pursuit of approval of the Disclosure Statement and confirmation of the Plan, the confirmation of the Plan, the Plan Documents, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, or the restructuring transactions contemplated hereunder; provided, however, that the foregoing provision shall not apply to an act or omission that is determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence.    Any of the Released Parties shall be entitled to rely,**

in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b)    <u>Releases by the Debtors</u>

To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the restructuring of the Debtors and the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors-in-possession on behalf of the Debtors' Estates, will be deemed to release and forever waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan or this Disclosure Statement, or any document or agreement related thereto that the Debtors or the Reorganized Debtors had or have against the Released Parties; provided, however, that the foregoing provision shall not apply to an act or omission that is determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence.

(c)    <u>Releases by Holders of Claims and Interests</u>

To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, each Holder of a Claim or an Interest who votes to accept the Plan or who, directly or indirectly, is entitled to receive a distribution under the Plan, including Persons entitled to receive a distribution via an attorney, agent, or trustee, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, <u>provided</u>, <u>however</u>, that the foregoing release shall not operate to waive or release any Causes of Action of any releasing party: (1) against a Released Party arising from the contractual obligations owed to the releasing party; (2) expressly set forth in and preserved by the Plan, the Plan Supplement, Plan Documents, or other related documents; or (3) arising from claims for fraud, gross negligence, willful misconduct, or criminal conduct.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement and other Plan Documents) executed to implement the Plan.  In addition, to the extent that (1) an ESOP Beneficiary instructs the ESOP Independent Fiduciary to direct the ESOP Trustees to vote the ESOP Beneficiary's

**ESOP Allocated Shares in favor of the Plan, and (2) an ESOP Distributee votes its ESOP Distributed Shares in favor of the Plan, each such ESOP Beneficiary and ESOP Distributee shall be deemed, as of the Effective Date, to have unconditionally canceled, waived and released any current or potential claims and interests that it holds, or that could be brought on its behalf by the ESOP or any fiduciary of the ESOP, against the Company and any present or former fiduciaries or administrators of the ESOP (as determined immediately prior to the Effective Date) relating to the ESOP with respect to any and all ESOP Interests, in each case to the extent permitted by the Code, the Bankruptcy Code and ERISA.**

(d)      **Injunction Related to Exculpation and Releases**

**All Persons that have held, hold or may hold any liabilities released or exculpated pursuant to Section 10.2 of the Plan will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

(e)      **Chapter 5 Claims Expressly Released**

**As of the Effective Date, all Chapter 5 Claims are and shall be permanently released to the fullest extent permitted by applicable law and approved by the Bankruptcy Court.**

(f)      **Survival of Indemnification Obligations**

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release, or other agreement entered into in connection with the Plan, the obligations of the Debtors to indemnify any past and present directors, officers, agents, employees and representatives, pursuant to certificates or articles of incorporation, by-laws, contracts and/or applicable statutes, in respect of all actions, suits and proceedings against any of such officers, directors, agents, employees and representatives, based upon any act or omission related to service with or for or on behalf of the Debtors, shall not be discharged or Impaired by confirmation or consummation of the Plan and shall continue as obligations of the Reorganized Debtors.

(g)      **Discharge of Claims and Termination of Interests**

Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Interests (other than Unimpaired Claims under the Plan not previously satisfied in full) of any nature whatsoever against the Debtors or any of their Estates, assets, properties or interest in property, and regardless of whether any property shall

have been distributed or retained pursuant to the Plan on account of such Claims and Interests. Upon the Effective Date, the Debtors shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests (other than Unimpaired Claims under the Plan not previously satisfied in full), including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, and the Interests.

(h)        <b><u>Preservation of Rights of Action and Settlement of Causes of Action</u></b>

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, Chapter 5 Claims and all other Claims released pursuant to the Releases provided by Section X herein), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors, as the successors-in-interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors, other than the Chapter 5 Claims which neither the Debtors nor the Reorganized Debtors may pursue, sue on, settle, or compromise.

No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Documents, or the Disclosure Statement, to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, any Plan Document, or in a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan, or the occurrence of the Effective Date.

**3.        Injunction**

**Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors (other than Unimpaired Claims under the Plan not previously satisfied in full), are (i) permanently enjoined from taking any of the following actions against the Estates, or any of their property, on account of any such Claims or Interests and (ii) permanently enjoined from taking any of the following actions against the Released Parties, the Debtors, the Reorganized Debtors or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action, or**

**other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting any right of setoff, subrogation or recoupment of any kind and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.**

**By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in Section 10.4 of the Plan.**

### 4.   Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## N.   MISCELLANEOUS PLAN PROVISIONS

THE FOLLOWING IS A SUMMARY OF CERTAIN MISCELLANEOUS PROVISIONS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN.

### 1.   Surrender of Instruments

As a condition to participation under the Plan, the Holder of an equity security, note, debenture or other evidence of indebtedness of the Debtors that desires to receive the property to be distributed on account of a Class 4 Claim, a Class 6 Claim, or Class 7 Claim, Class 8 Interest, or Class 9 Interest based on such equity security, note, debenture or other evidence of indebtedness shall surrender such equity security, note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of an equity security, note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then such Holder shall be deemed to have surrendered such Holder's equity security, note, debenture or other evidence of indebtedness upon surrender to The Newark Group of such global security by DTC or such other securities depositary or custodian thereof.  Except as otherwise provided in this Article V, if no surrender of an equity security, note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the Debtors, that such equity security, note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim or Interest is based on such equity security, note, debenture or other evidence of indebtedness thereof.  The Debtors shall make subsequent distributions only to the persons who surrender the securities for exchange (or their assignees) and the record

Holders of such securities shall be those Holders of record as of the Effective Date.  Except as otherwise provided herein or in the Plan or Plan Documents, the Prepetition Indenture shall be rendered void as of the Effective Date.

## 2.    Post-Confirmation Date Retention of Professionals

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

## 3.    Bar Date for Certain Administrative Expense Claims

All applications for final allowance of fees and expenses of professional persons employed by the Debtors or any statutory committee, if any, appointed in the Chapter 11 Cases, pursuant to orders entered by the Bankruptcy Court and on account of services rendered prior to the Effective Date, shall be filed with the Bankruptcy Court and served upon the Reorganized Debtors' counsel at the addresses set forth in Section 12.12 of the Plan no later than thirty (30) days after the Effective Date.  Any such claim that is not filed within this time period shall be discharged and forever barred.  Objections to any application for allowance of Administrative Expense Claims described in Section 12.3 of the Plan must be filed within twenty (20) days after the filing thereof.

## 4.    Effectuating Documents and Further Transactions

On and after the Effective Date, the Debtors and the Reorganized Debtors, in consultation with the Coalition of Prepetition Noteholders, the ORIX Exit Facility Lenders, the ORIX Exit Facility Agent, and the ABL Exit Facility Administrative Agent, are authorized to execute, deliver, file or record the Plan Documents and such other contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan, including actions that the Prepetition Indenture Trustee may reasonably request to further effect the terms of the Plan.

## 5.    Corporate Action

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the shareholders or directors of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the state in which the Debtors or the Reorganized Debtors are incorporated without any requirement of further action by the shareholders or directors of the Debtors or the Reorganized Debtors.

6.     **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

7.     **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date or as soon thereafter as is practicable.

8.     **Amendment or Modification of the Plan**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors, with the prior written consent of the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, may alter, amend or modify the Plan, the Plan Supplement or the Plan Documents at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.

A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, the Plan Supplement, and the Plan Documents, in each case, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

Any reference in the Plan to matters being acceptable or satisfactory to, approved by, or requiring consent of the ORIX DIP Facility Lenders, shall be deemed to mean acceptable or satisfactory to, or approved by or requiring consent of the ORIX DIP Facility Lenders that hold at least 50.1% of the aggregate outstanding balance of the ORIX DIP Facility (or prior to the making of the initial loans thereunder, 50.1% of all aggregate commitments to make such loans), provided that unless there is only one ORIX DIP Facility Lender, there must be at least two ORIX DIP Facility Lenders (with ORIX DIP Facility Lenders that are affiliates of each other considered to be a single ORIX DIP Facility Lender for purposes of this proviso).

Any reference in the Plan to matters being acceptable or satisfactory to, approved by, or requiring consent of the ORIX Exit Facility Lenders, shall be deemed to mean acceptable or satisfactory to, or approved by or requiring consent of, the ORIX Exit Facility Lenders that hold at least 50.1% of the aggregate outstanding balance of the ORIX Exit Facility (or prior to the making of the initial loans thereunder, 50.1% of all aggregate commitments to make such loans), provided that unless there is only one ORIX Exit Facility Lender, there must be at least two ORIX Exit Facility Lenders (with ORIX Exit Facility Lenders that are affiliates of each other considered to be a single ORIX Exit Facility Lender for purposes of this proviso).

9.     **Severability of Plan Provisions**

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

10.    **Successors and Assigns**

The Plan shall be binding upon and inure to the benefit of the Debtors, and its respective successors and assigns, including, without limitation, the Reorganized Debtors. The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

11.    **Revocation, Withdrawal or Non-Consummation of the Plan**

Subject to the obligations and covenants of the Debtors under the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan or if confirmation or consummation of the Plan does not occur, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

12.    **Notice**

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

THE NEWARK GROUP, INC.
20 Jackson Drive
Cranford, N.J. 07016
Telephone:  (908) 276-4000
Facsimile:  (908) 276-2888

Attn: Corporate Law Department

*with a copy to:*

LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, N.J. 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2478

Attn: Paul Kizel

### 13.    **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an Exhibit or schedule to the Plan, the Plan Documents or Disclosure Statement provide otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of New Jersey, without giving effect to the principles of conflicts of law of such jurisdiction.

### 14.    **Tax Reporting and Compliance**

The Reorganized Debtors are hereby authorized to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

### 15.    **Exhibits**

All Exhibits attached hereto are hereby incorporated and are a part of the Plan as if set forth in full in the Plan.

### 16.    **Filing of Additional Documents**

On or before substantial consummation of the Plan, the Reorganized Debtors and the Debtors, with the approval of Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 17.    **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order and the Effective Date occurs. The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

## ARTICLE VI.        VOTING PROCEDURES AND REQUIREMENTS

This Article describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan.  If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims or Interests.  If you are entitled to vote and did not receive a Ballot, or you received a damaged Ballot, or you lost your Ballot, please contact the Voting Agent, Kurtzman Carson Consultants, LLC by e-mail at KCC_TheNewarkGroup@kccllc.com or by phone at 310-751-2698 or 866-967-0498.

Votes <u>cannot</u> be transmitted orally, by facsimile or by electronic mail (e-mail).  Accordingly, you are urged to return your signed and completed Ballot promptly.  Any executed Ballot that does not indicate either an acceptance or a rejection of the Plan, or that indicates both an acceptance and a rejection of the Plan, will not be counted as a vote either to accept or reject the Plan.

THE DEBTORS RESERVE THE RIGHT TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE IN THE EVENT CLASSES 6, 7, 8, AND/OR 9 VOTE TO REJECT THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

SUBJECT TO THE TERMS AND CONDITIONS OF THE PLAN SUPPORT AGREEMENT AND THE PLAN, THE DEBTORS RESERVE THE RIGHT TO AMEND THE PLAN EITHER BEFORE OR AFTER THE PETITION DATE.

SUBJECT TO THE TERMS AND CONDITIONS OF THE PLAN SUPPORT AGREEMENT AND THE PLAN, AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF CLAIMS MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING WITHOUT THE NECESSITY OF RESOLICITING VOTES.  IN THE EVENT RESOLICITATION IS REQUIRED, THE DEBTORS WILL FURNISH NEW BALLOTS TO BE USED TO VOTE TO ACCEPT OR REJECT THE PLAN, AS AMENDED.

## A.      <u>VOTING RECORD DATE</u>

Consistent with the provisions of Rule 3018(b) of the Bankruptcy Rules, the Debtors have fixed May 4, 2010 as the Voting Record Date for the determination of the Holders of Claims and Interests entitled to vote to accept or reject the Plan.

## B.      <u>HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE</u>

According to the Bankruptcy Code, only Holders of Impaired Claims and Interests are entitled to vote.  As mentioned in Article V.F. above, this Disclosure Statement and related materials are being furnished prior to the commencement of the Chapter 11 Cases to, and the

Debtors are soliciting votes on the Plan from, the Holders of Allowed Claims and Interests in Classes 6, 7, 8, and 9, which Classes are deemed to be Impaired, as follows:

(a)    Holders of the Class 6 Prepetition Notes Claims whose names (or the names of whose nominees) appear as of the Voting Record Date in the list of Holders maintained by the Prepetition Indenture Trustee or in the list of participants provided by the DTC; and the Holder of the Mullen Note;

(b)    Von Zuben, as the Holder of the Class 7 Von Zuben Subordinated Unsecured Note Claim as of the Voting Record Date;

(c)    Holders of Class 8 Equity Interests whose names appear in the Debtors' records as of the Voting Record Date; and

(d)    Holders of Class 9 ESOP Interests, including the ESOP, ESOP Beneficiaries, and ESOP Distributees, whose names appear on the records maintained by the ESOP Trustees and the Debtors as of the Voting Record Date.

Holders of Impaired Claims and Interests that are entitled to vote will receive Ballots with their Solicitation Package that should be used to submit their vote.  **IF NOMINEES OF THE HOLDERS OF ELIGIBLE CLAIMS OR INTERESTS DO NOT HOLD FOR THEIR OWN ACCOUNT, THEY SHOULD PROVIDE COPIES OF THE SOLICITATION PACKAGE TO THE BENEFICIAL OWNERS OF THE ELIGIBLE CLAIMS.**

**ANY BENEFICIAL OWNER OF ELIGIBLE CLAIMS OR INTERESTS WHO HAS NOT RECEIVED A BALLOT SHOULD CONTACT HIS/HER OR ITS NOMINEE OR THE VOTING AGENT.**

## C.    VOTING DEADLINE

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF 5:00 P.M. (PREVAILING EASTERN TIME) ON JUNE 7, 2010, UNLESS THE DEBTORS, WITH THE CONSENT OF THE COALITION OF PREPETITION NOTEHOLDERS, THE ORIX DIP FACILITY LENDERS, THE ORIX EXIT FACILITY LENDERS, THE ORIX DIP FACILITY AGENT, AND THE ORIX EXIT FACILITY AGENT, EXTEND THE VOTING DEADLINE.  **THE DEBTORS EXPRESSLY RESERVE THE ABSOLUTE RIGHT, WITH THE CONSENT OF THE COALITION OF PREPETITION NOTEHOLDERS, THE ORIX DIP FACILITY LENDERS, THE ORIX EXIT FACILITY LENDERS, THE ORIX DIP FACILITY AGENT, AND THE ORIX EXIT FACILITY AGENT, AT ANY TIME OR FROM TIME TO TIME, TO EXTEND, BY ORAL OR WRITTEN NOTICE TO THE VOTING AGENT, THE PERIOD OF TIME (ON A DAILY BASIS, IF NECESSARY) DURING WHICH BALLOTS WILL BE ACCEPTED FOR ANY REASON, UNTIL THE NECESSARY BALLOTS HAVE BEEN RECEIVED.  THE DEBTORS WILL NOT HAVE ANY OBLIGATION TO PUBLISH, ADVERTISE, OR OTHERWISE COMMUNICATE ANY SUCH EXTENSION, OTHER THAN BY ISSUING A NEWS RELEASE THROUGH THE DOW JONES NEWS**

**SERVICE.    THERE CAN BE NO ASSURANCE THAT THE DEBTORS WILL EXERCISE THEIR RIGHT TO EXTEND THE SOLICITATION PERIOD FOR THE RECEIPT OF BALLOTS.**

Ballots received by the Voting Agent after the Voting Deadline will <u>not</u> be counted or otherwise used in connection with the Debtors' request for confirmation of the Plan (or any permitted modification thereof), except to the extent requested by the Debtors, in their sole discretion, or as permitted by the Bankruptcy Court pursuant to Rule 3018 of the Bankruptcy Rules.

**D.    <u>BALLOT MAILING ADDRESSES</u>**

BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESSES:

**1.    <u>FOR HOLDERS OF THE FOLLOWING CLAIMS AND INTERESTS:</u>**

- Class 6 Prepetition Notes Claims <u>arising under the Mullen Note only</u>
- Class 7 Von Zuben Subordinated Unsecured Note Claims
- Class 8 Equity Interests
- Class 9 <u>arising out of ESOP Distributed Shares only</u>

**Send your completed Ballot to:**

> The NEWARK GROUP, INC. BALLOT PROCESSING CENTER
> c/o Kurtzman Carson Consultants, LLC
> Attn: David M. Sharp
> 1230 Avenue of the Americas, 7th Floor
> New York, NY  10020

**2.    <u>FOR HOLDERS OF CLAIMS IN CLASS 6 ARISING UNDER THE PREPETITION 2014 NOTES ONLY:</u>**

If you hold your Prepetition 2014 Notes through a broker, bank, proxy, or other nominee (each, a "**<u>Nominee</u>**"), you should promptly complete, execute, and return the Beneficial Owner Ballot, according to the instructions provided therein, **<u>directly to your Nominee</u>**.    We have included a postage paid envelope with your Solicitation Package that you should address to your Nominee before mailing.    **<u>You should mail your completed Beneficial Owner Ballot to your Nominee by June 1, 2010 to ensure that your Nominee has sufficient time to process and forward your vote to the Voting Agent by the Voting Deadline.</u>**

If you are both the record or registered Holder <u>and</u> the Beneficial Owner of Prepetition 2014 Notes, you should promptly complete, execute, and return the Beneficial Owner Ballot, according to the instructions provided therein, to:

THE NEWARK GROUP, INC. BALLOT PROCESSING CENTER
c/o Kurtzman Carson Consultants, LLC
Attn: David M. Sharp
1230 Avenue of the Americas, 7th Floor
New York, NY  10020

**3.      FOR HOLDERS OF CLAIMS IN CLASS 9 ARISING OUT OF ESOP
ALLOCATED SHARES ONLY:**

**Send your completed Voting Instruction Forms to:**

THE NEWARK GROUP, INC. ESOP INDEPENDENT FIDUCIARY
Grandview Capital Strategies, Inc
c/o Robert F. Schatz
1007 Farmington Avenue, Suite 4
West Hartford, CT  06107

The ESOP Independent Fiduciary must have sufficient time to process your Voting
Instruction Forms and send your voting instructions to the ESOP Trustees; and the ESOP
Trustees must have sufficient time to vote your shares by sending your votes to the Voting Agent
by the Voting Deadline of 5:00 p.m. (prevailing Eastern Time) on June 7, 2010.  Therefore, **you
should mail your completed Voting Instruction Form to the ESOP Independent Fiduciary
by June 1, 2010 to ensure that the ESOP Independent Fiduciary has sufficient time to
process your vote and direct the ESOP Trustees accordingly; and to ensure that the ESOP
Trustees have sufficient time to forward your vote to the Voting Agent by the Voting
Deadline.**  The Voting Agent will not count votes that are received after the Voting Deadline,
unless the Voting Deadline is extended.

**E.     VOTING PROCEDURES**

**1.     Ballots**

Each Ballot enclosed with this Disclosure Statement is marked with the Class into which
the Claim or Interest has been placed under the Plan.  All votes to accept or reject the Plan with
respect to any Class of Claims or Interests must be cast by properly submitting the duly
completed and executed form of Ballot designated for such Class.  Holders of Impaired Claims
or Interests voting on the Plan should complete and sign the Ballot in accordance with the
instructions thereon, being sure to check the appropriate box entitled "**ACCEPT (vote FOR) the
Plan**" or "**REJECT (vote AGAINST) the Plan**."

Ballots must be delivered as set forth above, and received by the Voting Agent by the
Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK
OF THE VOTER.  If such delivery is by mail, it is recommended that voters use an air courier
with a guaranteed next day delivery or registered mail, properly insured, with return receipt
requested.  In all cases, sufficient time should be allowed to ensure timely delivery.

If you are entitled to vote and you did not receive a Ballot, or you received a damaged
Ballot, or you lost your Ballot, please contact the Voting Agent, Kurtzman Carson Consultants,

LLC by e-mail at KCC_TheNewarkGroup@kccllc.com or by phone at 310-751-2698 or 866-967-0498.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 2.     Agreements upon Furnishing Ballots

The delivery of Ballot to the Voting Agent by a Holder of an Allowed Claims pursuant to one of the procedures set forth herein voting to accept the Plan will constitute the agreement of such Holder to accept (i) all of the terms of, and conditions to the solicitation and (ii) the terms of the Plan; provided, however, all parties-in-interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 3.     Withdrawal or Change of Votes on the Plan

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any Holder who has submitted a properly completed Ballot to the Voting Agent prior to the Voting Deadline may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines was the last to be received.

### F.     SPECIAL VOTING INSTRUCTIONS FOR HOLDERS OF PREPETITION NOTES CLAIMS

With regard to Class 6 Prepetition Notes Claims, only Mullen and the Holders of the Prepetition 2014 Notes as of the Voting Record Date are entitled to vote on the Plan. The Prepetition Indenture Trustee will not vote on behalf of the Holders of the Prepetition 2014 Notes. Holders of Prepetition Notes Claims must submit their Ballots as set forth below.

### 1.     Prepetition 2014 Notes - Beneficial Owners

Beneficial owners of Prepetition 2014 Notes may vote on the Plan by one of the following methods:

(a)     If you hold your Prepetition 2014 Notes through a Nominee, complete and sign the enclosed Beneficial Owner Ballot. Return the Beneficial Owner Ballot to your Nominee in sufficient time to allow your Nominee to process the Beneficial Owner Ballot and return it to the Voting Agent by the Voting Deadline. **Therefore, you should mail your completed Beneficial Owner Ballot to your Nominee by June 1, 2010 to ensure that your Nominee has sufficient time to process and forward your vote to the Voting Agent by the Voting Deadline**.

(b)      If you hold your Prepetition 2014 Notes through a Nominee, and your Nominee has provided you with a pre-validated Beneficial Owner Ballot (as described below), complete and sign the pre-validated Beneficial Owner Ballot and return the completed Beneficial Owner Ballot **directly to the Voting Agent** by the Voting Deadline.

(c)      If you are both the record or registered Holder <u>and</u> the beneficial owner of Prepetition 2014 Notes (i.e., you hold the Prepetition 2014 Notes in your own name), you should promptly complete, execute, and return the Beneficial Owner Ballot directly to the Voting Agent on or before the Voting Deadline.

Any Beneficial Owner Ballot returned to a Nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Voting Agent that Beneficial Owner Ballot or a Master Ballot that reflects the vote of such beneficial owner.

## 2.      <u>Prepetition 2014 Notes - Nominees</u>

A Nominee that, on the Voting Record Date, is the registered Holder of Prepetition 2014 Notes for a beneficial owner should obtain the vote of the beneficial owner of such Prepetition 2014 Notes, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

(a)      Pre-Validated Beneficial Owner Ballots

A Nominee may pre-validate a Beneficial Owner Ballot by: (i) signing the Beneficial Owner Ballot; (ii) indicating on the Beneficial Owner Ballot the name of the registered Holder and the amount of Prepetition 2014 Notes held by the Nominee for that beneficial owner; and (iii) forwarding such Beneficial Owner Ballot, together with the Solicitation Package and other materials requested to be forwarded, to the beneficial owner for voting. The beneficial owner must then complete the information requested on the Beneficial Owner Ballot, review the certifications contained in the Beneficial Owner Ballot, and return the Beneficial Owner Ballot directly to the Voting Agent in the pre-addressed envelope so that it is received by the Voting Agent before the Voting Deadline. A list of the beneficial owners to whom "pre-validated" Beneficial Owner Ballots were delivered should be maintained by the Nominee for inspection for at least one year from the Voting Deadline.

(b)      Master Ballots

A Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Beneficial Owner Ballots, together with the Solicitation Package, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such beneficial owner must then indicate his/her or its vote on the Beneficial Owner Ballot, complete the information requested in the Beneficial Owner Ballot, review the certifications contained in the Beneficial Owner Ballot, execute the Beneficial Owner Ballot, and return the Beneficial Owner Ballot to the Nominee. After collecting the Beneficial Owner Ballots, the Nominee should complete a Master Ballot, compiling the votes and other information from the Beneficial Owner Ballots, execute the Master Ballot, and deliver the

Master Ballot to the Voting Agent so that it is received by the Voting Agent before the Voting Deadline.  All Beneficial Owner Ballots returned to the Nominee by beneficial owners should either be forwarded to the Voting Agent along with the Master Ballot or retained by the Nominees for inspection for at least one year from the Voting Deadline.

**EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BALLOTS TO THE NOMINEE BY JUNE 1, 2010 TO ALLOW THE NOMINEE SUFFICIENT TIME TO PREPARE AND SUBMIT THE MASTER BALLOT TO THE VOTING AGENT SO THAT THE MASTER BALLOT IS RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE.**

2.        **Mullen Note**

Mullen, as Holder of the Mullen Note as of the Voting Record Date, may vote his Prepetition Notes Claim directly by completing the Ballot that has been included in his Solicitation Package, and indicating how he wishes to vote his Claim, either to accept (vote for) or to reject (vote against) the Plan.  Mullen should sign and date his Ballot and submit the Ballot **so it is received by the Voting Agent by** the Voting Deadline.

If the Ballot is not completed, signed, and timely received by the Voting Agent by the Voting Deadline, the votes transmitted thereby will not be counted.  **THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY ELECTRONIC OR FACSIMILE TRANSMISSION**

3.        **DTC Securities Clearing Agency**

The Debtors expect that the DTC, as a Nominee Holder of certain of the Prepetition 2014 Notes, will arrange for its participants to vote by providing a Voting Record Date listing of participants entitled to vote.  Such participants will be authorized to vote their Voting Record Date positions held in the name of such securities clearing agency.

4.        **Miscellaneous**

For purposes of voting to accept or reject the Plan, the beneficial owners of Prepetition 2014 Notes as of the Voting Record Date will be deemed to be the Holders of the Claims represented by such Prepetition 2014 Notes.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.

Except as provided below, unless the Ballot is timely received by the Voting Agent before the Voting Deadline together with any other documents required by such Ballot (if any), the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

In the event of a dispute with respect to any Prepetition Notes Claim, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

## G.   SPECIAL VOTING INSTRUCTIONS FOR HOLDERS OF ESOP INTERESTS

With regard to Class 9 ESOP Interests, only the Holders of ESOP Interests according to the records maintained by the ESOP Trustees as of the Voting Record Date are entitled to vote on the Plan.

As explained in more detail below, ESOP Beneficiaries will be entitled to instruct the ESOP Independent Fiduciary to direct the ESOP Trustees as to how to vote their ESOP Allocated Shares. ESOP Beneficiaries must instruct the ESOP Independent Fiduciary to direct the ESOP Trustees to vote all of their ESOP Allocated Shares either (1) to accept the Plan or (2) to reject the Plan. The ESOP Independent Fiduciary will direct the ESOP Trustees to vote the ESOP Allocated Shares as instructed by the ESOP Beneficiaries. The ESOP Trustees will vote as directed by the ESOP Independent Fiduciary.

ESOP Distributees will vote their ESOP Interests directly. ESOP Distributees must vote all of their ESOP Distributed Shares either (1) to accept the Plan or (2) to reject the Plan.

Specific voting instructions for ESOP Beneficiaries and ESOP Distributees are set forth below:

### 1.   Voting Instructions for ESOP Beneficiaries

Each ESOP Beneficiary who holds ESOP Allocated Shares as of the Voting Record Date will receive a Voting Instruction Form that should be used to provide the ESOP Independent Fiduciary with instructions as to how to direct the ESOP Trustees to vote the shares of Company stock allocated to such ESOP Beneficiary's ESOP account. The ESOP Independent Fiduciary shall collect and process the Voting Instruction Forms and will direct the ESOP Trustees to vote the ESOP Allocated Shares in accordance with the voting instructions provided by the ESOP Beneficiaries, unless the ESOP Independent Fiduciary determines that doing so would cause a violation of its fiduciary duties under ERISA. The ESOP Trustees shall be entitled to deliver one vote per ESOP Allocated Share.

In the event an ESOP Beneficiary has not timely or properly submitted his or her Voting Instruction Form to the ESOP Independent Fiduciary, as determined by the ESOP Independent Fiduciary in its sole discretion, the ESOP Independent Fiduciary shall instruct the ESOP Trustees to vote such shares in favor of the Plan, provided that the ESOP Independent Fiduciary determines that doing so is consistent with its fiduciary obligations under ERISA.

Each ESOP Beneficiary should complete the Voting Instruction Form that has been included with its Solicitation Package and indicate how it wishes the ESOP Trustees to vote its ESOP Allocated Shares, either to accept (vote for) or to reject (vote against) the Plan. To the extent that an ESOP Beneficiary instructs the ESOP Independent Fiduciary to direct the ESOP Trustees to vote its ESOP Allocated Shares in favor of the Plan, such ESOP Beneficiary will unconditionally cancel, waive and release any current or potential claims and interests that it holds, or that could be brought on its behalf by the ESOP or any fiduciary of the ESOP, against the Company and any present or former fiduciaries or administrators of the ESOP (as determined immediately prior to the Effective Date) relating to the ESOP with respect to any and all ESOP Interests, including as described in Section 10.2 of the Plan, to the extent permitted by the Code,

the Bankruptcy Code and ERISA.  The ESOP Beneficiary should sign and date the Voting Instruction Form and **deliver the Voting Instruction Form to the ESOP Independent Fiduciary, so that it is received on or before 5:00 p.m. on June 1, 2010** by the ESOP Independent Fiduciary at the following address:

> **The Newark Group ESOP Independent Fiduciary**
> **Grandview Capital Strategies, Inc.**
> **c/o Robert Schatz**
> **1007 Farmington Avenue, Suite 4**
> **West Hartford, CT  06107**

### 2.    Voting Instructions for ESOP Distributees

Each ESOP Distributee who holds ESOP Distributed Shares as of the Voting Record Date will receive an ESOP Distributee Ballot that should be used to vote its ESOP Distributed Shares.  Each ESOP Distributee should vote its ESOP Distributed Shares directly by completing the ESOP Distributee Ballot that has been included with its Solicitation Package, and indicate how it wishes to vote its ESOP Shares, either to accept (vote for) or to reject (vote against) the Plan.

To the extent that an ESOP Distributee votes its ESOP Distributed Shares in favor of the Plan, such ESOP Distributee will unconditionally cancel, waive and release any current or potential claims and interests that it holds, or that could be brought on its behalf by the ESOP or any fiduciary of the ESOP against the Company and any present or former fiduciaries or administrators of the ESOP (as determined immediately prior to the Effective Date) relating to the ESOP with respect to any and all ESOP Interests, including as described in Section 10.2 of the Plan, to the extent permitted by the Code, the Bankruptcy Code and ERISA.

The ESOP Distributee should sign and date the ESOP Distributee Ballot and submit the ESOP Distributee Ballot so that it is received by 5:00 p.m. (prevailing Eastern Time) on June 7, 2010, the Voting Deadline, by the Voting Agent at the following address:

> **The NEWARK GROUP, INC. BALLOT PROCESSING CENTER**
> **c/o Kurtzman Carson Consultants, LLC**
> **Attn: David M. Sharp**
> **1230 Avenue of the Americas, 7th Floor**
> **New York, NY  10020**

If the ESOP Distributee Ballot is not completed, signed, and timely received by the Voting Agent by the Voting Deadline, the votes transmitted thereby will not be counted.

**PLEASE NOTE THAT THE VOTING AGENT WILL NOT ACCEPT BALLOTS BY ELECTRONIC OR FACSIMILE TRANSMISSION**

## H.   FIDUCIARIES AND OTHER REPRESENTATIVES

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED, HOWEVER,* THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH BALLOT BE COUNTED.   **IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE ESOP INDEPENDENT FIDUCIARY OR THE VOTING AGENT.**

## I.   WAIVERS OF DEFECTS, IRREGULARITIES, ETC.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding. As indicated in Article VI.J.4 herein, effective withdrawals of Ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## J.   DELIVERY OF EXTINGUISHED SECURITIES

The Debtors are not, at this time, requesting the delivery of, and neither the Debtors nor the Voting Agent will accept, certificates representing any securities which will, on and after the Effective Date, be cancelled. In connection with the Effective Date, the Debtors will furnish all record Holders of extinguished securities with appropriate letters of transmittal to be used to remit their extinguished securities in exchange for the distribution under the Plan. Information regarding such remittance procedure (together with all appropriate materials) will be distributed by the Reorganized Debtors after the Confirmation Date.

### K.    FURTHER INFORMATION; ADDITIONAL COPIES

If you have any questions or require further information about the voting procedure for voting your Claim or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by of Rule 3017(d) of the Bankruptcy Rules), please contact the Voting Agent, Kurtzman Carson Consultants, LLC by e-mail at KCC_TheNewarkGroup@kccllc.com or by phone at 310-751-2698 or 866-967-0498.

### L.    VOTE REQUIRED FOR ACCEPTANCE BY A CLASS

#### 1.    Class of Claims

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds ($^2/_3$) in amount and more than one-half ($^1/_2$) in number of the Allowed Claims in such Class that have voted on the Plan.

#### 2.    Class of Interests

A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds ($^2/_3$) in amount of the Allowed Interests in such Class that have voted on the Plan.

## ARTICLE VII.        CONFIRMATION OF THE PLAN

### A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on a date to be determined by the Bankruptcy Court after the Chapter 11 Cases are commenced.  The Confirmation Hearing may be adjourned from time to time by the Debtors, in consultation with the Coalition of Prepetition Noteholders, the ORIX DIP Facility Lenders, the ORIX Exit Facility Lenders, the ORIX DIP Facility Agent, the ORIX Exit Facility Agent, the ABL DIP Facility Administrative Agent, and the ABL Exit Facility Administrative Agent, or the Bankruptcy Court, without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received on or before the date to be fixed by the Bankruptcy Court.

The procedures for filing objections to confirmation of the Plan shall be determined by the Bankruptcy Court after the Chapter 11 Cases are filed.

## B.    **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of Holders of Claims and Interests Impaired under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(B) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

### 1.    **Acceptance by All Impaired Classes**

Claims and Interests in Classes 6, 7, 8, and 9 are Impaired under the Plan, and, therefore, must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, Impaired Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan. Impaired Classes of Interests will have accepted the Plan if the Plan is accepted by at least two-thirds in amount of the Interests of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.

Claims and Interests in Classes 1, 2, 3, 4, and 5 are Unimpaired under the Plan, and the Holders of Allowed Claims in each of these Classes are conclusively presumed to have accepted the Plan.

### 2.    **Fair and Equitable Test**

The Debtors will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any Impaired Class of Claims or Interests. To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class.

A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests. The Debtors believe that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(a)    Secured Claims.  Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(b)    Unsecured Claims. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(c)    Interests. Either (i) each holder of an interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the plan.

**THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS PROVIDED THAT CLASS 6 ACCEPTS THE PLAN. ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**

3.    <u>**Feasibility**</u>

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Debtors, in consultation with their financial advisors, have analyzed the Debtors' ability to meet their obligations under the Plan.  As part of that analysis, the Debtors have prepared consolidated projected financial results ("**Projections**") for each of the fiscal years ending April 30, 2010 through and including 2014.  These Projections, and the assumptions on which they are based, are annexed hereto as <u>Exhibit P</u>.

The Debtors have prepared the Projections based upon certain assumptions that they believe to be reasonable under the current circumstances.  Those assumptions the Debtors considered to be significant are described in the notes which are part of the Projections.  The Projections have not been examined or compiled by independent accountants.  Many of the

assumptions on which the Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material. All Holders of Claims and Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in evaluating the feasibility of the Plan.

### 4.    Best Interests Test and Liquidation Analysis

Even if the Plan is accepted by all Holders of Claims and Interests that are eligible to vote, section 1129 of the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan is in the best interests of all Holders of Claims and Interests that are Impaired by the Plan or that have not accepted the Plan. This "best interests" test must show that each Holder of Impaired Claims or Impaired Interests receive property with a value not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that under the Plan, Holders of Impaired Claims and Impaired Interests will receive property with a value equal to or in excess of the value such Holders would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

To estimate the potential returns to Holders of Claims and Interests in a chapter 7 liquidation, the Debtors will determine, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code.

The amount of liquidation value available to Holders of unsecured Claims against the Debtors would be reduced by first, the Claims of secured creditors, to the extent of the value of their collateral, and second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the Chapter 11 Cases. Costs of a liquidation under chapter 7 would include the compensation of a chapter 7 trustee, as well as counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and the accountants) that are allowed in the chapter 7 cases, litigation costs, and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the original course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured Claims.

In a chapter 7 liquidation, no junior Class of Claims or Interests may be paid unless all Classes of Claims or Interests senior to such junior Class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no Class of Claims or Interests that is contractually subordinated to

another Class would receive any payment on account of its Claims or Interests, unless and until such senior Class was paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. The Debtors believe that the Liquidation Analysis attached hereto as Exhibit Q will demonstrate that each member of each Class of Impaired Claims and Interests will receive at least as much, if not more, under the Plan as they would receive if the Debtors were liquidated pursuant to chapter 7 of the Bankruptcy Code.[14] Therefore, the Debtors believe that the Plan satisfies the requirements of the "best interests" test.

### ARTICLE VIII. PROJECTED FINANCIAL INFORMATION AND REORGANIZATION VALUE

### A. PROJECTED FINANCIAL INFORMATION

As noted earlier, the Debtors have prepared certain Projections, which are attached to this Disclosure Statement as Exhibit P. The Debtors have undertaken a thorough analysis of their operations and have applied that analysis to develop Projections for the years 2010-2014. The Projection period commences March 1, 2010. The development of the Projections considered historical and recent operational performance, opportunities for improving operational efficiency and reducing waste and costs, and published market research regarding forecast growth rates for the primary markets in which the Debtors participate. The principal assumptions that are part of the Projections are set forth as part of Exhibit P.

The Debtors prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors and their Non-Debtor Affiliates. The Debtors do not generally publish their business plans and strategies or make external projections of their anticipated financial position or results of operations. The Debtors do not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Furthermore, the Reorganized Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

THE PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT P WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN

---

[14] Exhibit C does not include a liquidation analysis of Debtors Jackson Drive Corp. and NP Cogen, Inc. because none of the Claims and Interest of these Debtors are being Impaired. Therefore, the Plan necessarily provides as much, if not more, than Holders of such Claims and Interests would receive in a chapter 7 liquidation, and the "best interests" test is satisfied.

INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER APRIL 30, 2010 OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE DEBTORS BELIEVE THAT THE PROJECTIONS ARE BASED ON ESTIMATES AND ASSUMPTIONS THAT ARE REASONABLE. THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN THE PROJECTIONS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE X, "RISK FACTORS" HEREIN.

## B.    REORGANIZED DEBTORS' ENTERPRISE VALUE

In conjunction with formulating the Plan, the Debtors have determined that it is appropriate to estimate the post-confirmation going concern value for TNG Global (the "**Reorganized TNG Global Enterprise Value**"). Accordingly, the Debtors have authorized and directed Jefferies to prepare such a valuation. The Reorganized TNG Global Enterprise Value was prepared solely by Jefferies at the request and direction of the Debtors. The Reorganized TNG Global Enterprise Value does not constitute a recommendation to any Holder of Claims or Interests against the Debtors as to how to vote on the Plan. Jefferies' estimate of a range of enterprise values does not constitute an opinion as to the fairness, from a financial point of view, of the potential consideration to be received under the Plan or of the terms and provisions of the Plan.

### 1.    Valuation Overview

For purposes of the Plan, the Reorganized TNG Global Enterprise Value is estimated to be between approximately $285 million and $330 million, with a midpoint of $307.5 million as of an assumed Effective Date of June 30, 2010. The Reorganized TNG Global Enterprise Value reflects the going concern value of TNG Global after giving effect to the implementation of the

Plan.   The common equity value (the "**Equity Value**") of TNG Global is estimated to be between approximately $135 million and $180 million, with a midpoint of $157.5 million.   The Equity Value reflects the difference between the Reorganized TNG Global Enterprise Value and the total amount of net debt that is estimated to be outstanding after consummation of the Plan.

With respect to the Projections prepared by the management of TNG Global and attached hereto as Exhibit P, Jefferies believes that such Projections have been reasonably prepared in good faith and on a basis reflecting the best available estimates and judgments of the Company as to its future operating and financial performance.   Jefferies' estimate of the Reorganized TNG Global Enterprise Value assumes that the operating results projected by the Company will be achieved.   If the business performs at levels below those set forth in the Projections, such performance may have a material impact on the estimated range of values.   Changes in facts and circumstances between the date hereof and the Effective Date, including, without limitation, a delay in the Effective Date, may result in changes to the Reorganized TNG Global Enterprise Value.

In preparing the Reorganized TNG Global Enterprise Value, Jefferies conducted the due diligence, including, but not limited to, the following: (1) multiple meetings with TNG Global management to discuss the business operations and financial projections; (2) review of TNG Global's operating strategy and business plan; (3) review of TNG Global management's financial forecasts, including various supporting schedules and information; (4) review of the assumptions underlying TNG Global management's projections, as well as risk factors and opportunities that could impact expected performance; (5) analysis of TNG Global's industry, key competitors, and trends in the environment in which TNG Global operates; and (6) analysis of the performance and market position of TNG Global relative to its key competitors and/or similar publicly traded companies; (7) consideration of the value assigned to certain precedent merger and acquisition transactions for businesses similar to the Company, as well as certain economic and industry information relevant to the operating business of the Company; (8) consideration, to the extent publicly available, of the final terms of restructurings and other similar transactions that have recently been effected; (9) consideration of other information, financial studies, analyses and investigations, along with financial, economic and market criteria that it deemed relevant; and (10) such other analyses as it deemed necessary under the circumstances.   Although Jefferies conducted a review and analysis of TNG Global's businesses, operating assets, and liabilities, as well as the business plan, Jefferies assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Company, as well as publicly available information.    Jefferies' estimate of the Reorganized TNG Global Enterprise Value reflects work performed on the basis of information provided to Jefferies as of January 31, 2010.

In addition to the foregoing, Jefferies relied upon the following assumptions in arriving at its estimated valuation of Reorganized TNG Global:

- The Effective Date occurs on or about June 30, 2010;

- TNG Global is able to recapitalize with adequate liquidity as of the Effective Date;

- TNG Global is able to implement the Plan in the manner described herein;

- The pro forma net debt levels of the Reorganized TNG Global would be approximately $150 million immediately following the Effective Date; and

- General financial and market conditions as of the Effective Date will not differ materially from the conditions prevailing as of the date of this Disclosure Statement and as assumed in the Projections.

## 2.    **Valuation Methodologies**

In performing its analysis, Jefferies utilized three primary methodologies: (a) Comparable Public Company Analysis; (b) Comparable M&A Transaction Analysis; and (c) Discounted Cash Flow Analysis. Each of these analyses are substantially similar in approach to those used by Jefferies' Investment Banking for other similar chapter 11 valuations, pricing debt and equity transactions, valuing transactions for fairness opinions, advising in mergers and acquisitions, and other similar transactions. These valuation methodologies are based upon TNG Global's business plan, certain publicly available information, and financial information provided by the Debtors.

In determining the Reorganized TNG Global Enterprise Value, Jefferies considered the "fair market value" of TNG Global's assets, defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts"[15]. The fair market value is assumed to occur in an open and unrestricted market, with "normal" conditions for capital and financing markets, strategic interest, and supply of similar assets.

THE FOLLOWING SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES AND FACTORS UNDERTAKEN TO SUPPORT JEFFERIES' CONCLUSIONS. THE PREPARATION OF A VALUATION IS A COMPLEX PROCESS INVOLVING VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE ANALYSES AND FACTORS TO CONSIDER, AS WELL AS THE APPLICATION OF THOSE ANALYSES AND FACTORS UNDER THE PARTICULAR CIRCUMSTANCES. AS A RESULT, THE PROCESS INVOLVED IN PREPARING A VALUATION IS NOT READILY SUMMARIZED.

(a)    Comparable Public Company Analysis

The Comparable Public Company Analysis estimates the value of a company based on a comparison of such company's financial statistics with the financial statistics of other public companies that are similar. Criteria for selecting comparable companies for this analysis include, among other relevant characteristics, similar lines of business, business risks, growth

---

[15]   This definition is from the United States Department of the Treasury's Internal revenue Code, Subchapter B, § 20.2031-1(b) and was utilized in *United States v. Cartwright*, 411 U.S. 546, 550-551 (1973) (internal citation omitted).

prospects, maturity of business, market presence, size, and scale of operations. The analysis establishes benchmarks for valuation by deriving financial multiples and ratios for the comparable companies, standardized using common variables such as EBITDA. In order to avoid distortion of the valuation, it is common to normalize the results of the company being valued, for example by excluding one-off extraordinary items.

(b)   Comparable M&A Transaction Analysis

The Comparable M&A Transaction Analysis estimates the value of a Company based on a comparison of prior merger and acquisition transactions of other public companies that are similar to the target company. Criteria for selecting comparable companies for this analysis are similar to those cited in the Comparable Public Company Analysis.

(c)   Discounted Cash Flow Analysis

The discounted cash flow analysis ("**DCF Analysis**") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF Analysis is a "forward looking" valuation methodology approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Company. This approach has two components: (i) the present value of the projected un-levered after-tax free cash flows for a determined period, and (ii) the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections).

**3.   Valuation Considerations**

An estimate of total enterprise value is not entirely mathematical, but rather it involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimates of total enterprise value set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Company, Jefferies, nor any other person assumes responsibility for their accuracy. Depending on the results of TNG Global's operations or changes in the financial markets, Jefferies' valuation analysis as of the Effective Date may differ from that disclosed herein. In addition, any valuation of newly-issued securities implied by the estimates of value set forth herein is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long term basis; and (d) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the Reorganized TNG Global Enterprise Value estimated by Jefferies does not necessarily reflect,

and should not be construed as reflecting, values that will be attained in the public or private markets.

## ARTICLE IX.     DESCRIPTION OF CAPITAL STOCK OF THE REORGANIZED COMPANY

On the Effective Date, the authorized capital stock of the Reorganized Company will consist of 28,730,100 shares of New Common Stock.  Set forth below is a summary of (i) the terms of the New Common Stock, (ii) the terms of the Warrants, (iii) the terms of a management incentive plan that may be enacted after the Effective Date, and (iv) the terms of the Reorganized Company Stockholders' Agreement.  To the extent that there is any inconsistency between this summary and the Certificate of Incorporation, the Warrant Agreement, the management incentive plan, or the Reorganized Company Stockholders' Agreement, the terms of the Certificate of Incorporation, the Warrant Agreement, the management incentive plan, or the Reorganized Company Stockholders' Agreement, respectively, shall control.

### A.    NEW COMMON STOCK

The terms of the New Common Stock are set forth in their entirety in the Certificate of Incorporation of the Reorganized Company, in substantially the form attached to this Disclosure Statement as Exhibit J.

### B.    WARRANTS

The terms of the Management Warrants to be issued to the Current Management Group on the Effective Date and the terms of the Equity Warrants to be issued to Class 8 Equity Interests on the Effective Date will be set forth in the applicable Warrant Agreement, which will be substantially in the form set forth in the Warrant Agreement attached hereto as Exhibit N.

### C.    MANAGEMENT INCENTIVE PLAN

An additional amount of up to 5% of the fully diluted New Common Stock, determined in each case at the time of exercise, may be granted to any successors of the Current Management Group and to other members of management of the Reorganized Company from time to time, at the discretion of the Board of Directors of the Reorganized Company pursuant to a management incentive plan that may be enacted after the Effective Date.

### D.    REORGANIZED COMPANY STOCKHOLDERS' AGREEMENT

The New Common Stock will not be freely transferable and will be subject to significant contractual transfer restrictions that may affect the development of an active trading market for the New Common Stock and/or the future trading prices of the New Common Stock.  The Plan contemplates that the Reorganized Company and all Holders of New Common Stock, other than Holders of New Common Stock received as a result of ESOP Interests that do not arise from, under, or relate to ESOP Distributed Shares, and upon all successors and assigns of such parties, will enter into (or be deemed to enter into) the Reorganized Company Stockholders' Agreement, in substantially the form attached to this Disclosure Statement as Exhibit F.  The Reorganized

Company Stockholders' Agreement shall contain provisions governing the rights of Holders of the New Common Stock including, without limitation, access to information, certain transfer restrictions such as drag-along and tag-along rights and limits on the number of record Holders.

## ARTICLE X.        RISK FACTORS

THE IMPLEMENTATION OF THE PLAN AND THE ISSUANCE OF THE NEW COMMON STOCK ARE SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS."   THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE EFFECT OF THE REORGANIZATION ON CUSTOMERS, SUPPLIERS, VENDORS AND EMPLOYEES, FLUCTUATIONS IN RAW MATERIAL PRICES AND ENERGY COSTS, DOWNTURNS IN INDUSTRIAL PRODUCTION, HOUSING AND CONSTRUCTION AND THE CONSUMPTION OF DURABLE AND NONDURABLE GOODS, THE DEGREE AND NATURE OF COMPETITION, DEMAND FOR THE DEBTORS' PRODUCTS, THE DEGREE OF SUCCESS ACHIEVED BY THE DEBTORS' NEW PRODUCT INITIATIVES, INCREASES IN PENSION AND INSURANCE COSTS, CHANGES IN GOVERNMENT REGULATIONS, THE APPLICATION OR INTERPRETATION OF THOSE REGULATIONS OR IN THE SYSTEMS, PERSONNEL, TECHNOLOGIES OR OTHER RESOURCES THE COMPANY DEVOTES TO COMPLIANCE WITH REGULATIONS, THE COMPANY'S ABILITY TO COMPLETE ACQUISITIONS AND SUCCESSFULLY INTEGRATE THE OPERATIONS OF ACQUIRED BUSINESSES, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. NO PARTY, INCLUDING, WITHOUT LIMITATION, THE DEBTORS OR

THE REORGANIZED DEBTORS, UNDERTAKES AN OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

## A.     GENERAL BANKRUPTCY LAW CONSIDERATIONS

### 1.     Failure to Obtain Confirmation of the Plan May Result in Liquidation or Confirmation of an Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the re-solicitation of votes on the Plan.

The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent necessary.  In the event that Classes 4, 6, and/or 7 fail to accept the Plan in accordance with sections 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 12.8 thereof.  While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against and Interests in the Debtors as the terms of the Plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

### 2.     Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Effective Date may occur shortly after the Confirmation Date, there can be no assurance as to such timing.  The occurrence of the Effective Date is also subject to certain conditions precedent as described in Section IX of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against and Interests in the Debtors as the terms of the Plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

## B.     OTHER RISK FACTORS

### 1.     Variances from Projections May Affect Ability to Pay Obligations.

The Debtors have prepared the projected financial information contained in Exhibit P to this Disclosure Statement relating to the Reorganized Company in connection with the development of the Plan and in order to present the anticipated effects of the Plan and the transactions contemplated thereby.  The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial position of the Reorganized Company for the periods indicated.  The Projections are qualified by the accompanying assumptions, and must be read in conjunction with such assumptions, which constitute an integral part of the Projections.  The Projections are based upon a variety of assumptions as set forth therein, and the Reorganized Company's future operating results are subject to and likely to be affected by a number of factors, including significant business, economic and competitive uncertainties, many of which are beyond the control of the Reorganized Company.   In addition, unanticipated events and circumstances occurring subsequent to January 31, 2010 may affect the actual financial results of the Reorganized Company's operations.  Accordingly, actual results may vary materially from those shown in the Projections, which may adversely affect the ability of the Reorganized Company to pay the obligations owing to certain Holders of Claims entitled to distributions under the Plan and other indebtedness incurred after confirmation of the Plan.

Management believes that the industry in which the Reorganized Company will be operating is volatile due to numerous factors, all of which make accurate forecasting very difficult.  Although it is not possible to predict all risks associated with the Projections and their underlying assumptions, there are some risks which management is presently able to identify.  The Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in this Disclosure Statement and that the publicity associated with the bankruptcy proceeding contemplated by the Plan will not adversely affect the Reorganized Company's operating results.  There can be no assurance that these two assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Reorganized Company's business, results of operations and financial condition.

Moreover, the Projections were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. Rather, the Projections were developed in connection with the planning, negotiation and development of the Plan.  The Reorganized Company does not undertake any obligation to update or otherwise revise the Projections to reflect events or circumstances existing or arising after October 31, 2009 or to

reflect the occurrence of unanticipated events. In management's view, however, the Projections were prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of the Reorganized Company after the Effective Date. Nevertheless, the Projections should not be regarded as a representation, guaranty or other assurance by the Debtors, the Reorganized Debtors or any other person that the Projections will be achieved, and Holders are therefore cautioned not to place undue reliance on the projected financial information contained in this Disclosure Statement.

## 2.    Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations.

Although the Plan will result in the elimination of debt, the Reorganized Company will continue to have a significant amount of indebtedness after the Effective Date.

Such levels of indebtedness may limit the ability of the Reorganized Company to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes. Such levels of indebtedness may also limit the ability of the Reorganized Company to adjust to changing market conditions and to withstand competitive pressures, possibly leaving the Reorganized Company vulnerable in a downturn in general economic conditions or in its business, or unable to carry out capital spending that is important to growth and productivity improvement programs.

## 3.    Uncertainty Regarding DIP and Exit Facility Credit Agreements May Adversely Affect Success of Reorganization.

The DIP Facility Credit Agreements and the Exit Facility Credit Agreements include various conditions to closing including, but not limited to, due diligence conditions. Accordingly, the Debtors cannot give assurances that the DIP Facilities or the Exit Facilities will be consummated. Furthermore, the ABL DIP Facility Lenders and the ABL Exit Facility Lenders have not provided written commitments to enter into the ABL DIP Facility or the ABL Exit Facility. In the event any of these facilities are not consummated, and the Debtors are unable to promptly obtain replacement facilities, the ability of the Debtors to confirm the Plan will be materially and adversely affected.

Even if the Exit Facility Credit Agreements and the DIP Facility Credit Agreements are entered into, any inability of the Reorganized Company to satisfy the financial covenants and maintain sufficient inventory and receivables levels required under the ABL DIP Facility and the ABL Exit Facility could restrict the ability of the Reorganized Company to fully access the maximum amount that may be borrowed under the Exit Facility Credit Agreements and the DIP Facility Credit Agreements. These uncertainties with respect to the Exit Facility Credit Agreements and the DIP Facility Credit Agreements may adversely affect the success of the reorganization of the Reorganized Company.

## 4.    Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.

It has been generally assumed in the preparation of the Projections that the historical book value of the Debtors' assets approximates those assets' fair value, except for specific adjustments. For financial reporting purposes, the fair value of the Debtors' assets must be

determined as of the Effective Date.  This determination will be based on an independent valuation.  Although the Debtors do not presently expect this valuation to result in values that are materially greater or less than the values assumed in the preparation of the Projections, the Debtors can make no assurances with respect thereto.

## 5.    Historical Financial Information May Not Be Comparable.

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

## 6.    Market and Business Risks May Adversely Affect Business Performance.

In the normal course of business, the Debtors are subject to the following types of risks and variables, which the Debtors anticipate may materially affect their business performance following the Effective Date:

- General economic and business conditions, particularly the current economic downturn;

- Fluctuations in raw material prices and energy costs;

- Downturns in industrial production, housing and construction and the consumption of durable and nondurable goods;

- The degree and nature of competition in the Debtors' markets;

- Fluctuations in demand for the Debtors' products;

- The degree of success achieved by the Debtors' new product initiatives;

- Increases in pension and insurance costs;

- Changes in government regulations, the application or interpretation of those regulations or in the systems, personnel, technologies or other resources the Debtors devote to compliance with regulations;

- The Debtors' ability to complete acquisitions and successfully integrate the operations of acquired businesses; and

- The Debtors' ability to obtain cash adequate to fund its needs, including the borrowings available under the Exit Facility Credit Agreements.

7. **Cycles, Conditions and Problems Inherent in the Debtors' Industry May Adversely Affect Financial Results.**

The Debtors' operating results tend to reflect the general cyclical nature of the business in which the Debtors operate. In addition, the Debtors' industry has suffered from excess capacity. The Debtors' industry also is capital intensive, which leads to high fixed costs and generally results in continued production as long as prices are sufficient to cover variable costs. These conditions have contributed to substantial price competition and volatility within the Debtors' industry. In a recession, demand and prices for the Debtors' products tend to drop substantially. Future decreases in prices for the Debtors' products could adversely affect the Debtors' operating results. These factors may adversely affect the Debtors' ability to respond to competition and to other market conditions or to otherwise take advantage of business opportunities.

8. **Future Increases in Raw Material and Other Operating Costs May Adversely Affect Financial Results.**

The Debtors' primary raw material is recycled paper, which is known in the Debtors' industry as "recovered fiber." The cost of recovered fiber has, at times, fluctuated greatly because of factors such as shortages or surpluses created by market or industry conditions. Although the Debtors have historically raised the selling prices of the Debtors' products in response to raw material price increases, sometimes raw material prices have increased so quickly or to such levels that the Debtors have been unable to pass the price increases through to the Debtors' customers on a timely basis, which has adversely affected the Debtors' operating margins. The Debtors cannot give assurances that they will be able to pass such price increases through to their customers on a timely basis and maintain the Debtors' margins in the face of raw material cost fluctuations in the future.

The Debtors have historically announced price increases on the Debtors' products to help offset increases in other operating costs as well, such as energy, freight, employee benefits and insurance. Although the Debtors seek to realize the full benefit of these announced price increases, the Debtors' ability to do so is dependent on numerous factors, such as customer acceptance of these increases, market dynamics including supply and demand, and contractual commitments that may prescribe the timing and amount of future price increases, without direct market correlation. For all these reasons, the Debtors may not be able to realize the full benefits of pricing increases that the Debtors announce and work to implement.

9. **Rising Energy Costs May Adversely Affect Financial Results.**

Excluding raw materials and labor, energy is the Debtors' most significant manufacturing cost. Energy consists of electrical purchases and fuel used to generate steam used in the paper-making process and to operate the Debtors' paperboard machines and the Debtors' other converting machinery. The Debtors' energy costs in 2009 increased 12.2% compared to 2008: in fiscal 2008, the average energy cost in the Debtors' North American mill system was approximately $90.00 per ton, and in fiscal 2009 it was approximately $101.00 per ton. Until the last several years, the Debtors' business had not been significantly affected by fluctuating energy costs, and the Debtors historically have not passed energy cost increases through to the Debtors'

customers.  Although the Debtors have recently responded to energy cost increases by raising the Debtors' selling prices, the Debtors' ability to realize the full benefit of these price increases is dependent on and limited by dynamics such as pricing strategies of the Debtors' competitors and contractual commitments that affect the Debtors' ability to raise prices as fast as the Debtors' costs increase.  Consequently, the Debtors may not be able to pass through to the Debtors' customers all of the energy cost increases the Debtors have incurred.  As a result, the Debtors' operating margins could be adversely affected.  Although the Debtors continue to evaluate their energy costs and consider ways to factor energy costs into its pricing, the Debtors cannot give assurances that their operating margins and results of operations will not continue to be adversely affected by fluctuating energy costs.

**10.**    **Cost of Compliance with Government Regulation, Including Environmental Laws, May Adversely Affect Financial Results.**

The Debtors are subject to various foreign, federal, state and local laws and regulations that affect the conduct of their operations, including environmental laws.  Among other things, these requirements regulate the discharge of materials into the water, air and land and govern the use and disposal of hazardous substances.  These regulations are complex, and the Debtors' compliance with them can be affected by a myriad of factors, including rates of production, changes in applicable standards or interpretations, human error, equipment malfunction and other factors.  From time to time, the Debtors have and may continue to find that they have inadvertently failed to meet specific regulations or standards despite the Debtors' efforts to comply with them.  Under environmental laws, the Debtors also can be held strictly liable if hazardous substances are found on real property the Debtors previously owned, operated or used as a disposal site.  Despite the Debtors' compliance efforts, risk of environmental liability is part of the nature of the Debtors' business.  The Debtors maintain and generate hazardous substances at some facilities, and although the Debtors do not believe that any related liabilities or remedial costs will be material, the Debtors cannot give assurances that environmental liabilities, including compliance and remediation costs, will not have a material adverse effect on the Debtors' business.  In addition, future events may lead to additional compliance or other costs that could have a material adverse effect on the Debtors' business.  Such future events could include changes in, or new interpretations of, existing laws, regulations or enforcement policies, discoveries of past releases, failure of indemnitors to fulfill their obligations, or further investigation of the potential health hazards of certain products or business activities.

The Company has identified environmental contamination at three of its closed facilities that may require remediation upon retirement of these assets.  However, no such liability has been recognized for these facilities, as the Company currently does not have sufficient information available to assess if remediation will be required or to reasonably estimate any potential obligation.  For these three locations, any potential obligation cannot be reasonably estimated as the settlement date or potential settlement dates, the settlement method or potential settlement methods, and other relevant facts to determine a reasonable estimate for the obligation are unknown at this time.  Due to uncertainties inherent in these matters, management is unable to estimate the Company's potential exposure, including possible remediation or other environmental responsibilities that may result from these matters at this time; such information is not expected to be known for a number of years  These uncertainties primarily include the completion and outcome of the environmental study and the percentage of contamination/natural

resource damage, if any, ultimately determined to be attributable to the Company and other parties,  It is possible that the Company's ultimate liability resulting from these issues could be material.

Among other laws, a change in the tax laws of the United States could materially affect the consequences of the Plan as described herein to the Debtors and the Holders of Claims.  See Article XI herein, "Certain Federal Income Tax Consequences of the Plan."

11.    **Price Fluctuations and Volatility in the Debtors' Highly Competitive Industry May Adversely Affect Financial Results.**

The industry in which the Debtors operate is highly competitive.  The Debtors' competitors include other large, vertically integrated paperboard, packaging and gypsum wallboard manufacturing companies, along with numerous small paperboard and packaging companies.  As a result of product substitution, the Debtors also compete indirectly with manufacturers selling to the same end-use markets, in which products are packaged with other materials, including flexible packaging.  In addition, the Debtors face increasing competition from foreign paperboard and packaging producers as a result of the continued migration of U.S. manufacturing offshore to find lower labor cost and the emergence of new, foreign competitors in these countries.  The industry in which the Debtors compete is particularly sensitive to price pressure, as well as other factors, including quality, service, innovation and design, with varying emphasis on these factors depending on the product line.  To the extent that the Debtors' competitors become more successful with respect to any key competitive factors, the Debtors' ability to attract and retain customers could be materially adversely affected.  Some of the Debtors' competitors are less leveraged than the Debtors are, and have access to greater resources.  These companies may be able to adapt more quickly to new or emerging technologies, may respond more quickly to changes in customer requirements and may better withstand industry-wide pricing pressures.  If the Debtors' facilities are not as cost-efficient as those of the Debtors' competitors or if the Debtors' competitors lower prices, the Debtors may need to temporarily or permanently close certain facilities, which could negatively affect the Debtors' sales volume and revenues.

12.    **The Debtors May Encounter Difficulties Restructuring Operations or Closing or Disposing of Facilities.**

The Debtors have closed certain higher-cost facilities and otherwise restructured operations in an effort to improve cost effectiveness and profitability.  Some of these activities are on-going, and there is no guarantee that any such activities will achieve the Debtors' goals and not divert the attention of management or disrupt the Debtors' ordinary operations. Moreover, production capacity, or the actual amount of products produced, may be reduced as a result of these activities.

13.    **Revenue and Operating Results would be Adversely Affected if Operations at the Fitchburg Paperboard Mill Were to Be Reduced.**

The Debtors rely on the Fitchburg paperboard mill to produce graphicboard that they sell to third parties in North America.  The Debtors' reliance on the Fitchburg paperboard mill will

increase to the extent sales of graphicboard increase.  If production at this facility was significantly reduced or was to became unavailable as a result of a natural or man-made disaster, labor dispute or any other reason, the Debtors may not be able to supply their graphicboard to their North American customers on a timely basis or at all.  As a result, the Debtors' operating results and its relationships with its customers would be materially adversely affected.

### 14.    The Debtors' Revenues and Earnings Could be Adversely Affected by Foreign Regulations and Changes in Economic Conditions in the Foreign Countries in Which the Debtors Operate their Business.

The Debtors have manufacturing operations in Europe where they generated approximately 21% and 18% of their net sales in 2008 and 2007, respectively.  Conducting an international business inherently involves a number of difficulties and risks that could adversely affect the Debtors' ability to generate revenues and could subject the Debtors to increased costs. Significant factors that may adversely affect the Debtors' revenues and increase their costs include:

- currency fluctuations, which could cause an increase in the price of the raw materials used in the Debtors' products and a decrease in the selling price of their products, both of which would decrease profits;

- more stringent restrictions on the Debtors' ability to invest or adjust their work force levels; and

- economic downturns which could adversely affect the Debtors' ability to deliver their products to their customers for a profit.

The Debtors have experienced, and may in the future experience, many of these risks and cannot predict the effect of any particular risk on their operations.  However, any of these factors may materially adversely affect the Debtors' revenues or increase their operating expenses.  In addition, many of the Debtors' customers operate in foreign countries and are subject to these and other risks, all of which may adversely affect their production and their need for the Debtors' products.  In the event the Debtors' customers reduce the amount of the Debtors' products that they purchase, the Debtors' revenues and operating results would be adversely affected.

### 15.    Terrorist Attacks/Other Military Disruptions

Additional terrorist attacks in the U.S. or against U.S. targets, or threats of war or the escalation of current hostilities involving the U.S. or its allies, or military or trade disruptions impacting the Company's domestic or foreign suppliers and/or customers may impact the Reorganized Debtors' operations, including, but not limited to, causes supply chain disruptions and decreased sales of the Company's products.  These events could also cause an increase in oil or other commodity prices, which could adversely affect the Company's raw materials and transportation costs.  More generally, any of these events could cause consumer confidence and spending to decrease.  These events could also exacerbate the economic recession in the U.S. or abroad.  Any of these occurrences could have a significant impact on the Reorganized Debtors' business, financial condition, or results of operations.

16.    **Some of The Debtors' Business is Seasonal and Weather Conditions Could Have an Adverse Effect on Revenues and Operating Results.**

Certain of the Debtors' products are used by customers in the packaging of food products, primarily fruits and vegetables. Due principally to the seasonal nature of certain of these products, sales of the Debtors' products to these customers have varied from quarter to quarter. Natural disasters such as hurricanes, tornadoes, fires, ice storms, wind storms, floods and other weather conditions may materially and adversely affect the Debtors' business and their earnings. In addition, poor weather conditions that reduce crop yields, packaged food products and reduced customer demand for food containers can adversely affect the Debtors' revenues and their operating results. The volumes of certain of the Debtors' converted products can also vary from quarter to quarter, partly due to the increased production of textbooks and binders before the beginning of the school year, as well as the production of board games and other products before the start of the Christmas season. The Debtors' overall level of sales and operating profit have historically been lower in the third quarter, ending January 31, due in part to the cyclicality of the demand for the Debtors' products as well as closures by the Debtors and their customers for the Thanksgiving, Christmas and New Year's holidays.

17.    **If Negotiations For Renewals of The Debtors' Various Labor Agreements Are Not Successful, The Debtors' Operations Could Be Subject to Interruptions, Which Would Adversely Affect their Results of Operations and Cash Flows.**

A significant number of the Debtors' employees in North America are governed by collective bargaining agreements that cover 16 facilities that have either already expired or will do so before January 15, 2014. Three of these agreements will expire by the end of fiscal 2010, and four additional agreements will expire by the end of fiscal 2011. Expired North American contracts are in the process of renegotiation. Substantially all of the Debtors' employees at their facilities outside of North America are governed by agreements that have either already expired or will do so within the next fiscal year. Those that have already expired are for locations covered by either local or national labor agreements and are currently being renegotiated If the Debtors are unable to successfully renegotiate the terms of any of their agreements, or if an industry association is unable to successfully negotiate a national agreement when it expires, or if the Debtors experience any extended interruption of operations at any of their facilities as a result of strikes or other work stoppages, the Debtors' results of operations and cash flows could be adversely affected**.**

C.    **RISKS TO CREDITORS AND INTEREST HOLDERS WHO WILL RECEIVE SECURITIES**

The ultimate recoveries under the Plan to Holders of Claims in Class 6 and Interests in Classes 8 and 9 that receive New Common Stock pursuant to the Plan will depend on the realizable value of the New Common Stock. The securities to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Plan, each Holder of Claims in Class 6 and Interests in Classes 8 and 9 should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan and the Disclosure Statement.

1.    **Lack of Established Market for the Securities May Adversely Affect Liquidity.**

The New Common Stock will be illiquid securities without a trading market.  There can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the prices at which such stock might be traded, should an active trading market develop.  The Debtors and the Reorganized Debtors do not anticipate that the New Common Stock to be issued under the Plan will be listed on or traded on any nationally recognized market or exchange.  Further, the New Common Stock to be issued under the Plan will not be registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated hereunder, the "**Securities Act**"), any state securities laws or the laws of any other jurisdiction.  Absent such registration, the New Common Stock may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws.  As explained in more detail in Article XII herein, "Certain Federal and State Securities Law Considerations," most recipients of New Common Stock will be able to resell such securities without registration pursuant to the exemption provided by Section 4(1) of the Securities Act.

2.    **Significant Contractual Transfer Restrictions**

The New Common Stock is not freely transferable and is subject to significant contractual transfer restrictions that may affect the development of an active trading market for the New Common Stock and/or the future trading prices of the New Common Stock.

3.    **Lack of Dividends on Securities May Adversely Affect Liquidity.**

The Debtors do not anticipate that cash dividends or other distributions will be made by the Reorganized Company with respect to the New Common Stock in the foreseeable future.  In addition, covenants in certain debt instruments to which the Reorganized Company will be a party may restrict the ability of the Reorganized Company to pay dividends and make certain other payments.  Further, such restrictions on dividends may have an adverse impact on the market demand for New Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

## ARTICLE XI.        CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States federal income tax aspects of the Plan.  It is for general information purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), final, temporary, and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or

administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  No ruling has been requested or obtained from the Internal Revenue Service (the "**IRS**") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  Thus, no assurance can be given as to whether the IRS will agree with the assertions and conditions discussed herein.  No representations or assurances are being made to the Holders of Claims or Interests with respect to the federal income tax consequences described herein.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE IRC; (II) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

The Company files a consolidated federal income tax return which takes into account the income and losses of the Debtors and certain of its subsidiaries.  The consolidated net operating losses ("**NOLs**") of the Company for federal income tax purposes were $219 million as of April 30, 2009, and are expected to exceed that amount by the time the Plan is implemented.  The amount of the Company's consolidated NOLs may be reduced if the IRS were to make adjustments to The Newark Group's taxable income or loss in connection with an examination of its consolidated federal income tax return.  As a general rule, an NOL incurred by a member of The Newark Group during a taxable year can be carried back and deducted from The Newark Group's taxable income generated within the two preceding taxable years, (or, in the case of NOLs incurred in any single fiscal year beginning or ending in 2008 or 2009, can be carried back and deducted (subject to certain limitations) from The Newark Group's taxable income generated within the three, four or five preceding years, at the election of The Newark Group), and the remainder can be carried forward and deducted from taxable income over the 20 succeeding taxable years.

As discussed below, as a result of the implementation of the Plan, The Newark Group's NOL carry forwards and the tax basis of The Newark Group's assets may be reduced or eliminated.  In addition, the Reorganized Debtors' ability to use any remaining NOL carry forwards, built-in losses and certain other tax attributes may be materially limited or effectively

eliminated following the Effective Date due to the changes in ownership of stock that occur either prior to, or in connection with, the implementation of the Plan.

## 1. Bankruptcy Exclusion for Cancellation of Indebtedness Income and Tax Attribute Reduction

Under the IRC, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("**COD Income**") realized during the taxable year. COD Income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property transferred by the debtor in satisfaction of such discharged indebtedness (including stock). COD Income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

IRC section 108(a)(1)(A) provides an exception to the general rule of inclusion, however, where a taxpayer is in bankruptcy and the discharge is granted, or is effected pursuant to a plan approved, by the bankruptcy court. In this case, unless the taxpayer makes a special election provided in IRC section 108(i) (discussed below), the taxpayer excludes the COD Income from taxable income and is required under IRC section 108(b) to reduce certain of its tax attributes by the amount of excluded COD Income. The attributes of the taxpayer are to be reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets, and finally, foreign tax credit carry forwards (collectively, "**Tax Attributes**"). A taxpayer is permitted to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above. The reduction of Tax Attributes occurs after the determination of the taxpayer's tax liability for the taxable year in which the COD Income is realized, and any downward adjustment to asset basis is made to the taxpayer's assets on the first day of the taxable year following such taxable year. To the extent the amount of COD Income exceeds the taxpayer's available Tax Attributes, the excess is still excludable from the taxpayer's gross income under the bankruptcy exclusion.

Pursuant to the Plan, the Prepetition Notes will be exchanged for New Common Stock. In general, The Newark Group will realize COD Income to the extent that the adjusted issue price of the Prepetition Notes exceeds the fair market value of the New Common Stock issued in exchange for the Prepetition Notes. Also pursuant to the Plan, the Von Zuben Subordinated Unsecured Note will be exchanged for $250,000 cash and the Von Zuben New Subordinated Notes. In general, The Newark Group will realize COD Income to the extent that the adjusted issue price of the Von Zuben Subordinated Unsecured Note exceeds $250,000 plus the issue price of the Von Zuben New Subordinated Notes issued in exchange for the Von Zuben Subordinated Unsecured Note. The Newark Group will be able to exclude such COD Income under IRC section 108(a) to the extent it does not elect under IRC section 108(i) to defer such COD Income. If The Newark Group does exclude its COD Income under IRC section 108(a), however, certain Tax Attributes of The Newark Group will be reduced or eliminated.

The mechanics of such attribute reduction will be governed by Treasury Regulation §1.1502-28, which contains rules that apply where the debtor corporation is a member of a group filing a consolidated return. These rules generally provide that the Tax Attributes attributable to

-117-

the corporation whose debt is discharged are the first to be reduced. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member pursuant to the consolidated return regulations, and also include the basis of property of the debtor (including subsidiary stock and the basis of intercompany loans made by the debtor to its subsidiaries), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group must be reduced (but not the tax basis of assets). In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be reduced by Tax Attributes attributable to other members of the consolidated group. In addition, to the extent that the debtor corporation is required to reduce its basis in the stock of another consolidated group member, the lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member, to the extent of the stock basis reduction. As noted, a debtor may elect to reduce the tax basis of depreciable assets before reducing other Tax Attributes, and may also elect to treat the stock of its subsidiaries as a depreciable asset for this purpose, provided that each such subsidiary reduces the tax basis of its depreciable assets by the amount by which the debtor reduces the basis of its subsidiary's stock. The Newark Group has not yet determined whether to make such elections should it determine to exclude COD Income rather than making the COD deferral election under IRC section 108(i). Any required Tax Attribute reduction will take place after The Newark Group determines its taxable income, and any federal income tax liability, for the taxable year in which the Effective Date occurs.

The amount of COD Income realized by The Newark Group, and accordingly the amount of The Newark Group's Tax Attributes required to be reduced, will depend on the fair market value of the New Common Stock issued in exchange for the Prepetition Notes and the issue price of the Von Zuben New Subordinated Notes. This amount cannot be known with certainty until after the Effective Date. To the extent The Newark Group excludes COD Income under the bankruptcy exclusion, The Newark Group's consolidated NOLs (and other Tax Attributes) will be subject to reduction as of the beginning of the taxable year following the year in which the Effective Date occurs as a result of the COD Income realized on the Effective Date. In that event, The Newark Group may not have NOL carryforwards to the year following the year in which the Effective Date occurs unless The Newark Group (i) makes the COD deferral election (described below) as to all or a portion of the COD Income, or (ii) excludes the COD Income under the bankruptcy exclusion but makes the election under IRC section 108(b)(5) to reduce the tax basis of depreciable assets before reducing other Tax Attributes.

## 2.    Deferral Election for COD Income under IRC Section 108(i)

IRC section 108(i) permits a debtor to elect, on an instrument by instrument basis, to defer the recognition of COD Income that arises pursuant to a discharge of debt that occurs in 2009 and 2010 (the "**COD Deferral Election**"). Absent an "acceleration event" (discussed below), the deferred COD Income is recognized ratably over the five-year period commencing with the debtor's fourth or fifth tax year following the deferral (which period, for The Newark Group, would commence May 1, 2014 and end April 30, 2019 (the "**Amortization Period**")). A debtor cannot claim any exclusion under IRC section 108(a) with respect to any deferred COD

Income at the time the deferred COD Income is recognized. However, a debtor making such election is not required to reduce its Tax Attributes by the amount of COD Income deferred.

Upon the occurrence of certain "acceleration" events, the deferred COD Income is accelerated and taken into account in the taxable year in which the acceleration event occurs. These events include the liquidation or sale of substantially all of a debtor's assets (including in a title 11 or similar case, unless the debtor reorganizes and emerges from bankruptcy as an operating company), and the cessation of business by the debtor. The Newark Group may determine, in consultation with its tax advisors, that it is more tax-efficient to make the COD Deferral Election as to all or a portion of its COD Income (thereby deferring recognition of such COD Income until the Amortization Period) in order to maximize the value of its Tax Attributes following the Effective Date.

### 3.     __Annual IRC Section 382 Limitation on Use of NOLs__

IRC section 382 contains certain rules limiting the amount of losses and tax credits that a corporate taxpayer can utilize in the years following an "ownership change." These rules are relevant only if (i) the loss corporation has NOLs and tax credits to carry forward to years after the date of the ownership change and/or (ii) the loss corporation has a "net unrealized built-in loss" ("__NUBIL__") in its assets as of the date of the ownership change. The built-in losses included in NUBIL ("__Built-In Losses__") are losses that have economically accrued but which are unrecognized as of the date of the ownership change and which exceed a specified threshold amount. The Newark Group will undergo an ownership change on the Effective Date, and, unless the "Bankruptcy Exception" (discussed below) applies, the amount of its pre-change losses that may be used to offset future taxable income will become subject to an annual use limitation (the "__Section 382 Limitation__").

Pursuant to the Plan, all of the Outstanding Common Stock Interests of The Newark Group will be cancelled, and 96.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants, will be issued to the Holders of the Prepetition Notes, thereby resulting in an ownership change. Consequently, any NOLs, tax credits and Built-In Losses (to the extent there is a NUBIL) will become subject to a Section 382 Limitation equal to the fair market value of the New Common Stock immediately after such ownership change (after giving effect to the discharge of the Prepetition Notes pursuant to the Plan and taking into account certain other adjustments) multiplied by the federal "long-term tax-exempt rate."

In addition, transfers of Common Stock that take place during the pendency of the bankruptcy proceeding could also cause an ownership change prior to the Effective Date. In that event, The Newark Group's NOLs, tax credits and Built-In Losses (to the extent there is a NUBIL) would become subject to a Section 382 Limitation based on the pre-discharge value of The Newark Group's equity. This would likely deny The Newark Group most, if not all, of the tax benefit of such losses.

Under a special exception contained in IRC section 382(l)(5) (the "__Bankruptcy Exception__"), if (i) immediately after the ownership change that will occur upon implementation

of the Plan, at least 50% of the vote and value of its stock is held by its historic shareholders and creditors who have held their Prepetition Notes for at least 18 months, (ii) certain other requirements are met, and (iii) The Newark Group does not elect out of the Bankruptcy Exception, the ownership change will not cause The Newark Group to be subject to a Section 382 Limitation.  If The Newark Group relies on the Bankruptcy Exception, it would be required to reduce its pre-change losses by the amount of any interest paid or accrued by it during the three taxable years preceding the taxable year in which the ownership change occurs, and during the pre-change portion of the current taxable year, with respect to the portion of the Prepetition Notes that is converted to New Common Stock.  Moreover, if the Bankruptcy Exception applies, an ownership change of The Newark Group within a two year period after the Effective Date will preclude The Newark Group from utilizing any of the pre-change losses at the time of the Effective Date in taxable years following the second ownership change.  The Newark Group has not yet decided whether to use the Bankruptcy Exception (assuming it satisfies the substantive requirements of such exception).

### 4.    Accrued Interest

To the extent that the consideration issued to Holders of Prepetition Notes or to the Holder of the Von Zuben Subordinated Unsecured Note pursuant to the Plan is attributable to accrued but unpaid interest, The Newark Group should be entitled to interest deductions in the amount of such accrued interest, but only to the extent it has not already deducted such amount.

### 5.    Federal Alternative Minimum Tax

In general, a federal alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation may otherwise be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's alternate minimum taxable income may be offset by available NOL carryforwards as computed for AMT purposes.

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of IRC section 382, and the corporation has a NUBIL, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the date of the ownership change.  This could increase the amount of The Newark Group's federal income tax liability following the Effective Date.  Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT.  Any unused credit is carried forward indefinitely.

### 6.    Federal Income Tax Consequences to The Newark Group from the Exchange of New Common Stock for the Prepetition Notes

The Newark Group will not recognize any gain or loss in connection with issuance of the New Common Stock in exchange for the Prepetition Notes, but will realize COD Income as a

result of such exchange, and will have the resulting federal income tax consequences described in Article XI.A.1. herein.

    **7.**    **Federal Income Tax Consequences to The Newark Group from the Exchange of the Von Zuben New Subordinated Notes for the Von Zuben Subordinated Unsecured Note**

The Newark Group will not recognize any gain or loss in connection with issuance of the Von Zuben New Subordinated Notes in exchange for the Von Zuben Subordinated Unsecured Note, but will realize COD Income as a result of such exchange, and will have the resulting federal income tax consequences described in Article XI.A.1. herein.

**B.**    **FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF PREPETITION NOTES**

    **1.**    **General Tax Considerations for Holders of Prepetition Notes**

The federal income tax consequences of the Plan to Holders of Prepetition Notes that are United States persons ("**U.S. Persons**") will depend upon a number of factors.  For purposes of the following discussion, a U.S. Person is any Person or Entity (1) who is a citizen or resident of the United States, (2) that is a corporation (or Entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States person for federal income tax purposes.  In the case of a partnership, the federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership.  U.S. Persons who are partners in a partnership should consult their tax advisors.  A "Non-U.S. Person" is any person or Entity (other than a partnership) that is not a U.S. Person. The following discussion refers only to Holders that are U.S. Persons, unless otherwise indicated.

The federal income tax consequences to Holders of Prepetition Notes and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Prepetition Note; (2) the length of time the Prepetition Note has been held; (3) whether the Prepetition Note was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Prepetition Note (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Prepetition Note; (6) the Holder's method of tax accounting; and (7) whether the Prepetition Note is an installment obligation for federal income tax purposes. Certain Holders of Prepetition Notes (such as Non-U.S. Persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, tax-exempt organizations, and persons holding a Prepetition Note as an installment obligation) may be subject to special rules not addressed in this summary.  There also may be state, local, and/or foreign income or other tax considerations or federal estate and gift tax considerations applicable to Holders of Prepetition Notes, which are not addressed herein.

EACH HOLDER OF A PREPETITION NOTE AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

2.      **Federal Income Tax Consequences if the Exchange Qualifies as a "Recapitalization"**

Pursuant to the Plan, The Newark Group will issue New Common Stock to Holders of Prepetition Notes to discharge their Prepetition Notes Claims.  The federal income tax consequences arising from the Plan to the Holders of Prepetition Notes will vary depending on, among other things, whether the Prepetition Notes constitute "securities" for federal income tax purposes.  Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security."  The determination of whether a debt instrument constitutes a "security" depends upon an evaluation of the nature of the debt instrument, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes.  Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities.  The Prepetition 2014 Notes were issued in March 2004 and mature on March 12, 2014.  The Prepetition 2014 Notes therefore may constitute securities.  The Mullen Note was issued on April 15, 2008, and matured on April 15, 2009, and therefore likely does not constitute a security.  Each Holder of a Prepetition Note is urged to consult its own tax advisor regarding the status of the Prepetition Notes, both the Prepetition 2014 Notes and the Mullen Note, as securities.

Assuming the Prepetition 2014 Notes constitute "securities" for federal income tax purposes, the exchange of Prepetition 2014 Notes for New Common Stock (the "**Exchange**") should constitute a "recapitalization" for federal income tax purposes.  As a result, except as discussed below with respect to Claims for accrued interest and accrued market discount, a Holder of Prepetition 2014 Notes should not recognize gain or loss on the Exchange (other than with respect to any Claim for accrued interest).  The adjusted tax basis for the New Common Stock will be equal to the Holder's adjusted tax basis for the Prepetition 2014 Notes exchanged therefor.  The holding period for the New Common Stock will include the Holder's holding period for the Prepetition 2014 Notes exchanged therefor.

Pursuant to the Plan, The Newark Group anticipates allocating for federal income tax purposes all distributions in respect of any Prepetition Notes Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest.  Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for federal income tax purposes.  No assurance can be given, however, that the IRS will not challenge such allocation.  If a distribution with respect to a Prepetition Note is entirely allocated to the principal amount thereof, a Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Prepetition Notes that was previously included in the Holder's gross income.  If a distribution with respect to a Prepetition Note is received in satisfaction of interest accrued during the holding period of such Prepetition Note, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).  Holders of Prepetition Notes are urged to consult their own tax

advisors regarding the particular federal income tax consequences to them of the treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

The market discount provisions of the IRC may apply to Holders of Prepetition Notes.  In general, a debt obligation (other than a debt obligation with a fixed maturity of one year or less that is acquired by a Holder in the secondary market (or, in certain circumstances, upon original issuance)) is a "market discount bond" as to that Holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the Holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount.  A Holder should not be required to recognize any accrued but unrecognized market discount upon the disposition of its Prepetition Notes for New Common Stock pursuant to the Plan if such disposition is treated as a recapitalization for federal income tax purposes, although it may be required to recognize any accrued but unrecognized market discount as ordinary income upon a subsequent taxable disposition of its New Common Stock.

### 3.    Federal Income Tax Consequences if the Exchange Does Not Qualify as a "Recapitalization"

If the Prepetition Notes do not constitute "securities" for federal income tax purposes, the Exchange will be a taxable exchange.  As a result, a Holder of Prepetition Notes would generally recognize gain or loss in an amount equal to the difference between (1) the fair market value of the New Common Stock received in exchange for Prepetition Notes, and (2) the Holder's adjusted tax basis in its Prepetition Notes.

The character of such recognized gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Prepetition Notes in such Holder's hands, whether the Prepetition Notes constitute a capital asset in the hands of the Holder, whether the Prepetition Notes were purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Prepetition Notes.  Any such gain recognized would generally be treated as ordinary income to the extent that the New Common Stock is received in respect of accrued but unpaid interest or accrued market discount that, in either case, have not been previously taken into account under the Holder's method of accounting.  A Holder of Prepetition Notes recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.  A Holder's tax basis in the New Common Stock received in exchange for its Prepetition Notes would generally be equal to the fair market value of such New Common Stock on the Effective Date.  The holding period for the New Common Stock received pursuant to the Plan would begin on the day after the Effective Date.

### 4.    Non-U.S. Persons

A Holder of a Prepetition Note that is a Non-U.S. Person generally will not be subject to United States federal income tax with respect to New Common Stock received in exchange for such Prepetition Note pursuant to the Plan, unless (i) such Holder is engaged in a trade or

business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

## C. FEDERAL INCOME TAX CONSEQUENCES OF OWNERSHIP AND DISPOSITION OF NEW COMMON STOCK

The gross amount of any distribution of cash or property made to a Holder with respect to New Common Stock generally will be includible in a Holder's gross income as dividend income to the extent such distributions are paid out of The Newark Group's current or accumulated earnings and profits as determined under federal income tax principles. A distribution which is treated as a dividend for federal income tax purposes may qualify for the 70% dividends received deduction if such amount is distributed to a Holder that is a corporation and certain holding period and taxable income requirements are satisfied. Any dividend received by a corporate Holder may be subject to the "extraordinary dividend" provisions of the IRC. A distribution in excess of The Newark Group's current and accumulated earnings and profits will be treated as a return of capital to the extent of the Holder's adjusted tax basis in its New Common Stock and will be applied against and reduce such basis dollar-for-dollar (thereby increasing the amount of gain and decreasing the amount of loss recognized on a subsequent taxable disposition of the New Common Stock). To the extent that such distribution exceeds the Holder's adjusted tax basis in its New Common Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such Holder's holding period in its New Common Stock exceeds one year as of the date of the distribution. Dividends received by non-corporate Holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

A Holder generally will recognize capital gain or loss on the sale, exchange or other taxable disposition of any of its New Common Stock in an amount equal to the difference, if any, between the amount realized for the New Common Stock and the Holder's adjusted tax basis in the New Common Stock. To the extent that the Holder had accrued market discount with respect to its Prepetition Notes exchanged for the New Common Stock, and if such exchange constitutes a recapitalization, the Holder will recognize ordinary income on the sale, exchange or other taxable disposition of its New Common Stock. Capital gains of non-corporate Holders derived with respect to a sale, exchange or other disposition of New Common Stock held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. Holders are urged to consult their own tax advisors regarding such limitations.

The ESOP may be subject to special tax rules. The ESOP and the ESOP Participants are urged to consult with their own tax advisors regarding such rules.

## D. FEDERAL INCOME TAX CONSEQUENCES TO HOLDER OF VON ZUBEN SUBORDINATED UNSECURED NOTE

Because the Von Zuben New Subordinated Notes likely do not constitute "securities" for federal income tax purposes, the issuance of the Von Zuben New Subordinated Notes in

exchange for the Von Zuben Subordinated Unsecured Note will likely be a taxable exchange.  As a result, the holder of the Von Zuben Subordinated Unsecured Note would generally recognize gain or loss in an amount equal to the difference between (1) the fair market value of the Von Zuben New Subordinated Notes plus the amount of cash received in exchange for the Von Zuben Subordinated Unsecured Note, and (2) the Holder's adjusted tax basis in the Von Zuben Subordinated Unsecured Note.

The character of any recognized gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Von Zuben Subordinated Unsecured Note constitutes a capital asset in the hands of the Holder, whether the Von Zuben Subordinated Unsecured Note was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Von Zuben Subordinated Unsecured Note.  Any such gain recognized would generally be treated as ordinary income to the extent that the Von Zuben New Subordinated Notes and cash are received in respect of accrued but unpaid interest or accrued market discount that, in either case, have not been previously taken into account under the Holder's method of accounting.  A Holder's tax basis in the Von Zuben New Subordinated Notes received in exchange for the Von Zuben Subordinated Unsecured Note would generally be equal to the fair market value of such Von Zuben New Subordinated Notes on the Effective Date.  The holding period for the Von Zuben New Subordinated Notes received pursuant to the Plan would begin on the day after the Effective Date.

In general, the Holder of the Von Zuben New Subordinated Notes will be required to include interest with respect to the Von Zuben New Subordinated Notes in taxable income as ordinary income at the time it accrues or is received, in accordance with the Holder's regular method of accounting for federal income tax purposes.

The sale, exchange, redemption, retirement or other taxable disposition of the Von Zuben New Subordinated Notes generally will result in the recognition of gain or loss to the Holder in an amount equal to the difference between (a) the amount of cash and fair market value of property received in exchange therefor (except to the extent attributable to the payment of accrued but unpaid stated interest) and (b) the Holder's adjusted tax basis in the Von Zuben New Subordinated Notes.

Any gain or loss on the sale or other taxable disposition of the Von Zuben New Subordinated Notes generally will be capital gain or loss and will be long-term capital gain or loss if the Von Zuben New Subordinated Notes had been held for more than one year and otherwise will be short-term capital gain or loss.  Payments on such disposition for accrued interest not previously included in income will be treated as ordinary interest income.

## E.  FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF OUTSTANDING COMMON STOCK INTERESTS

### 1.  General Tax Considerations for Holders of Interests

Pursuant to the Plan, (i) all Equity Interests will be cancelled, annulled and extinguished on the Effective Date and each Holder of an Equity Interest will receive its Pro Rata Share of (A)

1.5% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants, and (B) five year Equity Warrants to purchase 15% of the New Common Stock to be issued on the Effective Date (calculated by including the aggregate number of shares issuable upon exercise of the Equity Warrants, but not including the shares issuable upon exercise of the Management Warrants), subject to dilution by all subsequent issuances of shares, including pursuant to the exercise of the Management Warrants, at a price based on an equity value of $157.5 million in consideration of the cancellation of its Equity Interests, and (ii) all ESOP Interests will be cancelled, annulled and extinguished on the Effective Date and each ESOP Participant will receive its Pro Rata share of 2% of the New Common Stock to be issued on the Effective Date, subject to dilution by all subsequent issuances of shares including pursuant to the exercise of the Equity Warrants and the Management Warrants; provided that, as a condition to receipt of New Common Stock, each Holder of a Class 6 Claim, a Class 8 Interest, or Class 9 Interest (other than the ESOP), will be required to execute a counterpart of the Reorganized Company Stockholders' Agreement.

The exchange of existing stock for New Common Stock and Warrants, or exclusively for New Common Stock, as applicable, should constitute a "recapitalization" for federal income tax purposes.  As a result, a Holder generally should not recognize any gain or loss upon the exchange.  The adjusted tax basis to a Holder who receives both New Common Stock and Warrants will, in the aggregate, be equal to the Holder's adjusted tax basis for the existing stock exchanged therefor; such adjusted tax basis will be allocated between the New Common Stock and the Warrants based on their relative fair market values at the time of the exchange.  The adjusted tax basis to a Holder who receives only New Common Stock will be equal to the Holder's adjusted tax basis for the existing stock exchanged therefor.  The holding period for the New Common Stock and the Warrants will include the Holder's holding period for the existing stock exchanged therefor.

If the exchange of existing stock for New Common Stock and the Warrants does not qualify as a "recapitalization," a Holder should recognize gain or loss equal to the fair market value of New Common Stock and Warrants received, less the Holder's adjusted tax basis in its existing stock that is surrendered therefor.  In a taxable transaction, a Holder's tax basis in the New Common Stock and Warrants generally should equal their fair market value.

### 2.    <u>Federal Income Tax Consequences Associated with Warrants</u>

There is no taxable event for federal income tax purposes if the Warrants are exercised and New Common Stock is received.  A Holder's adjusted basis in the New Common Stock received upon exercise of the Warrants will equal the Holder's adjusted tax basis in the Warrants immediately prior to exercise, increased by the exercise price paid.  The holding period of the New Common Stock received upon the exercise of the Warrants would begin on the date of exercise and would not include the period during which the Warrants were held.

If the Warrants are sold or expire unexercised, then the Holder will recognize capital gain or loss.  Such capital gain or loss would be long term capital gain or loss if the Warrants are held for more than one year.

## F.  INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including payments in respect of accrued interest, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances.  Under the IRC's backup withholding rules, a United States Holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the Holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the Holder is a United States person, that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's United States federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## G.  IMPORTANCE OF OBTAINING PROFESSIONAL TAX ADVICE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

### ARTICLE XII.    CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

## A.  EXEMPTION FROM REGISTRATION REQUIREMENTS FOR NEW SECURITIES

Upon consummation of the Plan, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Common Stock, Warrants and additional shares of New Common Stock issuable upon exercise of the Warrants from the registration requirements of the Securities Act and of any state securities or "blue sky" laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan.  The Debtors believe that the Reorganized Company is a successor to The Newark Group under the Plan for purposes of section 1145 of the

Bankruptcy Code and that the offer and sale of the New Common Stock, Warrants and additional shares of New Common Stock issuable upon exercise of the Warrants under the Plan satisfy the requirements of section 1145 and are therefore exempt from the registration requirements of the Securities Act and state securities laws.

## B.    SUBSEQUENT TRANSFERS OF NEW SECURITIES

In general, recipients of New Common Stock, Warrants and additional shares of New Common Stock issuable upon exercise of the Warrants will be able to resell such securities without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such securities is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of new securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act.  Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of New Common Stock, Warrants and/or additional shares of New Common Stock issuable upon exercise of the Warrants under the Plan are deemed to be "underwriters," the resale of such securities by such persons would not be exempted from registration by Section 4(1) of the Securities Act.  Accordingly, the resale of such securities by such persons could only be made upon the registration of such securities in the future or an available exemption from such registration.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN "UNDERWRITER" WITH RESPECT TO NEW COMMON STOCK, WARRANTS AND/OR ADDITIONAL SHARES OF NEW COMMON STOCK ISSUABLE UPON EXERCISE OF THE WARRANTS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE SUCH SECURITIES UNDER THE PLAN.  THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

## ARTICLE XIII.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

### A.    CONTINUATION OF THE CHAPTER 11 CASES

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases.  The Debtors could have difficulty operating with the high operating and financing costs and the eroding confidence of their customers and trade vendors, if the Debtors remained in chapter 11.  It is unlikely that the Debtors would be able to find alternative bank financing if the DIP Facility Credit Agreements were terminated.  If the Debtors were able to obtain financing and continue as viable going concerns, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under chapter 7 or chapter 11.  Such alternative plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### B.    LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective Holders of Claims against or Interest in the Debtors, the Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors and Interest Holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization.  In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher

administrative costs.  Because a trustee is not required in a chapter 11 liquidation, expenses for professional fees could be lower than in a chapter 7 liquidation, in which a trustee must be appointed.  Any distributions to the Holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

It is highly unlikely that Interest Holders would receive any distribution in a liquidation under either chapter 7 or chapter 11.

Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that any liquidation is a much less attractive alternative for creditors than the Plan because of the greater return the Debtors anticipate will be provided by the Plan.  THE DEBTORS BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF IMPAIRED CLAIMS THAN WOULD ANY OTHER REASONABLY CONFIRMABLE REORGANIZATION PLAN OR LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by the Debtors with their financial advisors, is premised upon a liquidation in a chapter 7 case and is attached hereto as Exhibit Q.  In the Liquidation Analysis, the Debtors have taken into account the nature status, and underlying vale of the assets of the Debtors, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.  Based on this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan.

## ARTICLE XIV.      CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to Holders of Claims against and Interests in the Debtors.  In addition, any alternative to confirmation of the Plan could result in extensive delays and substantially increased administrative expenses.

Accordingly, the Debtors urge all Holders of Claims and Interests entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 5:00 P.M., prevailing Eastern Time, on June 7, 2010.

Respectfully submitted,

**THE NEWARK GROUP, INC.**

By:  /s/  *Robert H. Mullen*
       Robert H. Mullen
       President

Date: May 7, 2010

**JACKSON DRIVE CORP.**

By: /s/  *Robert H. Mullen*
      Robert H. Mullen
      President

Date: May 7, 2010

**NP COGEN, INC.**

By: /s/  *Robert H. Mullen*
      Robert H. Mullen
      President

Date: May 7, 2010

Dated:  May 7, 2010

Prepared by:

**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, N.J. 07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400

Kenneth A. Rosen (KAR 4963)
krosen@lowenstein.com

Paul Kizel (PK 4176)
pkizel@lowenstein.com

Suzanne Iazzetta (SI 2116)
siazzetta@lowenstein.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*